# EXHIBIT 2

# EXHIBIT 2

# BITACCESS MASTER PURCHASE AGREEMENT



THIS Master Purchase Agreement ("**Agreement**") was entered into on September 4th, 2015, and is being amended on this day 1/23/2020, by and between **BITACCESS INC.** a Canadian corporation, with its principal office located at 267 richmond rd, ottawa, Canada ("**BitAccess**"), and "Cash Cloud Inc (DBA Coin Cloud)" company organized and existing under the laws of the State of Nevada, with its principal office located at 9580 W Sahara Las Vegas NV 89117 ("**Customer**");

A. BitAccess is a manufacturer of BTM Devices that contain proprietary software of BitAccess which automates the purchase of digital currency (example e.g. Bitcoin) with banknotes enabling users to visit the kiosk purchase digital currency and exchange digital currency in their digital wallet for banknotes (the "**BTM Service**").

B. Customer recognizes there is significant market and legal uncertainty regarding transactions in crypto-currencies, such as Bitcoin and other peer-to-peer currencies but wishes to purchase one or more of BitAccess' BTM Devices in order to make the BTM Service available to Customer's customers and BitAccess is prepared to sell BTM Devices and provide the BTM Service on the terms of this Agreement which include terms governing the allocation of market and legal risk of using the BTM Service to deal in crypto-currencies.

**NOW THEREFORE**, for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **DEFINITIONS**

In this Agreement, the following terms have the following meanings:

"**Bitcoin**" means a unit of distributed electronic currency transferable on the bitcoin peer-to-peer network.

"**BTM Device**" means the BitAccess kiosk.

"**Device Software**" means all machine readable code and other electronic information provided by BitAccess that may be installed on a BTM Device and used to provide and receive the BTM Service.

"**Fees**" means the purchase price for BTM Devices, support (if applicable), Shipping Costs and Transaction Fees.

# BITACCESS MASTER PURCHASE AGREEMENT

"**Interest Rate**" means 18% per annum (1.5% per month) or the highest lawful amount permitted by applicable law, whichever is less.

"**Purchase Order**" means an order form indicating the number of BTM Devices requested by Customer together with payment terms and delivery terms, a form of which is provided in Schedule A.

"**Questionnaire**" means the due diligence questionnaire, attached as Schedule B.

"**Shipping Costs**" means all costs and expenses of physical shipping, handling, customs, duties, inspection, storage, insurance, and taxes.

"**SLA**" means the service level agreement in Schedule C setting out service level standards for the BTM Devices.

"**Transaction Fees**" is defined as the fee charged in addition to the trading price. The difference in the price traded on the exchange and the price charged to Customer is the transaction fee. If the operations are managed without an exchange, 1% of total transaction will be charged as a service fee.

2. **HARDWARE TERMS**
2.1 **Purchases**. Subject to Section 2.2 and 2.3, BitAccess agrees to offer BTM Devices for purchase in the amounts and on the terms indicated in a Purchase Order executed by the parties. All sales are final. BitAccess will not refund Customer's money for any reason not provided in this Agreement.
2.2 **Pre-Purchase Requirements**. Customer must complete and submit the Questionnaire to BitAccess. BitAccess, at its sole and absolute discretion, must either approve the Customer or reject the Customer. BitAccess may reject the Customer if any answer given by the Customer on the Questionnaire would give BitAccess a reasonable cause to believe that the Customer will use the BTM Device for illegal purposes. If these three conditions precedent do not occur, BitAccess must refund any pre-paid money received by BitAccess from Customer and Customer will have no further recourse against BitAccess. Customer agrees that the Questionnaire describes sufficiently certain criteria to create enforceable condition precedents.
2.3 **Delivery Terms**. BitAccess' delivery obligations for BTM Devices are EXWorks (EWX), as per INCO terms. BitAccess will make the purchased BTM Device(s) available EXW at its premises or at the premises of its agent, or at any other world-wide location that BitAccess may designate from time to time. The BTM Device may not be moved from the destination location unless agreed by Customer and BitAccess in writing.
2.4 **Import and Export**. Customer shall comply with all relevant export and import laws and regulations as they apply to Deliverables and related materials provided by BitAccess to Customer pursuant to this Agreement.

2.5 **Operational Expenses**. Customer's use of a BTM Device may subject the Customer to additional expenses for electrical power, network connectivity, physical security, Internet access, communications surcharges, roaming fees, applicable taxes and rates, etc. Customer is responsible for all expenses for the BTM Device's operation. BTM Device comes with Wi-Fi capability, however

**BITACCESS MASTER PURCHASE AGREEMENT**

we strongly discourage use of Wi-Fi or any wireless connection and may refuse right to provide service due to security concerns or instability. There must be a dedicated Ethernet connection to the BTM Device.

**2.6 Security; Generally.** BitAccess is not liable for loss or damage resulting from the criminal acts of third parties. Customer should always remove currency from BTM Device before departing location where BTM Device is installed. BitAccess recommends avoiding unlocking of BTM Device and accessing internal safe box while location is open to the public.

**2.7 Security; Mounting Surface Security.** Security and insurance of the BTM Device is Customer's obligation. Customer acknowledges that the BTM Device is only as secure as the surface it is mounted on. If Customer mounts the BTM Device to an insecure or weak surface, a third party may be able to remove the mounting surface itself. Customer understands the importance of properly securing the BTM Device, and further acknowledges that BitAccess is not responsible for any theft or vandalism of the BTM Device.

**3. BTM SYSTEM SOFTWARE AND BTM SERVICES**

3.1 **BTM Services.** Customer will have the ability, through the use of access to a BitAccess dashboard, to monitor operations, manage use of the BTM Devices and make changes to their system and manage use of the BTM Devices.

3.2 **Operational Responsibility.** Customer is responsible for the following:
   a) Contracting with and providing all required support to Customer's end users;
   b) Compliance with law in use of and provision of any services using the BTM Device(s) or BTM Services;
   c) Maintaining a minimum operating cash-flow to cover at least the level of the transaction limit for end users; and
   d) Ensure that power supply, Ethernet, and any other requirements indicated to Customer for use of the BTM Services, are in place at all times for proper functioning.

3.3 **Technical Support.** No Service Plan Included. BitAccess offers one (1) year of free technical support on warranty issues relating to defective BTM Device components. The Agreement does not include any kind of service or repair plan for the BTM Devices. BitAccess does not presently offer any service or repair plan.

3.4 **Verification Services**. BitAccess offers three optional levels of verification services for Know Your Customer (KYC) using 3rd party service offerings which are subject to change from time to time. Levels are as following:
   a) **SMS Verification.** Before performing any transaction on the machine, he is required to enter his telephone number. A code is sent to the phone, which is required to proceed with the transaction.
   b) **ID Verification.** User is required to show his government issued ID which is scanned and verified using a 3rd party. It could be health card, passport or driving license.
   c) **Facial recognition**. User face is matched against picture on the ID to confirm ownership.

3.5 **End Users.** Customer is responsible for setting appropriate terms for access and use of the BTM Device(s) and the BTM Services with Customer's end users. However, Customer agrees to

3

# BITACCESS MASTER PURCHASE AGREEMENT

incorporate into any end user license agreement the minimum licensing terms indicated in Schedule D.

## 4 FEES AND PAYMENT TERMS

**4.1 Payment for BTM Devices.** Customer must pay the (%) percentage amount indicated in a Purchase Order at the time of signing a Purchase Order for the purchase of the BTM Device. The remainder of the purchase amount for the BTM Device is payable before shipping.

**4.2 BTM Service Fees.** Bitaccess will be entitled to a percentage of the cumulative transaction amount. The cumulative transaction amount of the Customer includes all of the Customer's global subsidiaries who have agreements with Bitaccess Inc. Specifically, total platform transaction volume will be measured on a rolling monthly basis, starting on the first day of each calendar month at 12:00:00 UTC. The BTM service fee will be applied to each transaction, based on a pricing tier. The pricing tiers are listed in the table below.

| Pricing Tier | Monthly Customer Transaction Volume | | BTM Service Fee Rate |
|---|---|---|---|
| | From (USD) | To (USD) | |
| A | $0.00 | $10,000,000.00 | **1.00%** |
| B | $10,000,000.01 | $20,000,000.00 | 0.95% |
| C | $20,000,000.01 | $40,000,000.00 | 0.90% |
| D | $40,000,000.01 | $40,000,000+ | 0.80% |

BTM Service fees will be collected at the pricing tier A, applied to the total transaction amount of each transaction. After the monthly transaction volume exceeds that of pricing tier A, the BTM service fee rate for tier B will be applied to all subsequent transactions for the remainder of the month. This continues with tier C and D. At the end of the calendar month, the pricing tier will reset to tier A.

**4.3 Method of Payment.** BitAccess will automatically collect payment for BTM Service Fees on a bi-weekly basis through a pre-authorized deposit payment or such other methods as the parties shall agree in writing. If the payment method fails, BitAccess reserves the right to charge Customer a late payment charge at the level of the Interest Rate.

**4.4 Taxes.** All fees exclude taxes (including any applicable federal, state, provincial, use, value-added, goods and services, and local taxes) and customs duties. Customer shall pay to BitAccess the amount of all such taxes (excluding taxes based on BitAccess' net income) and customs duties.

## 5 WARRANTIES

**5.1 Mutual Warranties.** Each party represents and warrants to the other party that: (i) such party is a business duly incorporated, validly existing, and in good standing under the laws of its jurisdiction of incorporation; (ii) such party has all requisite corporate power, financial capacity, and authority to execute, deliver, and perform its obligations under this Agreement; (iii) the execution, delivery, and performance of this Agreement constitutes the legal, valid, and binding agreement of such party; (iv) as of the Effective Date, there is no outstanding litigation, arbitrated matter or other dispute to which such party is a party, which, if decided unfavorably to it, would reasonably be expected to have a potential or actual material adverse effect on such party's ability to fulfill its obligations

**BITACCESS MASTER PURCHASE AGREEMENT**

under this Agreement; and (v) no consent, approval or withholding of objection is required from any entity, including any governmental authority, with respect to such party's entering into this Agreement.

**5.2 Limited Hardware Warranty.** Subject to Section 5.3, BitAccess warrants that all components incorporated into a BTM Device will operate under normal interior conditions for a period of 12 months from the date of delivery. If any component fails within 12 months of the BTM Device being delivered for pick-up by Customer, BitAccess will replace that component. Customer will pay all Shipping Costs to return the allegedly defective unit to BitAccess. If the BTM Device proves defective, BitAccess will repair the BTM Device and pay all Shipping Costs to return the fixed unit (or a replacement) to the Customer. BitAccess is not responsible for customs duties or any other costs related to importing BTM Device into Customer's country. Customer voids this warranty by unauthorized servicing or tampering with the BTM Device in any manner not specified in the BTM Device's service manual.

**5.3 Limits on Hardware Warranty.** The warranty in Section 5.2 will not apply if the BTM Device has been tampered with or modified in any way by anyone other than BitAccess or its agents. Furthermore, improper use of the B TM Device will void the warranty in Section 7.2.

**5.4 Customer Warranty.** Customer represents and warrants that Customer will comply with all applicable laws in its use of the BTM Device(s) and BTM Services.

**5.5 Disclaimer of Warranties.** The BTM Devices are not consumer goods. Except for the limited warranty in Section 5.2 above, the BTM Devices are sold on an "as-is" basis. Customer bears the entire risk of the BTM Device's quality and performance. Except as explicitly provided, if a BTM Device proves defective after purchase, the Customer (and not BitAccess) assumes the entire cost of all servicing or repair. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR GIVE ANY WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**6  REGULATORY MATTERS**

**6.1 Assumption of Risk of Crypto-Currencies.** Customer understands that Bitcoin is a new and relatively untested exchange medium. Customer understands that BitAccess cannot predict how the value of a Bitcoin will change, the consumer demand for Bitcoin, technical difficulties in or modification to the Bitcoin peer-to-peer network, increased regulation, and all other obstacles that a peer-to-peer currency network might face. Customer affirmatively represents that Customer is a well versed and competent Bitcoin user and Customer, therefore knowingly assumes all known and unknown risk of loss. Customer has no recourse whatsoever against BitAccess for damages or liabilities suffered by the Customer due to the market performance of Bitcoin. BitAccess is not responsible for specific compatibility or compliance in the Customer's jurisdiction. BitAccess has no duty to advise Customer of additional compliance requirements. Customer agrees to investigate compliance requirements prior to shipping.

**6.2 Financial Regulation.** Customer understands that Bitcoin is a relatively new technology and no one can predict how a government may apply and enforce existing laws or regulate Bitcoin or other peer-to-peer exchange technologies in the future. Customer understands that there is significant

DocuSign Envelope ID: 4AD0EC38-A73C-4906-AC0C-3E2E7414E3C9
Case 23-01015-mkn    Doc 1-2    Entered 03/10/23 14:25:04    Page 7 of 17

**BITACCESS MASTER PURCHASE AGREEMENT**

uncertainty, and Customer assumes all financial regulatory risk inherent in operating a BTM Device. Customer has no recourse whatsoever against BitAccess for damages, civil or criminal, suffered by the Customer due to regulatory enforcement. BitAccess does not and cannot warrant that the use of the BTM Device is legal in any specific jurisdiction. BitAccess has no duty to advise or warn and BitAccess will not advise or warn Customer about any particular legal or regulatory requirement. Customer is solely obligated to understand the laws and regulations of its local jurisdiction before using a BTM Device, and Customer is solely responsible for any of its actions that may be unlawful.

6.3 **Financial Regulation Compliance**. Customer is wholly responsible for understanding the laws and rules governing financial transactions, money transmission, payment processing, and similar issues in the Customer's jurisdiction. Customer must never rely on statements made by BitAccess concerning legal issues, and BitAccess will not advise Customer on legal issues.

6.4 **Compliance with Local Laws and Regulations.** Customer is wholly responsible for understanding the laws and rules that govern the possession and use of the BTM Device in the jurisdiction in which the Customer wishes to possess and use the BTM Device. It is Customer's obligation to inform BitAccess of any compliance requirement before buying the BTM Device. Any changes in the compliance must be communicated to BitAccess. BitAccess do not assume any responsibility for future regulation changes.

7 **TERM AND TERMINATION.**

7.1 **Term**. This Agreement begins on the Effective Date and will remain in full force and effect unless/until terminated under Section 7.2.

7.2 **Service Termination.** BitAccess reserves the right to terminate this Agreement and access to the BTM Service if:
   a) BitAccess considers that Customer is non-compliant with applicable laws or fails to adhere to the terms of this Agreement (including non-payment of Fees);
   b) Any requirement of a regulator or government body renders Bitcoin, crypto-currencies or the provision of services as contemplated under this Agreement, illegal or subject to operational charges or fees which BitAccess considers unreasonable;

7.3 **Effect of Termination**. On termination for any reason, BitAccess will be entitled to either (i) reclaim any BTM Device not fully paid for by Customer; or (ii) require Customer to pay the remaining outstanding balance of any BTM Device which Customer has not fully paid for as at the date of termination. On termination access to and use of the BTM Service will terminate and no further transactions will be processed via the BTM Service using the Device Software.

8 **LIABILITY TERMS**

8.1 **Risk of Injury**. BitAccess is not responsible to any person for injury (including but not limited to injuries from electric shock or blunt force trauma from the BTM Device's weight) or damage to persons of property as a result of the Customer's installation, operation, or use of the BTM Device. If any third party sues BitAccess for injuries or damages, Customer will indemnify, defend, and hold BitAccess harmless in respect of any such claims.

# BITACCESS MASTER PURCHASE AGREEMENT

8.2 **Risk of Loss**. Customer bears the risk of loss or damage to the BTM Devices at the moment BitAccess or BitAccess' agent makes the BTM Devices available at the premises designated by BitAccess for pick-up by Customer.

8.3 **EXCLUSION OF INDIRECT LOSSES**. BITACCESS SHALL HAVE NO LIABILITY WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH OR RELATED TO THIS AGREEMENT OR THE RIGHTS PROVIDED HEREUNDER FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, RELIANCE, PUNITIVE, OR EXEMPLARY DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION LOST REVENUES, PROFITS, OR SAVINGS, LOSS OF BUSINESS, USE, OR DATA), EVEN IF INFORMED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER IN AN ACTION IN CONTRACT, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE), STRICT LIABILITY, OR OTHER LEGAL OR EQUITABLE THEORY.

## 9 INTELLECTUAL PROPERTY

9.1 **Software Licensed; Not Sold**: The Device Software is licensed; not sold to the Customer by this Agreement. Customer agrees that it does not own the software installed on the BTM Devices. Customer acknowledges that the Device Software is proprietary to BitAccess and constitutes trade secrets and Confidential Information of BitAccess.

9.2 **Limited License**. BitAccess grants Customer a perpetual, royalty-free license to use the Device Software to receive the BTM Services. Customer must not copy, modify, distribute, sell, or sublicense any of the Device Software or its run-time code without BitAccess' permission. Customer must not (and must not attempt to) disassemble, reverse engineer, or decompile the Device Software. Customer must not allow third parties to do any of these prohibited acts either. BitAccess will make updates to its Software available for use from time to time under the terms of this license terms.

9.3 **Attribution.** Customer may white label services offered via the BTM Device but must include a 'powered by BitAccess' attribution on the BTM Device. Device Software is not capable of being whitelabelled. Customer must not use BitAccess' name or trademarks to imply BitAccess' endorsement of Customer or Customer's products or services unless consent has been given by BitAccess in writing to such use.

## 10 INTELLECTUAL PROPERTY INDEMNIFICATION

10.1 Except for claims covered by Sections 10.3 and 10.4 below, if a third party claims that the technology as embodied by the BTM Devices (including the underlying software) infringes that third party's copyright, trade secret or patent, BitAccess will defend the Customer against that claim at its expense and pay all costs, damages, and attorney's fees that a court finally awards or that are included in a settlement approved by BitAccess, provided that Customer: i) promptly notifies BitAccess in writing of the claim; and ii) allows BitAccess to control the defence and related settlement negotiations; and (iii) cooperates with BitAccess in the defense and any related settlement negotiations. This is BitAccess' entire obligation to Customer regarding any claim of Intellectual Property infringement arising under this Agreement.

10.2 If Customer's use of the BTM Services is enjoined (or if a claim under Section 10.1 appears likely to be made) due to the Device Software contained therein, BitAccess shall at its election and expense, either: i) procure the right to use the infringing element of the Device Software; ii) procure

DocuSign Envelope ID: 4AD0EC38-A73C-4906-AC0C-3E2E7414E3C9
Case 23-01015-mkn    Doc 1-2    Entered 03/10/23 14:25:04    Page 9 of 17

**BITACCESS MASTER PURCHASE AGREEMENT**

the right to an element which performs the same function without any material loss of functionality; or iii) replace or modify the element of the Device Software so that the infringing portion is no longer infringing and still performs the same function without any material loss of functionality. If BitAccess determines that none of these alternatives are reasonably available, BitAccess may terminate this Agreement (and affected Purchase Orders) upon written notice to the Customer without penalty or liability for any damages.

10.3  Notwithstanding the generality of the foregoing, BitAccess will have no obligations under Section 10.1 above regarding any claim based on any of the following: i) Customer's modification of or tampering with the BTM Device or Device Software; (ii) any use or combination of the BTM Device with Customer or third party components, products, data, apparatus or business method that BitAccess did not provide.

10.4  BitAccess and Customer both agree that this Agreement will not create any right or cause of action for any third party claims, nor will the other party be responsible for any third party claims against BitAccess or Customer except as described in this Section 10.

## 11  CONFIDENTIALITY

11.1  Each Party shall use reasonable efforts, which are no less than the efforts used to protect its own Confidential Information, to protect against the disclosure of Confidential Information of the other Party. Each Party shall divulge such Confidential Information only to its employees or agents who require access to it for the purposes of this Agreement or as otherwise provided in this Agreement.

11.2  Each Party agrees to indemnify the other ("**Claimant**") for all losses incurred as a result of a failure to comply with its obligations under this Section 11, provided that the Claimant has given prompt notice of any such claim upon becoming aware of any such claim. To the extent that a claim may lie against a third party for the unauthorized disclosure of such Confidential Information, the Claimant has the right to control and direct the investigation, preparation, action and settlement of each such claim. Furthermore, the party in breach of Section 11 of this Agreement is required to provide the Claimant with all information in its possession related to such claim and such further assistance as reasonably requested by the Claimant.

11.3  Each Party acknowledges and agrees that any breach by it of any of the provisions of this Section 11 would cause serious and irreparable harm to the other which could not adequately be compensated for in damages and in the event of a breach of any of such provisions, each Party hereby consents to an injunction being issued against it restraining it from any further breach of such provision, but such action shall not be construed so as to be in derogation of any other remedy which the other Party may have in the event of such a breach.

## 12  DISPUTE RESOLUTION

12.1  **Informal Resolution**. If either Customer or BitAccess has any concerns regarding a breach or default under this Agreement, the complaining party must first notify the other and allow the other party at least 30 days to remedy the claimed breach or default.

## BITACCESS MASTER PURCHASE AGREEMENT

12.2 **Binding Arbitration**. Any dispute arising out of or relating to this contract, or the breach thereof, shall be finally resolved by arbitration administered by the Canadian Arbitration Association under its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The arbitration will be conducted in the English language in the City of Ottawa, Canada, in accordance with the Canadian Arbitration Act. There shall be one arbitrator, named in accordance with such rules unless the damages claimed under the Agreement is 1,000,000 or higher in which case a panel of three arbitrators will be appointed in accordance with such rules.

12.3 **Attorney's Fees & Judgment Rates.** If, after reasonable attempts to obtain a party's performance under this Agreement, a party resorts to legal or arbitration proceedings and that party prevails, then the non-prevailing party shall pay the prevailing party's reasonable attorney fees, costs, and expenses.

## 13  MISCELLANEOUS PROVISIONS

13.1 **Force Majeure.** Dates and times by which BitAccess is required to render performance under the Agreement shall be automatically postponed to the extent and for the period that BitAccess is prevented from meeting them by reason of any cause beyond its reasonable control. A party is not liable for failure to perform the party's obligations if such failure is as a result of Acts of God (including fire, flood, earthquake, storm, hurricane or other natural disaster), war, invasion, act of foreign enemies, hostilities (regardless of whether war is declared), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, nationalization, government sanction, or government prohibition or regulation preventing the manufacture, sale, import, export, possession or use of BTM Devices.

13.2 **Nature of Obligations Between Parties**. Nothing contained in this Agreement shall be deemed to constitute either Party or any of its representatives the partner, agent, franchisee, or legal representative of the other Party or to create any fiduciary relationship for any purpose whatsoever. Except as otherwise specifically provided in this Agreement, nothing in this Agreement shall confer on either Party or any of its representatives any authority to act for, bind, or create or assume any obligation or responsibility on behalf of the other Party.

13.3 **Notices**. expressly provided otherwise, any notice or other communication required or permitted to be given pursuant to this Agreement to Customer or BitAccess shall be in writing and shall be sufficiently given if delivered personally to such party, or if sent by prepaid registered mail or if transmitted by fax or if sent by electronic mail to such party at the addresses indicated on the front page of this Agreement. Either party may change their address and/or facsimile number by written notice to the other party.

13.4 **Choice of Law**. This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein without regard to its conflict of laws provisions. Customer and BitAccess submit to the non-exclusive jurisdiction of the courts of the Province of Ontario.

13.5 **Severability**. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If the application of any provision of this Agreement to any particular facts or circumstances is held to be invalid or unenforceable by an

DocuSign Envelope ID: 4AD0FC39-A73C-4906-AC0C-3E2E7414E3C9
Case 23-01015-mkn    Doc 1-2    Entered 03/10/23 14:25:04    Page 11 of 17

BITACCESS MASTER PURCHASE AGREEMENT

    arbitrator or court of competent jurisdiction, then (a) the validity and enforceability of such provision as applied to any other particular facts or circumstances and the validity of other provisions of this Agreement shall not in any way be affected or impaired thereby, and (b) such provision shall be enforced to the maximum extent possible so as to effect the intent of the Parties and shall be reformed without further action by the Parties to the extent necessary to make such provision valid and enforceable.

13.6    **Amendments; Waivers**. This Agreement may be amended, and the taking of any action required hereunder may be waived, by the written consent of each Party at the time such amendment or waiver is sought. No such waiver shall operate as a waiver of, or estoppel with respect to, any other action. No failure to exercise, and no delay in exercising, any right, remedy, or power hereunder shall operate as a waiver thereof, nor shall single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power provided herein or by law or at equity.

13.7    **Successors; Assignment**. BitAccess may assign this Agreement, or any of its rights or obligations hereunder, in whole or in part, subject to providing prior written notice to Customer. Customer may assign this Agreement, or any of its rights or obligations hereunder, in whole or in part, only with the prior written consent of BitAccess. Customer acknowledges that additional fees for configuration or set-up may apply to any permitted assignment. This Agreement shall enure to the benefit of and be binding upon each of Customer and BitAccess and their respective successors and permitted assigns.

13.8    **Interpretation**. In this Agreement, the words "including", "include" and "includes" shall each be deemed to be followed by the term "without limitation". Any agreement or schedule referred to herein means such agreement or schedule as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof and by this Agreement. References to any statute or regulation means such statute or regulation as amended at the time and includes any successor statute or regulation. Unless otherwise stated, references to recitals, articles, sections, paragraphs, schedules and exhibits shall be references to recitals, articles, sections, paragraphs, schedules and exhibits of this Agreement. The Parties agree that this Agreement shall be fairly interpreted in accordance with its terms without any strict construction in favor of or against either party and that ambiguities shall not be interpreted against the Party that drafted the relevant language. Currency is in US Dollars unless otherwise indicated in a Purchase Order.

13.9    **Entire Agreement.** This Agreement, together with the schedules hereto, which are hereby incorporated by reference, constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all previous communications, agreements, and understandings between the Parties relating to the subject matter hereof. Neither Party has entered into this Agreement in reliance upon any representation, warranty, condition or undertaking of the other Party that is not set out or referred to in this Agreement.

# BITACCESS MASTER PURCHASE AGREEMENT

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

| **BITACCESS INC** | **CUSTOMER** |
|---|---|
| *DocuSigned by:* Mohammed Adham | *DocuSigned by:* |
| Mohammed Adham | Christopher McAlary |
| Director | Owner |
| | |
| BITACCESS INC. | Cash Cloud Inc (DBA Coin Cloud) |
| ADDRESS: | ADDRESS: |
| 267 richmond rd, ottawa, canada | 9580 W Sahara, Las Vegas, NV 89117 |

11

**BITACCESS MASTER PURCHASE AGREEMENT**

<u>**SCHEDULE A**</u>
<u>**PURCHASE ORDER FORM**</u>

The following terms and conditions are incorporated into the Agreement. Capitalized words not defined in this Schedule shall have the meaning ascribed to such words in the Agreement.

Price per Unit. BitAccess agrees to offer BTM Devices for purchase in accordance with an attached Purchase Order according to the following price schedule in U.S. dollars:

| Units | Price/Unit | Total |
|---|---|---|
| - | - | - |

Prices are exclusive of Shipping Costs.

**BITACCESS MASTER PURCHASE AGREEMENT**

**SCHEDULE B**
**DUE DILIGENCE QUESTIONNAIRE**

- Have you ever filed for bankruptcy?  Yes/No  _____

- Have you ever been the subject of insolvency proceedings?  Yes/No  _____

- Do you understand that you may qualify as a money transmitter by offering services in which you may use a BTM Device?  Yes/No  _____

- Have you reviewed the electronic currency guidelines published by FinCEN or the currency guidelines applicable in your jurisdiction of operation? Yes/No  _____

- Have you had an adequate opportunity to consult with your legal counsel about your potential liability under the laws of your state and federal jurisdiction?  Yes/No  _____

- Have you ever been convicted of a crime?  Yes/No  _____

- Have you ever been convicted of a financial crime?  Yes/No  _____

- Do you consent to a background check?  Yes/No  _____

Customer warrants that all answers to this questionnaire are both truthful and complete. Customer has had adequate opportunity to investigate its compliance requirements, and to consult with its counsel. Customer understands that it may be subject to regulation or registration as a money transmitter in the country of Customer's residence, and further acknowledges that failure to investigate or comply with all laws of Customer's jurisdiction is the sole responsibility of the Customer.

I certify under penalty of perjury that the foregoing is true and correct.

DATE    1/23/2020
        _____

SIGNATURE    _____

# BITACCESS MASTER PURCHASE AGREEMENT

## SCHEDULE C
## SUPPORT AND SERVICE TERMS

This Schedule C sets out the terms on which BitAccess will provide support and maintenance services for the BTM Devices (including the underlying embedded software used to provide the BTM Service).

I.   **Service Scope**

   The following support services are covered by this Agreement but are subject to change on prior notification to Customer:

   - Telephone support
   - Monitored email support
   - Remote assistance using Remote Desktop and a Virtual Private Network where available
   - Regular system health check including updates to the Device Software

II.  **Service Availability**
   - <u>Telephone support</u> : 10:00 A.M. to 4:00 P.M. EST Monday – Friday

   Calls received out of office hours will be forwarded to a mobile phone and reasonable commercial efforts will be made to action the call, however there will be a backup voicemail/answer phone service

   - <u>Email support</u>: Monitored 10:00 A.M. to 4:00 P.M. EST Monday – Friday

   Emails received outside of office hours will be collected, however no action can be guaranteed until the next working day

   Customer is responsible for having a customer representative available when resolving a service related incident or request.

III. **Service Requests**
   BitAccess will assess any service request and class the same into High, Medium or Low priority and will respond to service related incidents and/or requests submitted by the Customer within the following time frames:

   - 0-8 hours (during business hours) for issues classified as **High** priority.
   - Within 48 hours for issues classified as **Medium** priority.
   - Within 5 working days for issues classified as **Low** priority.

   Classifications of High, Medium and Low priority generally fall into the following categories of incident:

14

**BITACCESS MASTER PURCHASE AGREEMENT**

| Priority Category | Definition |
|---|---|
| High | The BTM Device is inoperable and further operation cannot proceed until the problem is fixed. |
| Medium | A material function of the BTM Device or BTM Service is inoperable and further operation of that function cannot proceed but operation of other functions can proceed before this problem is fixed. |
| Low | An observation which does not materially affect the functionality of the BTM Device is recorded. |

Remote assistance will be provided in accordance with the above timescales dependent on the priority of the support request. Response time is not equal to issue resolve time, which might take longer and will be different for each request.

**BITACCESS MASTER PURCHASE AGREEMENT**

<u>**SCHEDULE D**</u>
<u>**MINIMUM TERMS FOR END USERS**</u>

Customer must have an end user license agreement ("**EULA**") agreed to by all end users prior to access and use of the services Customer provides through use of the BTM Service and/or the BTM Device which contains the following minimum terms:

(a) Provide a disclaimer of all implied warranties, including, without limitation warranties of merchantability and fitness for a particular purpose are disclaimed in relation to the services.

(b) Provide that the agreement for use of the services can be terminated if a user is in material breach of any of the provisions of the EULA.

(c) Provide that user shall: (i) safeguard any login details provided and prevent unauthorized access to or use of services, and shall notify Customer promptly upon becoming aware of any such unauthorized access or use; and (iii) comply with all applicable local, state, provincial, federal and foreign laws in using the services; (iii) not attempt to gain unauthorized access to the system used to provide the services; and (iv) not to engage in or encourage any illegal transactions.