# EXHIBIT 3

# EXHIBIT 3

**425**

425 1 d396102d425.htm 425

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(D)**

**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported): August 24, 2022**

**GSR II Meteora Acquisition Corp.**

**(Exact name of registrant as specified in its charter)**

| Delaware | 001-41305 | 87-3203989 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 840 Park Drive East Boca Raton, Florida | 33432 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

**(561) 532-4682**

**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☒ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Units, each consisting of one share of Class A common stock, one warrant and one sixteenth of one right | GSRMU | The Nasdaq Stock Market LLC |
| Class A common stock, par value $0.0001 per share | GSRM | The Nasdaq Stock Market LLC |
| Warrants, each whole warrant exercisable for one share of Class A common stock at an exercise price of $11.50 per share | GSRMW | The Nasdaq Stock Market LLC |
| Rights, each whole right entitling the holder to receive one share of Class A common stock | GSRMR | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

| Item 1.01 | Entry Into A Material Definitive Agreement. |
|---|---|

**Transaction Agreement**

On August 24, 2022, GSR II Meteora Acquisition Corp., a Delaware corporation (the "*Company*," "*us*" or "*our*"), entered into a Transaction Agreement (as it may be amended, supplemented or otherwise modified from time to time, the "*Transaction Agreement*"), by and among the Company, GSR II Meteora Sponsor LLC, a Delaware limited liability company ("*Sponsor*", and together with the Company, "*GSR Entities*"), BT Assets, Inc., a Delaware corporation ("*BT Assets*"), and Lux Vending, LLC, a Georgia limited liability company and a wholly owned subsidiary of BT Assets ("*Lux Vending*"). The transactions contemplated by the Transaction Agreement as described below are hereinafter referred to as the "*Business Combination*" and the closing date of the Business Combination is hereinafter referred to as the "*Closing*." All of the terms used, but not defined herein shall have the meanings ascribed to such terms in the Transaction Agreement.

In connection with the Business Combination, the Company will be renamed "Bitcoin Depot Inc." or another name to be determined by the BT Entities (defined below) in their reasonable discretion ("*PubCo*").

The Transaction Agreement and the transactions contemplated thereby were approved by the board of directors of the Company and the leadership team of BT Assets.

*The Business Combination*

Upon the terms and subject to the conditions of the Transaction Agreement, in accordance with the Delaware General Corporation Law, and prior to or at the Closing, the GSR Entities and the BT Entities will enter into the following transactions:

| (i) | Lux Vending will merge with and into a newly-formed Delaware limited liability company known as "Bitcoin Depot Operating LLC" ("*BT OpCo*", and together with BT Assets, "*BT Entities*"); |

| (ii) | BT Assets will sell, transfer, assign, convey and deliver to PubCo and PubCo will purchase and accept from BT Assets, the Purchased Common Units in exchange for certain cash consideration (the "*Over the Top Consideration*"). |

| (iii) | PubCo will assign, transfer, contribute and deliver to BT OpCo certain cash consideration (the "*Contribution Amount*"), and BT OpCo will issue and deliver to PubCo (i) at the Closing, the Contribution Common Units, and (ii) at the Closing and immediately following the effectiveness of the BT OpCo A&R LLC Agreement, certain Matching Warrants and PubCo Earn-Out Units. The Over the Top Consideration and the Contribution Amount will be distributed in accordance with the Cash Distribution Waterfall as set forth in the Transaction Agreement. |

Following the foregoing transactions, and assuming no redemptions, BT Assets and its affiliated entities, including Brandon Mintz, the founder, Chief Executive Officer and controlling stockholder of BT Assets, are expected to own a majority of the outstanding Common Units and the outstanding BT Earn-Out Units and a supermajority of the outstanding voting shares of PubCo, and PubCo will own the remainder of the outstanding Common Units and BT Earn-Out Units. The Business Combination is expected to close in the first quarter of 2023, following the receipt of the required approvals by the Company's stockholders and the fulfillment of other customary closing conditions, including a minimum cash condition.

*Transaction Consideration*

As of the date of this filing, the Company has approximately $310 million in its Trust Account, net of deferred underwriting fees of approximately $11.1 million, which will be used as cash consideration in connection with the Business Combination. In addition, the Transaction Agreement permits the Company to raise additional equity financing prior to the Closing, subject to certain terms and conditions.

*Representations and Warranties; Covenants*

The Transaction Agreement contains representations, warranties and covenants of each of the parties thereto that are customary for transactions of this type, including with respect to corporate organization and authorization, third party consents, capitalization, financial statements, material contracts, tax matters, compliance with laws, employee and benefits matters and intellectual property, among others. Effective immediately following the Closing, PubCo's board of directors shall be comprised of seven directors, two of whom shall be designated by the Sponsor and five of whom shall be designated by BT Assets prior to the Closing.

*Conditions to Each Party's Obligations*

The Closing is subject to certain customary conditions, including, but not limited to, (i) the requisite approvals of the stockholders of the Company, (ii) the expiration or termination of any applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (if applicable), (iii) the PubCo Class A Common Stock being approved for listing on Nasdaq and (iv) performance of each parties' covenants to be performed under the Transaction Agreement in all material respects.

*Termination*

The Transaction Agreement may be terminated under certain customary and limited circumstances prior to the Closing, including, (i) by BT Assets and the Company, (ii) by BT Assets or the Company if any Governmental Authority shall have enacted any Governmental Order which has become final and non-appealable and has the effect of making consummation of the Business Combination illegal or otherwise preventing or prohibiting consummation of the Business Combination, (iii) by BT Assets if the Company Stockholder Approval is not obtained by reason of the failure to obtain the required vote at the Company's Stockholders' Meeting, (iv) by BT Assets after there has been a Modification in Recommendation, (v) by the Company upon the failure to meet specified deadlines for the filing of the Proxy Statement, subject to certain conditions, (vi) prior to the Closing, by the Company if (A) there is any breach of any representation, warranty, covenant or agreement on the part of the BT Entities set forth in the Transaction Agreement such that certain conditions to closing cannot be satisfied and such breach is not cured within the cure period window or (B) the Closing has not occurred on or before February 28, 2023, unless the Company is then in

material breach of the Transaction Agreement, or (vii) prior to the Closing, by the Company if (A) there is any breach of any representation, warranty, covenant or agreement on the part of the Company or Sponsor set forth in the Transaction Agreement such that certain conditions to closing cannot be satisfied and such breach is not cured within the cure period window or (B) the Closing has not occurred on or before the Agreement end date, unless any of the BT Entities is then in material breach of the Transaction Agreement.

If the Transaction Agreement is validly terminated, none of the parties to the Transaction Agreement will have any liability or any further obligation under the Transaction Agreement other than customary confidentiality obligations and other miscellaneous provisions, except in the case of fraud or willful and material breach of the Transaction Agreement.

The foregoing description of the Transaction Agreement and the Business Combination does not purport to be complete and is qualified in its entirety by the terms and conditions of the Transaction Agreement, a copy of which is attached hereto as Exhibit 2.1 and is incorporated herein by reference. The Transaction Agreement contains representations, warranties and covenants that the respective parties made to each other as of the date of the Transaction Agreement or other specific dates. The assertions embodied in those representations, warranties and covenants were made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating such agreement. The representations, warranties and covenants in the Transaction Agreement are also modified in important part by the underlying disclosure schedules which are not filed publicly with the U.S. Securities and Exchange Commission (the "*SEC*") and which are subject to a contractual standard of materiality different from that generally applicable to stockholders and were used for the purpose of allocating risk among the parties rather than establishing matters as facts. The Company does not believe that these schedules contain information that is material to an investment decision.

**Sponsor Support Agreement**

Concurrently with the execution of the Transaction Agreement, the Sponsor, the Company and BT Assets entered into a sponsor support agreement (the "*Sponsor Support Agreement*"), pursuant to which the Sponsor agrees, among other things, (i) to vote at any meeting of the Company's stockholders, and in any action by written consent of the Company's stockholders, all of its Company equity securities in favor of the adoption and approval of the Transaction Agreement, the transactions contemplated thereby, and the other approvals contemplated to be sought with respect thereto; (ii) be bound by certain other covenants and agreements related to the Business Combination and (iii) be bound by certain transfer restrictions with respect to such securities and on the terms and subject to the conditions set forth in the Sponsor Support Agreement.

The foregoing description of the Sponsor Support Agreement does not purport to be complete and is qualified in its entirety by the terms and conditions of the Sponsor Support Agreement filed as Exhibit 10.1 hereto and incorporated by reference herein.

**Registration Rights Agreement**

At the Closing, Sponsor and BT Assets, among others (collectively, the "*Holders*"), and the Company will amend and restate the Registration Rights Agreement, dated as of February 24, 2022, by and between the Company and Sponsor (as amended and restated, the "*Registration Rights Agreement*"), pursuant to which, among other things, PubCo will agree to use commercially reasonable efforts to file a registration statement for a shelf registration on Form S-1 or Form S-3 within 45 days following Closing and the Holders will be granted certain customary registration rights with respect to the securities of PubCo.

The foregoing description of the Registration Rights Agreement does not purport to be complete and is qualified in its entirety by the terms and conditions of the form of Registration Rights Agreement, a copy of which is filed as Exhibit 10.2 hereto and incorporated by reference herein.

**Tax Receivable Agreement**

At the Closing, the Company and the BT Entities will enter into a Tax Receivable Agreement (the "*Tax Receivable Agreement*"). Pursuant to the Tax Receivable Agreement, the Company will generally be required to pay BT Assets 85% of the amount of savings, if any, in U.S. federal, state, local, and foreign income taxes that the Company realizes, or is deemed to realize, as a result of certain tax attributes, including:

| • | existing tax basis in certain assets of BT OpCo, including assets that will eventually be subject to depreciation or amortization, once placed in service, attributable to BT OpCo Common Units acquired by the Company at the Closing and thereafter in accordance with the terms of the A&R LLC Agreement (as defined below); |

| • | tax basis adjustments resulting from the Company's acquisition of BT OpCo Common Units from BT Assets at the Closing and thereafter pursuant to the terms of the A&R LLC Agreement (including any such adjustments resulting from certain payments made by the Company under the Tax Receivable |

| | | Agreement); |
|---|---|---|
| | • | disproportionate tax-related allocations made to the Company as a result of Section 704(c) of the U.S. Internal Revenue Code of 1986, as amended; and |

| | | • | tax deductions in respect of interest payments deemed to be made by the Company in connection with the Tax Receivable Agreement. |
|---|---|---|---|

The foregoing description of the Tax Receivable Agreement does not purport to be complete and is qualified in its entirety by the terms and conditions of the form of Tax Receivable Agreement filed as Exhibit 10.3 hereto and incorporated by reference herein.

**Amended and Restated Limited Liability Company Agreement of BT OpCo**

At the Closing, the Company, BT OpCo and BT Assets will enter into an Amended and Restated Limited Liability Company Agreement of BT OpCo (the "*A&R LLC Agreement*") setting forth the rights and obligations of the members of BT OpCo, and pursuant to which, among other things, BT OpCo will be controlled by PubCo, as managing member. In addition, the A&R LLC Agreement contains customary provisions for operating partnerships held by a public company, including providing for PubCo to maintain a one-to-one ratio between its outstanding PubCo Class A Common Stock and the number of Common Units held by PubCo.

The foregoing description of the A&R LLC Agreement does not purport to be complete and is qualified in its entirety by the terms and conditions of the form of A&R LLC Agreement filed as Exhibit 10.4 hereto and incorporated by reference herein.

| Item 3.02 | Unregistered Sales of Equity Securities. |
|---|---|

The disclosure set forth above in Item 1.01 of this Current Report on Form 8-K with respect to the issuance of PubCo's common stock pursuant to the Transaction Agreement is incorporated herein by reference herein. The common stock issuable pursuant to the Transaction Agreement will not be registered under the Securities Act of 1933, as amended (the "*Securities Act*"), in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.

| Item 7.01 | Regulation FD Disclosure. |
|---|---|

On August 25, 2022, the Company and BT Assets issued a press release announcing their entry into the Transaction Agreement. The press release is attached hereto as Exhibit 99.1 and incorporated by reference herein.

Furnished as Exhibit 99.2 hereto and incorporated into this Item 7.01 by reference is the investor presentation that the Company and BT Assets have prepared for use in connection with the announcement of the Business Combination.

---

The foregoing (including Exhibits 99.1 and 99.2) is being furnished pursuant to Item 7.01 and will not be deemed to be filed for purposes of Section 18 of the Securities and Exchange Act of 1934, as amended (the "*Exchange Act*"), or otherwise be subject to the liabilities of that section, nor will it be deemed to be incorporated by reference in any filing under the Securities Act or the Exchange Act regardless of any general incorporation language in such filings. This Current Report will not be deemed an admission as to the materiality of any of the information in this Item 7.01, including Exhibits 99.1 and 99.2.

*Additional Information*

In connection with the Business Combination, the Company intends to file a preliminary proxy statement of the Company with the SEC, copies of which will be mailed (if and when available) to all Company stockholders once definitive. The Company also plans to file other documents with the SEC regarding the Business Combination. The Company will mail copies of the definitive proxy statement and other relevant documents to its stockholders as of the record date established for voting on the Business Combination. This communication is not a substitute for the definitive proxy statement or any other document that the Company will send to its stockholders in connection with the Business Combination. **The Company's stockholders and other interested persons are advised to read, once available, the preliminary proxy statement and any amendments thereto and, once available, the definitive proxy statement, as well as all other relevant materials filed or that will be filed with the SEC, in connection with the Company's solicitation of proxies for its special meeting of stockholders to be held to approve, among other things, the Business Combination, because these documents will contain important information about the Company, BT Assets and the Business Combination.** Stockholders may also obtain a copy of the preliminary or definitive proxy statement, once available, as well as other documents filed with the SEC regarding the Business Combination and other documents filed with the SEC by the Company, without charge, at the SEC's website located at www.sec.gov or by directing a request to Cody Slach or Alex Kovtun, (949) 574-3860, GSRM@gatewayir.com.

*Participants in the Solicitation*

The Company, BT OpCo and certain of their respective directors, executive officers and other members of management and employees, under SEC rules, may be deemed to be participants in the solicitation of proxies of the Company's stockholders in connection with the Business Combination. Information regarding the persons who may, under SEC rules, be deemed participants in the solicitation of the Company's stockholders in connection with the Business Combination will be set forth in the Company's proxy statement when it is filed with the SEC. Investors and security holders may obtain more detailed information regarding the names of the Company's directors and executive officers and a description of their interests in the Company in the Company's filings with the SEC, including the Company's prospectus dated February 24, 2022 relating to its initial public offering, which was filed with the SEC and is available free of charge at the SEC's web site at www.sec.gov. To the extent such holdings of Company's securities may have changed since that time, such changes have been or will be reflected on Statements of Change in Ownership on Form 4 filed with the SEC. Additional information regarding the participants in the proxy statement and a description of their direct and indirect interests will be contained in the proxy statement and other relevant materials to be filed with the SEC when they become available. Stockholders, potential investors and other interested persons should read the proxy statement carefully when it becomes available before making any voting or investment decisions. Free copies of these documents may be obtained from the sources indicated above.

*Forward-Looking Statements*

The information included herein and in any oral statements made in connection herewith include "forward-looking statements" within the meaning of the "safe harbor" provisions of the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of words such as "estimate," "plan," "project," "forecast," "intend," "will," "expect," "anticipate," "believe," "seek," "target" or other similar expressions that predict or indicate future events or trends or that are not statements of historical matters, although not all forward-looking statements contain such identifying words. These forward-looking statements include, but are not limited to, statements regarding estimates and forecasts of financial and performance metrics and expectations and timing related to potential benefits, terms and timing of the Business Combination. These statements are based on various assumptions, whether or not identified herein, and on the current expectations of BT Assets', Lux Vending's and the Company's management and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances

are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of BT Assets, Lux Vending and the Company. These forward-looking statements are subject to a number of risks and uncertainties, including changes in domestic and foreign business, market, financial, political and legal conditions; the inability of the parties to successfully or timely consummate the Business Combination, including the risk that any required regulatory approvals are not obtained, are delayed or are subject to unanticipated conditions that could adversely affect the combined company or the expected benefits of the Business Combination or that the approval of the shareholders of the Company is not obtained; failure to realize the anticipated benefits of the Business Combination; risks relating to the uncertainty of the projected financial information with respect to BT OpCo; future global, regional or local economic and market conditions; the development, effects and enforcement of laws and regulations; BT OpCo's ability to manage future growth; BT OpCo's ability to develop new products and solutions, bring them to market in a timely manner, and make enhancements to its platform; the effects of competition on BT OpCo's future business; the amount of redemption requests made by the Company's public stockholders; the ability of the Company or the combined company to issue equity or equity-linked securities in connection with the Business Combination or in the future; the outcome of any potential litigation, government and regulatory proceedings, investigations and inquiries; and those factors described or referenced in the Company's final initial public offering prospectus dated February 24, 2022 and its most recent Quarterly Report on Form 10-Q for the quarter ended June 30, 2022, in each case, under the heading "Risk Factors," and other documents of the Company filed, or to be filed, from time to time with the SEC. If any of these risks materialize or our assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. There may be additional risks that neither BT Assets, Lux Vending nor the Company presently know or that BT Assets, Lux Vending and the Company currently believe are immaterial that could also cause actual results to differ from those contained in the forward-looking statements. In addition, forward-looking statements reflect BT Assets', Lux Vending's and the Company's expectations, plans or forecasts of future events and views as of the date hereof. BT Assets, Lux Vending and the Company anticipate that subsequent events and developments will cause BT Assets', Lux Vending's and the Company's assessments to change. However, while BT Assets, Lux Vending and the Company may elect to update these forward-looking statements at some point in the future, BT Assets, Lux Vending and the Company specifically disclaim any obligation to do so except as otherwise required by applicable law. These forward-looking statements should not be relied upon as representing BT Assets, Lux Vending and the Company's assessments as of any date subsequent to the date hereof. Accordingly, undue reliance should not be placed upon the forward-looking statements.

*No Offer or Solicitation*

This Current Report on Form 8-K is for informational purposes only and shall not constitute an offer to sell, nor a solicitation of an offer to buy, any securities in connection with the proposed Business Combination or otherwise, or the solicitation of a proxy, consent or authorization in any jurisdiction pursuant to the Business Combination or otherwise, nor shall there be any sale of securities in any jurisdiction in which the offer, solicitation or sale would be unlawful prior to the registration or qualification under the securities laws of any such jurisdiction or otherwise in contravention of applicable law. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act, or an exemption therefrom, and otherwise in accordance with applicable law.

| Item 9.01 | Financial Statements and Exhibits. |
|---|---|

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 2.1* | Transaction Agreement, dated as of August 24, 2022, by and among GSR II Meteora Acquisition Corp., GSR II Meteora Sponsor LLC, BT Assets, Inc., and Lux Vending, LLC. |
| 10.1 | Sponsor Support Agreement, dated as of August 24, 2022, by and among GSR II Meteora Acquisition Corp., GSR II Meteora Sponsor LLC, and Lux Vending, LLC. |
| 10.2 | Form of Amended and Restated Registration Rights Agreement. |
| 10.3 | Form of Tax Receivable Agreement. |
| 10.4 | Form of Amended and Restated LLC Agreement. |
| 99.1 | Press Release, dated August 25, 2022. |
| 99.2 | Investor Presentation. |
| 104 | Cover Page Interactive Data File (embedded with the Inline XBRL document) |
| * | Certain schedules and exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A copy of any omitted schedule or exhibit will be furnished supplementally to the SEC upon request. |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: August 25, 2022

| GSR II METEORA ACQUISITION CORP. | | |
|---|---|---|
| By: | | /s/ Gus Garcia |
| Name: | | Gus Garcia |
| Title: | | Co-Chief Executive Officer |

**Exhibit 2.1**

**Execution Version**

**TRANSACTION AGREEMENT**

**by and among**

**GSR II METEORA ACQUISITION CORP,**

**GSR II METEORA SPONSOR LLC,**

**LUX VENDING, LLC,**

**AND**

**BT ASSETS, INC.**

**dated as of August 24, 2022**

**TABLE OF CONTENTS**

| | | | Page |
|---|---|---|---|
| ARTICLE I | | | |
| CERTAIN DEFINITIONS | | | |
| Section 1.1 | Definitions | | 2 |
| Section 1.2 | Construction | | 18 |
| Section 1.3 | Knowledge | | 19 |
| ARTICLE II | | | |
| TRANSACTIONS; CLOSING | | | |
| Section 2.1 | Unit Purchase | | 19 |
| Section 2.2 | Cash Distribution Waterfall | | 20 |
| Section 2.3 | Closing | | 21 |

| Section 2.4 | Earn-Out Consideration | | 21 |
|---|---|---|---|
| Section 2.5 | PubCo Common Stock Issuance to BT Assets | | 23 |
| Section 2.6 | Treatment of Phantom Equity | | 23 |
| Section 2.7 | Closing Deliverables | | 24 |
| Section 2.8 | Closing Payments | | 25 |

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE BT COMPANIES

| Section 3.1 | Company Organization | | 27 |
|---|---|---|---|
| Section 3.2 | Subsidiaries | | 27 |
| Section 3.3 | Due Authorization | | 27 |
| Section 3.4 | No Violation | | 28 |
| Section 3.5 | Governmental Authorizations | | 28 |
| Section 3.6 | Capitalization | | 28 |
| Section 3.7 | Financial Statements | | 30 |
| Section 3.8 | Undisclosed Liabilities | | 31 |
| Section 3.9 | Litigation and Proceedings | | 31 |
| Section 3.10 | Legal Compliance | | 31 |
| Section 3.11 | Contracts; No Defaults | | 32 |
| Section 3.12 | BT Benefit Plans | | 34 |
| Section 3.13 | Labor Relations; Employees | | 36 |
| Section 3.14 | Taxes | | 37 |
| Section 3.15 | Real Property | | 40 |
| Section 3.16 | Environmental, Health and Safety | | 40 |
| Section 3.17 | Intellectual Property | | 41 |
| Section 3.18 | Data Privacy; Personal Data | | 43 |
| Section 3.19 | Absence of Changes | | 44 |
| Section 3.20 | Anti-Corruption Compliance | | 44 |
| Section 3.21 | Insurance | | 45 |

i

| Section 3.22 | Subscription-Related Representations | | 45 |
|---|---|---|---|
| Section 3.23 | Information Supplied | | 46 |
| Section 3.24 | Brokers' Fees | | 46 |
| Section 3.25 | No Outside Reliance | | 46 |
| Section 3.26 | Indebtedness; Cash; Transaction Expenses | | 46 |
| Section 3.27 | No Additional Representation or Warranties | | 46 |

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BT ASSETS

| Section 4.1 | Company Organization | | 47 |
|---|---|---|---|
| Section 4.2 | Due Authorization | | 47 |
| Section 4.3 | No Violation | | 48 |
| Section 4.4 | Governmental Authorizations | | 48 |
| Section 4.5 | Title to Units of BT OpCo | | 48 |
| Section 4.6 | Solvency | | 48 |
| Section 4.7 | Reserved | | 49 |
| Section 4.8 | Brokers' Fees | | 49 |
| Section 4.9 | No Outside Reliance | | 49 |
| Section 4.10 | Tax Matters | | 49 |

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF PUBCO

| Section 5.1 | Company Organization | | 50 |
|---|---|---|---|
| Section 5.2 | Due Authorization | | 50 |
| Section 5.3 | No Violation | | 51 |
| Section 5.4 | Governmental Authorizations | | 51 |
| Section 5.5 | Capitalization of PubCo | | 52 |
| Section 5.6 | Internal Controls; Listing; Financial Statements | | 53 |
| Section 5.7 | No Undisclosed Liabilities | | 54 |
| Section 5.8 | Litigation and Proceedings | | 55 |

| | | |
|---|---|---|
| Section 5.9 | Taxes | 55 |
| Section 5.10 | SEC Filings | 55 |
| Section 5.11 | Trust Account | 56 |
| Section 5.12 | Investment Company Act; JOBS Act | 56 |
| Section 5.13 | Absence of Changes | 57 |
| Section 5.14 | Anti-Corruption Compliance | 57 |
| Section 5.15 | Indebtedness; Transaction Expenses | 58 |
| Section 5.16 | Business Activities | 58 |
| Section 5.17 | Nasdaq Stock Market Quotation | 58 |
| Section 5.18 | Proxy Statement | 59 |
| Section 5.19 | Takeover Statutes and Charter Provisions | 59 |
| Section 5.20 | Brokers' Fees | 59 |
| Section 5.21 | No Outside Reliance | 59 |
| Section 5.22 | No Additional Representation or Warranties | 60 |

ii

**ARTICLE VI**

**COVENANTS OF THE BT ENTITIES**

| | | |
|---|---|---|
| Section 6.1 | Conduct of Business | 60 |
| Section 6.2 | Inspection | 63 |
| Section 6.3 | Closing Spreadsheet | 63 |
| Section 6.4 | Acquisition Proposals | 64 |
| Section 6.5 | Support of Transaction | 65 |
| Section 6.6 | Confidentiality | 65 |
| Section 6.7 | Indemnification and Insurance | 66 |
| Section 6.8 | BitAccess Buyout | 68 |
| Section 6.9 | Preparation and Delivery of Quarterly Financial Statements | 68 |
| Section 6.10 | BT OpCo Organizational Documents | 69 |
| Section 6.11 | BT Information Supplied | 69 |

**ARTICLE VII**

**COVENANTS OF PUBCO**

| | | |
|---|---|---|
| Section 7.1 | Trust Account Proceeds and Related Available Equity | 69 |
| Section 7.2 | Equity Line | 70 |
| Section 7.3 | Nasdaq Listing | 70 |
| Section 7.4 | No Solicitation by PubCo | 70 |
| Section 7.5 | PubCo Conduct of Business | 71 |
| Section 7.6 | PubCo Public Filings | 72 |
| Section 7.7 | PIPE Subscription | 72 |
| Section 7.8 | Support of Transaction | 72 |
| Section 7.9 | Post-Closing Directors and Officers of PubCo | 73 |
| Section 7.10 | PubCo Information Supplied | 73 |

**ARTICLE VIII**

**JOINT COVENANTS**

| | | |
|---|---|---|
| Section 8.1 | Regulatory Approvals; Other Filings | 73 |
| Section 8.2 | Preparation of Proxy Statement; Stockholders' Meeting and Approvals | 74 |
| Section 8.3 | Tax Matters | 78 |
| Section 8.4 | Section 16 Matters | 79 |
| Section 8.5 | Equity Plan | 79 |
| Section 8.6 | Refinance | 80 |
| Section 8.7 | Personal Guarantee | 80 |
| Section 8.8 | Personal Data | 80 |

**ARTICLE IX**

**CONDITIONS TO OBLIGATIONS**

| | | |
|---|---|---|
| Section 9.1 | Conditions to Obligations of PubCo and the BT Entities | 81 |
| Section 9.2 | Conditions to Obligations of PubCo | 82 |
| Section 9.3 | Conditions to the Obligations of the BT Entities | 83 |

iii

| | | | |
|---|---|---|---|
| **ARTICLE X** | | | |
| TERMINATION/EFFECTIVENESS | | | |
| Section 10.1 | Termination | | 83 |
| Section 10.2 | Effect of Termination | | 85 |
| | | | |
| **ARTICLE XI** | | | |
| MISCELLANEOUS | | | |
| Section 11.1 | Trust Account Waiver | | 85 |
| Section 11.2 | Waiver | | 86 |
| Section 11.3 | Notices | | 86 |
| Section 11.4 | Assignment | | 87 |
| Section 11.5 | Rights of Third Parties | | 87 |
| Section 11.6 | Expenses | | 88 |
| Section 11.7 | Governing Law | | 88 |
| Section 11.8 | Headings; Counterparts | | 88 |
| Section 11.9 | BT Companies and PubCo Disclosure Letters | | 88 |
| Section 11.10 | Entire Agreement | | 89 |
| Section 11.11 | Amendments | | 89 |
| Section 11.12 | Publicity | | 89 |
| Section 11.13 | Severability | | 89 |
| Section 11.14 | Jurisdiction; Waiver of Jury Trial. | | 90 |
| Section 11.15 | Enforcement | | 90 |
| Section 11.16 | Non-Recourse | | 90 |
| Section 11.17 | Non-Survival of Representations, Warranties and Covenants | | 91 |
| Section 11.18 | Conflicts and Privilege | | 91 |

iv

| **Exhibits** | |
|---|---|
| Exhibit A | PubCo Charter |
| Exhibit B | PubCo Bylaws |
| Exhibit C | Pre-Closing Restructuring Plan |
| Exhibit D | Registration Rights Agreement |
| Exhibit E | Sponsor Support Agreement |
| Exhibit F | Form of Tax Receivable Agreement |
| Exhibit G | Form of BT OpCo A&R LLC Agreement |

**BT Disclosure Letter**

**PubCo Disclosure Letter**

v

## TRANSACTION AGREEMENT

This Transaction Agreement (this "**Agreement**"), dated as of August 24, 2022 (the "**Execution Date**"), is made and entered into by and among GSR II Meteora Acquisition Corp, a Delaware corporation ("**PubCo**"), GSR II Meteora Sponsor LLC, a Delaware limited liability company ("**Sponsor**", and together with PubCo, "**GSR Entities**"), BT Assets, Inc., a Delaware corporation ("**BT Assets**"), and Lux Vending, LLC, a Georgia limited liability company and a wholly owned subsidiary of BT Assets ("**BT OpCo**", and together with BT Assets, "**BT Entities**").

## RECITALS

**WHEREAS**, PubCo is a blank check company formed for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses;

**WHEREAS**, PubCo desires to, subject to the terms and conditions set forth in this Agreement, contribute, pay and deliver to BT OpCo and BT Assets the PubCo Available Cash, without interest, and BT Assets or BT OpCo, as applicable, shall in consideration therefor issue or sell and deliver to PubCo, at the Closing (i) certain Common Units of BT OpCo and (ii) immediately following the effectiveness of the BT OpCo A&R LLC Agreement, certain PubCo Matching Warrants and the PubCo Earn-Out Units, free from any Encumbrances and subject to the terms and conditions set forth in this Agreement;

**WHEREAS**, prior to or at the Closing (and in any case prior to the Unit Purchase), PubCo will enter into a series of reorganizations, including, (i) amending and restating the certificate of incorporation of PubCo to be substantially in the form attached as Exhibit A (the "**PubCo Charter**") and (ii) amending and restating the bylaws of PubCo to be substantially in the form attached as Exhibit B (the "**PubCo Bylaws**", and such transactions the "**PubCo Pre-Closing Restructuring**");

**WHEREAS**, prior to or at the Closing (and in any case prior to the Unit Purchase), the BT Entities will enter into a series of reorganizations, including, the merger of BT OpCo with and into a newly-formed Delaware limited liability company known as "Bitcoin Depot Operating LLC" (the "**BT Surviving Entity**" and such transactions, the "**BT Pre-Closing Restructuring**", and together with the PubCo Pre-Closing Restructuring, the "**Pre-Closing Restructuring Plan**"); provided that BT Entities and PubCo may make amendments to the Pre-Closing Restructuring Plan, as attached hereto as Exhibit C after the Execution Date subject to the prior written consent of the other party (not to be unreasonably conditioned, withheld or delayed);

**WHEREAS**, prior to the Closing, and as an inducement to PubCo to enter into this Agreement and consummate the Transactions (including the Unit Purchase), each of the Key Employees is entering into an employment agreement with BT OpCo and PubCo in a form mutually agreed by PubCo and BT Assets (each, an "**Employment Agreement**"), each of which shall be effective as of the Closing;

**WHEREAS**, concurrently with the execution and delivery of this Agreement, the Sponsor, BT OpCo, and PubCo have entered into the Sponsor Support

Agreement, a copy of which is attached as Exhibit E (the "**Sponsor Support Agreement**");

1

**WHEREAS**, at the Closing and immediately following the effectiveness of the BT OpCo A&R LLC Agreement, PubCo shall issue the Share Transaction Consideration to BT Assets for par value as set forth in this Agreement; and

**WHEREAS**, each of the Board of Directors of BT Assets, the sole member of BT OpCo, and the Board of Directors of PubCo has unanimously (i) determined that it is advisable for and in the best interests of such party and its equityholder(s) to enter into this Agreement and the Transactions (as defined below), and (ii) approved the execution and delivery of this Agreement and the documents contemplated by this Agreement and the Transactions.

**NOW**, **THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and intending to be legally bound, the parties agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

Section 1.1 Definitions.

(a) As used in this Agreement, the following terms have the following meanings:

"**Acquisition Proposal**" means, as to any Person, other than the Transactions and other than the acquisition or disposition of equipment or other tangible personal property in the ordinary course of business, any offer or proposal relating to: (a) any acquisition or purchase, direct or indirect, of (i) 15% or more of the consolidated assets of such Person and its Subsidiaries or (ii) 15% or more of any class of equity or voting securities of (x) such Person or (y) one or more Subsidiaries of such Person holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of such Person and its Subsidiaries; (b) any tender offer (including a self-tender offer) or exchange offer that, if consummated, would result in any Person beneficially owning 15% or more of any class of equity or voting securities of (i) such Person or (ii) one or more Subsidiaries of such Person holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of such Person and its Subsidiaries; or (c) a merger, consolidation, share exchange, business combination, sale of substantially all the assets, reorganization, recapitalization, liquidation, dissolution or other similar transaction involving (i) such Person or (ii) one or more Subsidiaries of such Person holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of such Person and its Subsidiaries.

"**Action**" means any claim, action, suit, charge, audit, examination, assessment, arbitration, mediation or inquiry, or any proceeding or investigation, by or before any Governmental Authority.

"**Affiliate**" means, with respect to any specified Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such specified Person, whether through one or more intermediaries or otherwise. The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

2

"**Aggregate Phantom Equity Cash Consideration**" means the aggregate Phantom Equity Cash Consideration payable in respect of the cancellation of the Phantom Equity Awards held by the Phantom Equity Holders immediately prior to the Closing, pursuant to the Phantom Equity Plan and Section 2.6, as set forth on the Closing Spreadsheet.

"**Aggregate Phantom Equity Consideration**" means the total dollar value of the consideration payable in respect of the cancellation of the Phantom Equity Awards held by the Phantom Equity Holders immediately prior to the Closing pursuant to the Phantom Equity Plan and Section 2.6, as set forth on the Closing Spreadsheet.

"**Aggregate Phantom Equity Non-Cash Consideration**" means, the aggregate number of PubCo Class A Common Stock issuable in respect of the cancellation of the Phantom Equity Awards held by the Phantom Equity Holders immediately prior to the Closing pursuant to the Phantom Equity Plan and Section 2.6, as set forth on the Closing Spreadsheet.

"**Alternative Business Combination Proposal**" means any offer, inquiry, proposal or indication of interest (whether written or oral, binding or non-binding, and other than an offer, inquiry, proposal or indication of interest with respect to the Transactions), relating to a Business Combination.

"**Anti-Bribery Laws**" means the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977, Canada's Corruption of Foreign Public Officials Act and Criminal Code, and all other applicable anti-corruption and bribery Laws (including the U.K. Bribery Act 2010 or other Laws of other countries implementing the OECD Convention on Combating Bribery of Foreign Officials).

"**Antitrust Laws**" means the United States Sherman Antitrust Act of 1890, the United States Clayton Act of 1914, the HSR Act, the United States Federal Trade Commission Act of 1914, and all other domestic and foreign Laws, including foreign merger control and other competition Laws, issued by a Governmental Authority that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**BitAccess Equity Plan**" means the BitAccess Inc. Stock Option Plan.

"**BitAccess Option**" means each outstanding and unexercised option to purchase BitAccess capital stock granted under the BitAccess Equity Plan.

"**BT Assets Disclosure Breach**" means the failure of a BT Entity to furnish to PubCo all information concerning itself, its Subsidiaries, officers, directors, managers, stockholders, and other equityholders and information regarding such other matters as may be reasonably necessary or advisable (including any approval or consent of an independent auditor of a BT Entity) or as may be reasonably requested by PubCo in connection with the preparation and filing of the Proxy Statement, or any amendment thereto, on a timely basis to permit the filing or amendment of the same on or prior to a specified time.

"**BT Companies**" means BT OpCo and all of its Subsidiaries.

3

"**BT Company Interests**" means all of the outstanding equity interests of the BT Companies.

"**BT Earn-Out Units**" means, the following units of BT OpCo: (i) 5,000,000 Class 1 Earn-Out Units of BT OpCo ("**BT OpCo Class 1 Earn-Out Units**"), (ii) 5,000,000 Class 2 Earn-Out Units of BT OpCo ("**BT OpCo Class 2 Earn-Out Units**"), and (iii) 5,000,000 Class 3 Earn-Out Units of BT OpCo ("**BT OpCo Class 3 Earn-Out Units**").

"**BT Intellectual Property**" means, collectively, the Owned Intellectual Property and the Licensed Intellectual Property.

"**BT Material Adverse Effect**" means any event, series of events, condition, state of facts, development, change, circumstance, occurrence or effect (collectively, "**Events**") that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on (i) the business, results of operations or financial condition of the BT Companies, taken as a whole or (ii) the ability of the BT Entities to consummate the Transactions; provided, however, that in no event would any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been or will be, a "BT Material Adverse Effect": (a) any change in applicable Laws or GAAP or any interpretation of such Laws or GAAP following the Execution Date, (b) any change in interest rates or economic, political, business or financial market conditions generally (including, without limitation, (1) any change in the price or relative value of any Token, or other digital currency or cryptocurrency, including but not limited to Bitcoin or (2) any change in trading volume of any Token, or other digital currency or cryptocurrency, or any halt or suspension in trading of any Token, or other digital currency or cryptocurrency on any digital currency exchange, in each case, including but not limited to Bitcoin), (c) the taking of any action expressly required by or, with respect to Sections 8.1, 8.2 or 8.4, permitted to be taken under this Agreement, (d) any natural disaster (including hurricanes, storms, tornados, flooding, earthquakes, volcanic eruptions or similar occurrences), pandemic (including COVID-19, or any COVID-19 Measures or any change in such COVID-19 Measures or interpretations following the Execution Date), acts of nature or change in climate, or any declaration of a national emergency by any Governmental Authority; (e) any acts of terrorism or war, the outbreak or escalation of hostilities, geopolitical conditions, local, national or international political conditions, or social conditions, (f) any failure in and of itself of the BT Entities or any of their respective Subsidiaries to meet any projections or forecasts, provided that the exception in this clause (f) shall not prevent or otherwise affect a determination that any change, effect or development underlying such change has resulted in or contributed to a BT Material Adverse Effect,

(g) any Events generally applicable to the industries or markets in which the BT Entities or any of their respective Subsidiaries operate, (h) any action taken by, or at the request of, or with the express consent of PubCo; *provided*, that in the case of each of clauses (a), (b), (d), (e) and (g), any such Event to the extent it disproportionately affects the BT Entities or any of their respective Subsidiaries relative to other participants in the industries in which such Persons operate shall not be excluded from the determination of whether there has been, or would reasonably be expected to be, a BT Material Adverse Effect.

"*BT OpCo Common Units*" means Common Units of BT OpCo.

4

"*BT OpCo Matching Warrants*" means warrants to purchase a number of units of BT OpCo equal to the number of shares of PubCo Class A Common Stock that may be purchased upon the exercise in full of all PubCo Warrants outstanding immediately following the Closing.

"*BT Transaction Bonus Payments*" means all amounts payable pursuant to the arrangements listed on the "BT Transaction Bonus Payments Schedule" of Section 1.1 of the BT Disclosure Letter.

"**BT Transaction Bonus Termination Agreement**" means a BT Transaction Bonus termination agreement in the form mutually agreed upon between the BT Entities and PubCo prior to the Closing.

"*BT Transaction Expenses*" means any reasonable and documented out-of-pocket fees and expenses paid or payable by the BT Entities or any of their respective Subsidiaries or any of their respective Affiliates (whether or not billed or accrued for) as a result of or in connection with the negotiation, documentation and consummation of the Transactions, including (A) all fees, costs, expenses, brokerage fees, commissions, finders' fees and disbursements of financial advisors, investment banks, data room administrators, attorneys, accountants and other advisors and service providers, (B) change-in-control payments, transaction bonuses, retention payments, severance or similar compensatory payments pursuant to any written arrangements entered into prior to the Closing, payable by the BT Entities or any of their Subsidiaries to any current or former employee, independent contractor, officer, director or other individual service provider of the BT Entities or any of their Subsidiaries as a result of the Transactions (whether alone or together with any other event), but excluding, for the avoidance of doubt, (x) any such payments that arise from employment-related actions taken by PubCo, the BT Entities or any of their respective Subsidiaries or Affiliates following the Closing and (y) the BT Transaction Bonus Payments and the Aggregate Phantom Equity Consideration, including the employer portion of payroll Taxes arising therefrom, (C) up to $1,000,000 of the sum of the BT Transaction Bonus Payments and the employer portion of payroll Taxes arising from the aggregate amount of the BT Transaction Bonus Payments (whether paid in cash or equity), (D) up to $1,000,000 of the sum of the Aggregate Phantom Equity Cash Consideration and the employer portion of payroll Taxes arising from the Aggregate Phantom Equity Consideration (whether paid in cash or equity), and (E) any and all filing fees payable by the BT Entities or any of their Subsidiaries or any of their Affiliates to Governmental Authorities in connection with the Transactions.

"*Business Combination*" has the meaning set forth in the PubCo Governing Documents as in effect on the Execution Date.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

"*CARES Act*" means (i) the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. 116-136) and any administrative or other guidance published with respect to the CARES Act by any Governmental Authority (including IRS Notices 2020-22 and 2020-65), or any other Law or executive order or executive memorandum (including the Memorandum on Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster, dated August 8, 2020) intended to address the consequences of COVID-19 (in each case, including any comparable provisions of

5

state, local or non-U.S. Law and including any related or similar orders or declarations from any Governmental Authority) and (ii) any extension of, amendment, supplement, correction, revision or similar treatment to any provision of the CARES Act, the Families First Coronavirus Response Act of 2020 (H.R. 6201), and "Division N - Additional Coronavirus Response and Relief" of the Consolidated Appropriations Act, 2021 (H.E. 133) contained in the Consolidated Appropriations Act, 2021, H.R. 133.

"*Change of Control*" has the meaning set forth in the BT OpCo A&R LLC Agreement.

"*Code*" means the Internal Revenue Code of 1986.

"*Contracts*" means any contracts, agreements, subcontracts, leases, commitments and undertakings, whether written or oral.

"*Contribution Common Units*" means a number of OpCo Common Units equal to (i) the number of shares of PubCo Common Stock, other than PubCo Class E Common Stock, outstanding at the Closing and not held by BT Assets, *multiplied by* (ii) the Contribution Amount, *divided by* (iii) the amount of PubCo Available Cash.

"*COVID-19*" means the novel coronavirus, SARS-CoV-2 or COVID-19 (and all related strains and sequences), including any resurgence or any evolutions or mutations of COVID-19, and/or related or associated epidemics, pandemics, disease outbreaks or public health emergencies.

"*COVID-19 Measures*" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar Law, directive, guidelines or recommendations promulgated by any industry group or any Governmental Authority, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to COVID-19, including the CARES Act and Families First Act.

"*COVID-19 Tax Measure*" means any legislation or order enacted or issued by any Governmental Authority with respect to any Tax matter in response to COVID-19 (including, without limitation, the CARES Act).

"*Data Room*" means the virtual data room titled "BTM" hosted by DataSite at: https://americas.datasite.com.

"*Data Subject*" means any "person," "individual," or "data subject" as defined by the applicable Privacy Laws.

"*Designated Jurisdiction*" means any country or territory to the extent that such country or territory is the subject of any Sanction.

"*Disclosure Letter*" means, as applicable, the BT Disclosure Letter or the PubCo Disclosure Letter.

"*Dollars*" or "*$*" means lawful money of the United States.

6

"*Earn-Out Units*" means the BT Earn-Out Units and the PubCo Earn-Out Units.

"*Environmental Laws*" means any and all Laws relating to the protection of the environment or natural resources, pollution or worker health or safety, including as it relates to Hazardous Materials exposure.

"*ERISA Affiliate*" means any corporation or trade or business, whether or not incorporated, that together with any of the BT Companies would, at any relevant time, be deemed to be a single employer pursuant to Section 4001(b) of ERISA or Section 414(b), (c), (m) or (o) of the Code.

"*Event*" has the meaning specified in the definition of BT Material Adverse Effect.

"*Exchange Act*" means the Securities Exchange Act of 1934.

"*Founder*" means Brandon Mintz.

"*GAAP*" means generally accepted accounting principles in the United States as in effect from time to time.

"*Governing Documents*" means the legal agreements and instruments by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a corporation are its certificate of incorporation and by-laws, the "Governing Documents" of a limited partnership are its limited partnership agreement and certificate of limited partnership, the "Governing Documents" of a limited liability company are its operating agreement and certificate of formation and the "Governing Documents" of an exempted company are its memorandum and articles of association.

"*Governmental Authority*" means any federal, national, state, provincial, territorial or municipal government, or any political subdivision of such government,

and any agency, commission, department, board, bureau, official, minister, arbitral body (public or private), tribunal or court, whether national, state, provincial, local, foreign or multinational, exercising executive, legislative, judicial, regulatory or administrative functions of a nation, state, province or municipal government, or any political subdivision of such authority, including any authority having governmental or quasi-governmental powers, domestic or foreign.

"**Governmental Order**" means any order, judgment, injunction, decision, decree, writ, stipulation, determination, directive or award, in each case, entered or issued by or with any Governmental Authority.

"**Governmental Permit**" means any consent, franchise, approval, registration, variance, license, permit, grant, certificate, registration or other authorization or approval of a Governmental Authority or pursuant to any Law.

"**Hazardous Materials**" means any material, substance, chemical, contaminant, pollutant or waste for which liability or standards of conduct may be imposed, or that is listed, classified or regulated pursuant to Environmental Laws, including petroleum or petroleum products, asbestos or asbestos-containing materials, mold, lead, radioactive materials, polychlorinated biphenyls, or per- or polyfluoroalkyl substances.

7

"**Indebtedness**" means, with respect to any Person, (a) all indebtedness for borrowed money, including accrued interest, (b) capitalized lease obligations under GAAP, (c) letters of credit, bank guarantees, bankers' acceptances and other similar instruments, (d) obligations evidenced by bonds, debentures, notes and similar instruments, (e) interest rate protection agreements and currency obligation swaps, hedges or similar arrangements, (f) all obligations to pay the deferred and unpaid purchase price of property, goods, services and equipment which have been delivered, including "earn outs" and "seller notes", and (g) all breakage costs, prepayment or early termination premiums, penalties, or other fees or expenses payable as a result of the Transactions in respect of any of the items in the foregoing clauses (a) through (g), and (h) all Indebtedness of another Person referred to in clauses (a) through (g) above guaranteed directly or indirectly, jointly or severally, by such Person.

"**Intellectual Property**" means: (i) patents, patent applications and continuations, continuations-in-part, extensions, divisions, reissues, reexaminations of such Intellectual Property, and patent disclosures, industrial designs, and other intellectual property rights in inventions (whether or not patentable or reduced to practice); (ii) trademarks, service marks, trade dress, trade names, logos, internet domain names, social media handles, and other indicia of source of origin, together with the goodwill associated with any of the foregoing; (iii) intellectual property rights in works of authorship, data and databases, as well as copyrights and mask works; (iv) intellectual property rights in or to Software and other technology (including source code and object code); (v) trade secrets and other intellectual property rights in Proprietary Information; (vi) registrations, issuances, and applications for any of the foregoing; and (vii) all other intellectual property rights in any jurisdiction throughout the world.

"**Investment Company Act**" means the Investment Company Act of 1940.

"**IRS**" means the Internal Revenue Service.

"**IT Systems**" means computers, Software, hardware, servers, workstations, routers, hubs, switches, data communications lines, firmware, networks and all other information technology equipment owned, leased or licensed by the BT Companies and used in their business.

"**Key Employees**" means Brandon Mintz, Scott Buchanan and Mark Smalley.

"**Law**" means any statute, law, common law, ordinance, rule, regulation, code or Governmental Order, in each case, of any Governmental Authority.

"**Leased Real Property**" means all real property leased, licensed, subleased or otherwise used or occupied by any of the BT Companies.

"**Licensed Intellectual Property**" means Intellectual Property that any of the BT Companies license from a third party.

"**Lien**" means all liens, judgments, charges, easements, servitudes, mortgages, deeds of trust, pledges, hypothecations, encumbrances, security interests, options, licenses, leases, subleases, restrictions, title retention devices (including the interest of a seller or lessor under any conditional sale agreement or capital lease, or any financing lease having substantially the same economic effect as any of the foregoing), collateral assignments, claims or other encumbrances of

8

any kind whether consensual, statutory or otherwise, and whether filed, recorded or perfected under applicable Law (including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset and any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset, but in any event excluding restrictions under applicable securities Laws).

"**made available**" means that documents were posted in the Data Room at or prior to 5:00 p.m., New York time, on the date that is one (1) day prior to the Execution Date and were not removed from the Data Room on or prior to the Execution Date.

"**Minimum Condition PubCo Available Cash**" means, an amount equal to (i) the PubCo Available Cash, *minus* (ii) any amount of the outstanding BT Transaction Expenses (other than any amount not paid in cash in respect of clauses (C) and (D) of the definition of the BT Transaction Expenses) payable in accordance with the Closing Spreadsheet and Section 2.2(a), *minus* (iii) any amount of the BT Closing Indebtedness payable in accordance with the Closing Spreadsheet and Section 2.2(b) (*provided*, *that*, in no event shall the BitAccess Contribution Amount be greater than $6,000,000 for purposes of this definition).

"**OFAC**" means the U.S. Office of Foreign Assets Control.

"**Open Source Software**" means any Software that is distributed as "free software," "open source software," "shareware," including the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), or any other license for Software that meets the "Open Source Definition" promulgated by the Open Source Initiative.

"**Owned Intellectual Property**" means all Intellectual Property owned by the BT Companies.

"**Permitted Liens**" means (i) mechanic's, materialmen's and similar Liens arising in the ordinary course of business with respect to any amounts (A) not yet due and payable or which are being contested in good faith through (if then appropriate) appropriate proceedings and (B) for which adequate accruals or reserves have been established in accordance with GAAP, (ii) Liens for Taxes (A) not yet due and payable or which are being contested in good faith through appropriate proceedings and (B) for which adequate accruals or reserves have been established in accordance with GAAP, (iii) defects or imperfections of title, easements, encroachments, covenants, rights-of-way, conditions, matters that would be apparent from a physical inspection of such real property, restrictions and other similar charges or encumbrances that do not materially interfere with the present use of the Leased Real Property, (iv) with respect to any Leased Real Property (A) the interests and rights of the respective lessors with respect to any Leased Real Property, including any statutory landlord liens and any Lien thereon, (B) any Lien permitted under the Real Property Lease, and (C) any Liens encumbering the real property of which the Leased Real Property is a part, (v) zoning, building, entitlement and other land use and environmental regulations promulgated by any Governmental Authority that do not materially interfere with the current use of the Leased Real Property, (vi) non-exclusive licenses of Intellectual Property, (vii) ordinary course purchase money Liens and Liens securing rental payments under operating or capital lease arrangements for amounts not yet due or payable, (viii) other Liens arising in the ordinary course of business and not incurred in connection with the borrowing of money and on a basis consistent with past practice in connection with workers' compensation, unemployment insurance or other types of social security and (ix) all other Liens that would not, individually or in the aggregate, reasonably be expected to result in a BT Material Adverse Effect.

9

"**Person**" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, bank, trust company, trust or other entity, whether or not a legal entity, Governmental Authority or any department, agency or political subdivision of such Governmental Authority.

"**Personal Data**" means any information which identifies or could reasonable be used to identify, whether alone or in combination with other information, a natural Person, or other information that constitutes "personal information" or "personal data" under applicable Privacy Laws.

"**Personal Data Processor**" means any person other than an employee of any BT Company (or the applicable Data Subject) that processes or has access to any Personal Data processed by or on behalf of any BT Company.

"**Phantom Equity Award Termination Agreement**" means a Phantom Equity Holder's Phantom Equity Award termination agreement in the form mutually agreed upon between the BT Entities and PubCo prior to the Closing.

"***Phantom Equity Awards***" means the awards under the Phantom Equity Plan.

"***Phantom Equity Holder***" means each Person who has been granted a Phantom Equity Award under the Phantom Equity Plan.

"***Phantom Equity Plan***" means the Lux Vending, LLC d/b/a Bitcoin Depot 2021 Participation Plan.

"***Pre-Closing Tax Period***" means any taxable period (or portion of such period) ending on or before the Closing Date.

"***Privacy Agreements***" means all Personal Data and privacy related policies (e.g., privacy and data security policies, acceptable use policies, terms of service, etc., including all Privacy Policies) and other Contracts to which any BT Company is a party whereby such BT Company makes commitments to a third party regarding the processing of Personal Data.

"***Privacy Laws***" means all Laws concerning or otherwise applicable to data security, data privacy and cyber security, including Federal Trade Commission Act; the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003; the Children's Online Privacy Protection Act; the California Consumer Privacy Act of 2018; the Computer Fraud and Abuse Act; the Electronic Communications Privacy Act; the Family Educational Rights and Privacy Act; and all other similar international, federal, state, provincial, and local Laws, and in each case, the rules implemented under such Laws.

10

"***Privacy Policy***" means an externally facing policy of any BT Company in connection with the collection of information provided by or on behalf of individuals that is labelled as a "Privacy Policy," is reached on a web site by a link that includes the label "Privacy" or that is a written policy or disclosure that describes how Personal Data will be held, used, processed or disclosed.

"***Privacy Token***" means any Token that includes, as a feature of such Token, the concealment from public disclosure of the public keys for the source or destination wallet in respect of any transaction undertaken in connection with such Token.

"***Proprietary Information***" means all trade secrets and all other confidential or proprietary information, including confidential or proprietary know-how, inventions, methodologies, processes, techniques, research and development information, specifications, algorithms, financial, technical, marketing and business data, sales, pricing and cost information, customer information and supplier lists.

"***PubCo Available Cash***" means, in respect of PubCo, an amount equal to the (i) cash available in the Trust Account, *minus* (ii) any amounts required to satisfy the PubCo Share Redemption Amount, *plus* (iii) any proceeds from the consummation of the PIPE Subscription, *plus* (iv) any amounts drawn by PubCo in connection with the Closing under the Equity Line (for the avoidance of doubt, any amounts undrawn under the Equity Line in connection with the Closing shall not constitute PubCo Available Cash), *minus* (v) any unpaid PubCo Transaction Expenses payable in cash as of the Closing.

"***PubCo Class A Common Stock***" means Class A Common Stock of PubCo, par value $0.0001 per share, each share of which is entitled to one vote per share according to the PubCo Charter.

"***PubCo Class B Common Stock***" means Class B Common Stock of PubCo, par value $0.0001 per share, each share of which is entitled to one vote per share according to the PubCo Charter.

"***PubCo Class E Common Stock***" means Class E Common Stock of PubCo, par value $0.0001 per share, which shall be non-voting according to the PubCo Charter.

"***PubCo Class M Common Stock***" means Class M Common Stock of PubCo, par value $0.0001 per share, each share of which is entitled to 10 votes per share according to the PubCo Charter.

"***PubCo Class O Common Stock***" means Class O Common Stock of PubCo, par value $0.0001 per share, each share of which is entitled to one vote per share and is not entitled to any economic rights, including dividends or distributions of cash, property or shares of capital stock of PubCo according to the PubCo Charter.

"***PubCo Class V Common Stock***" means Class V Common Stock of PubCo, par value $0.0001 per share, each share of which is entitled to 10 votes per share and is not entitled to any economic rights, including dividends or distributions of cash, property or shares of capital stock of PubCo according to the PubCo Charter.

11

"***PubCo Common Stock***" means the PubCo Class A Common Stock, PubCo Class B Common Stock, PubCo Class E Common Stock, PubCo Class M Common Stock, PubCo Class O Common Stock, and PubCo Class V Common Stock.

"***PubCo Earn-Out Units***" means, the following units of BT OpCo: (i) a number of BT OpCo Class 1 Earn-Out Units equal to the number of shares of PubCo Class E-1 Common Stock issued to Sponsor under the Sponsor Support Agreement, if any, (ii) a number of BT OpCo Class 2 Earn-Out Units equal to the number of shares of PubCo Class E-2 Common Stock issued to Sponsor under the Sponsor Support Agreement, if any, and (iii) a number of BT OpCo Class 3 Earn-Out Units equal to the number of shares of PubCo Class E-3 Common Stock issued to Sponsor under the Sponsor Support Agreement, if any.

"***PubCo Governing Documents***" means the amended and restated memorandum and articles of association of PubCo.

"***PubCo Material Adverse Effect***" means any Event that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on (i) the business, results of operations or financial condition of PubCo, taken as a whole or (ii) the ability of PubCo to consummate the Transactions; provided, however, that in no event would any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been or will be, a "PubCo Material Adverse Effect": (a) any change in applicable Laws or GAAP or any interpretation of such Laws or GAAP following the Execution Date, (b) any change in economic, political, business or financial market conditions generally, (c) the taking of any action expressly required to be taken under this Agreement, (d) any natural disaster (including hurricanes, storms, tornados, flooding, earthquakes, volcanic eruptions or similar occurrences), pandemic (including COVID-19, or any COVID-19 Measures or any change in such COVID-19 Measures or interpretations following the Execution Date), acts of nature or change in climate, or any declaration of a national emergency by any Governmental Authority, (e) any acts of terrorism or war, the outbreak or escalation of hostilities, geopolitical conditions, local, national or international political conditions, or social conditions, (f) the consummation and effects of any PubCo Share Redemptions, (g) any Events generally applicable to the industries or markets in which PubCo operates, (h) any action taken by, or at the request of, or with the express consent of the BT Entities; provided, that in the case of each of clauses (a), (b), (d), (e) and (g), any such Event to the extent it disproportionately affects PubCo relative to other participants in the industries in which such Persons operate shall not be excluded from the determination of whether there has been, or would reasonably be expected to be, a PubCo Material Adverse Effect. Notwithstanding the foregoing, with respect to PubCo, the amount of the PubCo Share Redemptions or the failure to obtain the PubCo Stockholder Approval shall not be deemed to be a PubCo Material Adverse Effect.

"***PubCo Private Placement Warrants***" means the warrants to purchase one share of PubCo Class A Common Stock issued to PubCo's initial stockholders in a private placement that closed simultaneously with the closing of the PubCo's initial public offering.

"***PubCo Public Warrants***" means the redeemable warrants to purchase one share of PubCo Class A Common Stock, whether acquired by a holder as part of a PubCo Unit in PubCo's initial public offering or anytime thereafter on the open market.

12

"***PubCo Rights Agent***" means Continental Stock Transfer & Trust Company, a New York corporation.

"***PubCo Rights Agreement***" means the Rights Agreement, dated as of February 24, 2022, by and between PubCo and the PubCo Rights Agent, in respect of the PubCo Rights.

"***PubCo Rights***" means the rights of PubCo that entitle the holder of such rights to one share of PubCo Class A Common Stock and were issued and sold to holders as fractional rights included in PubCo Units in PubCo's initial public offering.

"***PubCo Share Redemption Amount***" means the aggregate amount payable from the Trust Account with respect to all PubCo Share Redemptions.

"***PubCo Share Redemptions***" means the election of an eligible (as determined in accordance with the PubCo Governing Documents) holder of shares of PubCo Class A Common Stock to have PubCo repurchase the shares of PubCo Class A Common Stock held by such holder at a per-share price, payable in cash, equal to a pro rata share of the aggregate amount on deposit in the Trust Account (including any interest earned on the funds held in the Trust Account and not previously

released to PubCo to pay PubCo's franchise and income taxes as well as expenses relating to the administration of the trust account) (as determined in accordance with the PubCo Governing Documents) in connection with the Transaction Proposals.

"*PubCo Stockholder Approval*" means the approval of (i) the Business Combination Proposal by the affirmative vote of the holders of a majority of the shares of PubCo Common Stock that are voted at a PubCo Stockholders' Meeting held to consider such proposal, (ii) the Charter Proposal by the affirmative vote of a majority of the outstanding shares of PubCo Common Stock entitled to vote thereon, (iii) the Nasdaq Listing Proposal by a majority of the votes cast by the PubCo Stockholders present in person or represented by proxy at such PubCo Stockholders' Meeting and entitled to vote thereon and (iv) the Other Required Proposals, if any, in accordance with applicable Law and the PubCo Governing Documents.

"*PubCo Stockholders*" means the stockholders of PubCo as of immediately prior to the Closing.

"*PubCo Transaction Expenses*" means any reasonable and documented out-of-pocket fees and expenses paid or payable by PubCo or any of its Subsidiaries or any of their respective Affiliates (whether or not billed or accrued for) as a result of or in connection with the negotiation, documentation and consummation of the Transactions, including (A) all fees, costs, expenses, brokerage fees, commissions, finders' fees and disbursements of financial advisors, investment banks, data room administrators, attorneys, accountants and other advisors and service providers, and (B) any and all filing fees payable by PubCo or any of its Subsidiaries to the Governmental Authorities in connection with the Transactions.

"*PubCo Units*" means the units comprised of one share of PubCo Class A Common Stock, one-sixteenth of one PubCo Right and one PubCo Public Warrant issued and sold to holders in PubCo's initial public offering.

13

---

"*PubCo Warrant Agent*" means Continental Stock Transfer & Trust Company, a New York corporation.

"*PubCo Warrant Agreement*" means the Warrant Agreement, dated as of February 24, 2022, by and between PubCo and the PubCo Warrant Agent, in respect of the PubCo Public Warrants and PubCo Private Placement Warrants.

"*PubCo Warrants*" means, PubCo Public Warrants and PubCo Private Placement Warrants.

"*Purchased Common Units*" means a number of OpCo Common Units equal to (i) the number of shares of PubCo Common Stock, other than PubCo Class E Common Stock, outstanding at the Closing and not held by BT Assets, *multiplied by* (ii) the amount of the Over the Top Consideration, *divided by* (iii) the amount of PubCo Available Cash.

"*Registration Rights Agreement*" means that certain Registration Rights Agreement substantially in the form attached as <u>Exhibit D</u>.

"*Related Party*" means any of the current or former directors, officers, employees, managers, members, or equityholders (both indirect and direct) (or any child or spouse of any such Person) of any BT Company.

"*Related Party Transaction*" means all agreements or contracts between any BT Company and/or any of its Subsidiaries, on the one hand, and any Related Party, on the other hand, or any payment between or among such parties other than (i) loans and other extensions of credit to officers and employees of the BT Companies for travel, business or relocation expenses or other employment-related purposes made in the ordinary course of business (ii) the BT Benefit Plans and (iii) commercial transactions entered into in the ordinary course of business on arms' length terms for the use of services provided by the BT Companies.

"*Sanctions*" means any sanction administered or enforced by the United States government (including OFAC), the Government of Canada, the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"*Sarbanes-Oxley Act*" means the Sarbanes-Oxley Act of 2002.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933.

"*Share Transaction Consideration*" means, 44,100,000 shares of PubCo Class V Common Stock.

"*Software*" means computer programs and software, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, emulation and simulation reports, test vectors and software development tools and databases.

14

---

"*Subsidiary*" means, with respect to a Person, a corporation, general or limited partnership, limited liability company, joint venture, partnership or other entity of which a majority of the economic interests or the voting interests is owned, directly or indirectly, by such Person.

"*Tax Act*" means the *Income Tax Act* (Canada).

"*Tax Receivable Agreement*" means that certain Tax Receivable Agreement substantially in the form attached as <u>Exhibit F</u>.

"*Tax Return*" means any return, form, election, declaration, report, statement, information statement or other document filed or required to be filed with any Governmental Authority with respect to Taxes, including any claims for refunds of Taxes, any information returns and any amendments or supplements of any of the foregoing.

"*Taxes*" means all federal, state, provincial, local, foreign or other taxes imposed by any Governmental Authority (or other imposts, assessments, fees, levies, customs, import duties or charges, in each case, in the nature of a tax), including all income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, alternative or add-on minimum, or estimated taxes, and including any interest, penalty, or addition to such Taxes.

"*Token*" means any digital token, coin, cryptocurrency or any other similar digital asset, whether or not classified as "securities" under U.S. securities laws.

"*Trading Days*" means, with respect to the PubCo Common Stock, days on which trades in respect of the PubCo Common Stock may be made on Nasdaq or any similar system of automated dissemination of quotations of securities prices.

"*Transactions*" means, collectively, the Unit Purchase, the PIPE Subscription, the Equity Line, the PubCo Share Redemption, the Pre-Closing Restructuring, and each of the other transactions contemplated by this Agreement (including, for the avoidance of doubt, the Pre-Closing Restructuring) and the Ancillary Agreements.

(b) Other capitalized terms used in this Agreement and not defined in Section 1.1(a) shall have the meanings assigned to such terms in the following Sections:

| Defined Term | Section |
|---|---|
| "*Agreement End Date*" | Section 9.1(f) |
| "*Agreement*" | Preamble |
| "*Ancillary Agreements*" | Section 11.10 |
| "*Audited Financial Statements*" | Section 3.7(a) |
| "*Authentication Credentials*" | Section 3.17(f) |
| "*BitAccess Contribution Amount*" | Section 6.8 |
| "*BitAccess Payment Amount*" | Section 6.8 |

15

| | |
|---|---|
| "*BitAccess*" | Section 6.8 |
| "*BT Assets Unit Purchase*" | Section 2.1(a) |
| "*BT Assets*" | Preamble |
| "*BT Benefit Plan*" | Section 3.12(a) |
| "*BT Closing Indebtedness*" | Section 2.2(b) |
| "*BT Company Software*" | Section 3.17(d) |
| "*BT Cure Period*" | Section 9.1(f) |
| "*BT Designated Directors*" | Section 7.9(a) |
| "*BT Disclosure Letter*" | Article III |
| "*BT Entities*" | Preamble |
| "*BT Indemnified Parties*" | Section 6.7(a) |
| "*BT Non-Recourse Party*" | Section 11.16(b) |
| "*BT OpCo A&R LLC Agreement*" | Section 6.10 |
| "*BT OpCo Contribution*" | Section 2.1(b) |
| "*BT OpCo*" | Preamble |
| "*BT Pre-Closing Restructuring*" | Recitals |
| "*BT Registered Intellectual Property*" | Section 3.17(a) |
| "*BT Surviving Entity*" | Recitals |
| "*Business Combination Proposal*" | Section 8.2(b) |
| "*Cash Distribution Waterfall*" | Section 2.2 |
| "*Cash Payout Percentage*" | Section 2.6(a) |
| "*CBA*" | Section 3.11(a)(i) |
| "*Charter Proposal*" | Section 8.2(b) |
| "*Closing Date*" | Section 2.3 |
| "*Closing Spreadsheet*" | Section 6.3(a) |
| "*Closing*" | Section 2.3 |
| "*Confidentiality Agreement*" | Section 11.10 |
| "*Contribution Amount*" | Section 2.2 |
| "*D&O Indemnified Parties*" | Section 6.7(a) |
| "*Digital Gold*" | Section 6.8 |
| "*Earn-Out Period*" | Section 2.4(a)(iii) |
| "*Employment Agreement*" | Recitals |
| "*Equity Line*" | Section 7.2 |
| "*Equity Payout Percentage*" | Section 2.6(a) |
| "*ERISA*" | Section 3.12(a) |
| "*Execution Date*" | Preamble |
| "*Financial Statements*" | Section 3.7(a) |
| "*First Earn-Out Period*" | Section 2.4(a)(i) |
| "*First Milestone*" | Section 2.4(a)(i) |
| "*Flow-Thru Tax Return*" | Section 8.3(a)(i) |
| "*Foreign BT Benefit Plan*" | Section 3.12(c) |
| "*Founder Guarantees*" | Section 8.7 |
| "*Governmental Authorization*" | Section 3.5 |
| "*Governmental Plan*" | Section 3.12(a) |
| "*GSR Designated Directors*" | Section 7.9(a) |
| "*GSR Entities*" | Preamble |

16

| | |
|---|---|
| "*Incentive Equity Plan Share Reserve*" | Section 8.5 |
| "*Incentive Equity Plan*" | Section 8.5 |
| "*Incentive Plan Proposal*" | Section 8.2(b) |
| "*Interim Period*" | Section 6.1 |
| "*Intervening Event Change in Recommendation*" | Section 8.2(c) |
| "*Intervening Event Notice Period*" | Section 8.2(c) |
| "*Intervening Event*" | Section 8.2(c) |
| "*JOBS Act*" | Section 5.6(a) |
| "*Legal Proceedings*" | Section 3.9 |
| "*Modification in Recommendation*" | Section 8.2(b) |
| "*Multiemployer Plan*" | Section 3.12(d) |
| "*Nasdaq Listing Proposal*" | Section 8.2(b) |

| | |
|---|---|
| "*Nasdaq*" | Section 1.2(e) |
| "*New Business*" | Section 6.1(t) |
| "*Other Required Proposals*" | Section 8.2(b) |
| "*Over the Top Consideration*" | Section 2.2 |
| "*Payment Network Rules*" | Section 3.10(a) |
| "*Phantom Equity Cash Consideration*" | Section 2.6(a) |
| "*Phantom Equity Consideration Cap*" | Section 2.6(a) |
| "*Phantom Equity Non-Cash Consideration*" | Section 2.6(a) |
| "*PIPE Subscription*" | Section 7.7 |
| "*Pre-Closing Restructuring Plan*" | Recitals |
| "*Prospectus*" | Section 11.1 |
| "*Proxy Statement*" | Section 8.2(a)(i) |
| "*PubCo Bylaws*" | Recitals |
| "*PubCo Charter*" | Recitals |
| "*PubCo Cure Period*" | Section 9.1(g) |
| "*PubCo Disclosure Letter*" | Article V |
| "*PubCo EL Minimum Cash*" | Section 7.1(a) |
| "*PubCo Financial Statements*" | Section 5.6(e) |
| "*PubCo Indemnified Parties*" | Section 6.7(a) |
| "*PubCo Minimum Cash*" | Section 7.1(a) |
| "*PubCo No EL Minimum Cash*" | Section 7.1(a) |
| "*PubCo Non-Recourse Party*" | Section 11.16(b) |
| "*PubCo Pre-Closing Restructuring*" | Recitals |
| "*PubCo SEC Filings*" | Section 5.10 |
| "*PubCo Securities*" | Section 5.5(a) |
| "*PubCo Stockholders' Meeting*" | Section 8.2(b) |
| "*PubCo*" | Preamble |
| "*Real Property Leases*" | Section 3.15(a) |
| "*Regulatory Approvals*" | Section 9.1(b) |
| "*Representatives*" | Section 6.6 |
| "*Second Earn-Out Period*" | Section 2.4(a)(iii) |
| "*Second Milestone*" | Section 2.4(a)(ii) |
| "*Security Incident*" | Section 3.18(d) |
| "*Solicitation Documents*" | Section 8.2(a)(i) |

| | |
|---|---|
| "*Sponsor Support Agreement*" | Recitals |
| "*Sponsor*" | Preamble |
| "*Tax Contest*" | Section 8.3(c) |
| "*Terminating Company Breach*" | Section 10.1(f) |
| "*Terminating PubCo Breach*" | Section 10.1(g) |
| "*Third Milestone*" | Section 2.4(a)(iii) |
| "*Title IV Plan*" | Section 3.12(d) |
| "*Transaction Proposals*" | Section 8.2(b) |
| "*Transaction Units*" | Section 2.1(b) |
| "*Transfer Taxes*" | Section 8.3(f) |
| "*Trust Account*" | Section 11.1 |
| "*Trust Agreement*" | Section 5.11 |
| "*Trustee*" | Section 5.11 |
| "*Unaudited Financial Statements*" | Section 3.7(a) |
| "*Unit Purchase*" | Section 2.1(b) |
| "*WARN Act*" | Section 3.13(b) |

Section 1.2 <u>Construction</u>.

(a) Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement, (iv) the terms "Article" or "Section" refer to the specified Article or Section of this Agreement; (v) the word "including" means "including, without limitation" and (vi) the word "or" shall be disjunctive but not exclusive.

(b) Unless the context of this Agreement otherwise requires, references to statutes or other Laws shall include all regulations and references promulgated under such statutes or other Laws and references to statutes, regulations or other Laws shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation, and references to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms of such agreement, document or instrument, and if applicable of this Agreement.

(c) Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

proper provision shall be made so that the successors and assigns of any of the BT Companies, as the case may be, shall succeed to the obligations set forth in this <u>Section 6.7</u>.

(d) The provisions of this <u>Section 6.7(a)-(d)</u>: (i) are intended to be for the benefit of, and shall be enforceable by, each Person who is now, or who has been at any time prior to the Execution Date or who becomes prior to the Closing, a D&O Indemnified Party, his or her heirs and his or her personal representatives, (ii) shall be binding on the BT Companies and their successors and assigns, (iii) are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have, whether pursuant to Law, Contract, Governing Documents, or otherwise and (iv) shall survive the consummation of the Closing and shall not be terminated or modified in such a manner as to adversely affect any D&O Indemnified Party without the consent of such D&O Indemnified Party.

(e) On the Closing Date, BT OpCo shall enter into customary indemnification agreements reasonably satisfactory to BT Assets and PubCo with the post-Closing directors and officers of BT OpCo, which indemnification agreements shall continue to be effective following the Closing.

67

Section 6.8 <u>BitAccess Buyout</u>. Promptly after the Closing (and no later than 30 Business Days following the Closing), (a) BT OpCo shall contribute a portion of the Contribution Amount (such amount, the "***BitAccess Contribution Amount***") to Intuitive Software, LLC, a Delaware limited liability company, which shall then contribute such amount to Digital Gold Ventures Inc., an Ontario corporation ("***Digital Gold***"), and (b) BitAccess, Inc., an Ontario corporation ("***BitAccess***") shall, and BT OpCo shall cause Digital Gold to, use such BitAccess Contribution Amount to (and use solely for the purposes set forth in this Agreement), purchase or cause cancellation of all of the outstanding capital stock of or other equity interests in BitAccess, including BitAccess Options, not held by Digital Gold as of the date of such purchase, in accordance with the terms of the amended and restated shareholders agreement of BitAccess, dated as of July 20, 2021, and on such terms that are negotiated with the holders of such shares of BitAccess, such that immediately after the consummation of such purchase transactions, BitAccess shall be a wholly owned subsidiary of Digital Gold (the amount required to effect such purchase, the "***BitAccess Payment Amount***"); *provided*, *that*, at BT Assets' discretion, a portion of the BitAccess Payment Amount may consist of shares of capital stock of PubCo (which such stock PubCo shall contribute (or shall be deemed to have contributed in accordance with Treasury Regulations Section 1.1032-3) to BT OpCo and BT OpCo shall then contribute in the same manner as the BitAccess Contribution Amount), in which case the BitAccess Contribution Amount will be decreased accordingly and BT OpCo shall issue to PubCo a number of Common Units equal to the number of shares of PubCo capital stock included in the BitAccess Payment Amount. At BT Assets' discretion, the aggregate value of the shares of capital stock of PubCo used for such purposes may be up to 75% greater than the amount equal to (a) the fair market value of such other capital stock of BitAccess being purchased, *minus* (b) the BitAccess Contribution Amount.

Section 6.9 <u>Preparation and Delivery of Quarterly Financial Statements</u>.

(a) As soon as reasonably practicable following September 30, 2022, BT Assets shall deliver to PubCo the unaudited consolidated balance sheets and statements of operations and comprehensive loss, cash flow and change in members' equity of BT Companies as of the three-months ended September 30, 2022, presented in a similar format and fashion as the Unaudited Financial Statements (subject to normal and recurring year-end adjustments and the absence of footnotes) (the "***2022 Q3 Financial Statements***"); <u>provided</u> that upon delivery of such Interim Financial Statements, the representations and warranties set forth in <u>Section 3.7</u> shall be deemed to apply to the Interim Financial Statements with the same force and effect as if made as of the Execution Date.

(b) If the Closing has not occurred prior to December 31, 2022, as soon as reasonably practicable following December 31, 2022, BT Assets shall deliver to PubCo the audited consolidated balance sheets and statements of operations and comprehensive loss, cash flow and change in members' equity of BT Companies as of December 31, 2022 (subject to normal and recurring year-end adjustments and the absence of footnotes) (the "***2022 Annual Financial Statements***"); <u>provided</u> that upon delivery of such 2022 Annual Financial Statements, the representations and warranties set forth in <u>Section 3.7</u> shall be deemed to apply to the 2022 Annual Financial Statements with the same force and effect as if made as of the Execution Date.

68

(c) If the Closing has not occurred prior to March 31, 2023, as soon as reasonably practicable following March 31, 2023, BT Assets shall deliver to PubCo the unaudited consolidated balance sheets and statements of operations and comprehensive loss, cash flow and change in members' equity of BT Companies as of and for the three-month period ended March 31, 2023 (subject to normal and recurring year-end adjustments and the absence of footnotes) (the "***2023 Q1 Financial Statements***"); provided that upon delivery of such 2023 Q1 Financial Statements, the representation and warranties set forth in <u>Section 3.7</u> shall be deemed to apply to the 2023 Q1 Financial Statements with the same force and effect as if made as of the Execution Date.

Section 6.10 <u>BT OpCo Organizational Documents</u>. Immediately prior to the Closing, the BT Surviving Entity shall amend and restate its limited liability company agreement so as to read in its entirety in the form set forth in <u>Exhibit G</u> (the "***BT OpCo A&R LLC Agreement***"). Effective as of the Closing, BT Assets will hold 44,100,000 of BT OpCo Common Units.

Section 6.11 <u>BT Information Supplied</u>. None of the information supplied or to be supplied by any BT Entity specifically for inclusion in the Proxy Statement will, at the date on which the Proxy Statement is first mailed to the PubCo Stockholders or at the time of the PubCo Stockholders' Meeting, include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading (subject to the qualifications and limitations set forth in the materials provided by any BT Entity or that are included in the Proxy Statement). Notwithstanding the foregoing, the BT Entities make no representation, warranty or covenant with respect to (a) statements made or incorporated by reference therein based on information supplied by PubCo for inclusion or incorporation by reference in the Proxy Statement or (b) any projections or forecasts included in the Proxy Statement.

**ARTICLE VII**

**COVENANTS OF PUBCO**

Section 7.1 <u>Trust Account Proceeds and Related Available Equity</u>.

(a) Prior to the Closing, the Sponsor and its Affiliates shall be entitled to arrange for the purchase by third Persons of additional shares of PubCo Common Stock at a price per share of $10.00, such that (i) if an Equity Line is not obtained at or prior to Closing, the Minimum Condition PubCo Available Cash at the Closing is equal to at least $45,000,000 (the "***PubCo No EL Minimum Cash***"), and (ii) if an Equity Line is obtained at or prior to Closing, the Minimum Condition PubCo Available Cash at the Closing is equal to at least $30,000,000 (the "***PubCo EL Minimum Cash***", and together with the PubCo No EL Minimum Cash, the "***PubCo Minimum Cash***"). The BT Entities shall reasonably cooperate with and shall take all actions reasonably required to effect the foregoing. For the purposes of this <u>Section 7.1(a)</u>, (x) in the event the BT Closing Indebtedness is in excess of $0.00 as of immediately prior to the Closing, the PubCo Minimum Cash shall equal: (i) the applicable PubCo Minimum Cash *less* (ii) the amount of the BT Closing Indebtedness (up to $15,000,000 in the aggregate) that is paid off at the Closing using the Contribution Amount in accordance with <u>Section 2.2(b)</u> and (y) in the event that, immediately following the Closing, the consolidated Indebtedness of PubCo, BT OpCo and their respective Subsidiaries is in excess of $85,000,000 the PubCo Minimum Cash shall equal: (i) the applicable PubCo Minimum Cash *less* (ii) the amount of such Indebtedness in excess of $85,000,000.

69

(b) Upon satisfaction or waiver of the conditions set forth in Article IX and provision of notice of such satisfaction or waiver to the Trustee (which notice PubCo shall provide to the Trustee in accordance with the terms of the Trust Agreement), (i) in accordance with and pursuant to the Trust Agreement, at the Closing, PubCo (a) shall cause any documents, opinions and notices required to be delivered to the Trustee pursuant to the Trust Agreement to be so delivered and (b) shall use its reasonable best efforts to cause the Trustee to, and the Trustee shall thereupon be obligated to (1) pay as and when due all amounts payable to PubCo Stockholders pursuant to the PubCo Share Redemptions, and (2) immediately thereafter, pay all remaining amounts then available in the Trust Account to PubCo for immediate use, subject to this Agreement and the Trust Agreement and (ii) thereafter, the Trust Account shall terminate, except as otherwise provided in the Trust Agreement.

Section 7.2 <u>Equity Line</u>. From the Execution Date until the earlier of the Closing or the termination of this Agreement in accordance with Section <u>10.1</u>, PubCo agrees to use its commercially reasonable efforts to obtain and make available a committed equity financing facility for the benefit of PubCo and BT OpCo following the Closing (such financing, the "***Equity Line***") on terms and conditions acceptable to BT Assets (BT Assets consent to any such terms and conditions to not be unreasonably withheld, conditioned and delayed).

Section 7.3 <u>Nasdaq Listing</u>. From the Execution Date through the Closing, PubCo shall ensure that PubCo remains listed as a public company on the Nasdaq. Prior to the Closing, PubCo shall prepare, in consultation with BT Assets, and submit to the Nasdaq and obtain approval of a listing application covering (i) shares of PubCo Class A Common Stock issued or issuable in connection with the Transactions, (ii) shares of PubCo Class A Common Stock issuable upon redemption of BT OpCo Common Units and exchanges of shares of Class O Common Stock and Class V Common Stock in connection therewith (and for the avoidance of doubt, including shares of Class A Common Stock issuable upon conversions of Class M Common Stock) and (iii) shares of PubCo Class A Common Stock issuable upon exercise of BT OpCo Matching Warrants and the redemption of BT OpCo Common Units received in connection therewith. The parties shall reasonably cooperate

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Amended and Restated Limited Liability Company Agreement as of the date first written above.

| [BITCOIN DEPOT OPERATING LLC] |
|---|
| By: _____ |
| Name: |
| Title: |

*Signature Page to [Bitcoin Depot Operating LLC] Amended and Restated Limited Liability Company Agreement*

| [BITCOIN DEPOT INC.], as a Member |
|---|
| By: _____ |
| Name: |
| Title: |

*Signature Page to [Bitcoin Depot Operating LLC] Amended and Restated Limited Liability Company Agreement*

| BT ASSETS, INC., as a Member |
|---|
| By: _____ |
| Name: |
| Title: |

*Signature Page to [Bitcoin Depot Operating LLC] Amended and Restated Limited Liability Company Agreement*

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

**Joinder**

The undersigned agrees to become a party to the Amended and Restated Limited Liability Company Agreement of [Bitcoin Depot Operating LLC], a Delaware limited liability company, dated as of [•], 2022 (the "**Agreement**"), and agrees to be bound by the terms and conditions of the Agreement as a Member.

| MEMBER: |
|---|
| [ • ] |
| By: _____ |
| Its: |
| Address for Notices: |
| [ • ] |
| [ • ] |
| [ • ] |
| [ • ] |

**Exhibit 99.1**



**BITCOIN DEPOT, A LEADING BITCOIN ATM OPERATOR, TO BECOME A**

**PUBLICLY-TRADED COMPANY VIA BUSINESS COMBINATION WITH GSR**

**II METEORA ACQUISITION CORP.**

*- Bitcoin Depot's Mission is to Bring Cryptocurrency to the Masses by Providing a Simple and Convenient Process to Convert Cash Into Cryptocurrency Through its Bitcoin ATMs and Mobile App -*

*- Leading Bitcoin ATM Network in North America with Over 7,000 Kiosk Locations Across the US and Canada -*

*- Attractive Combination of Historical Growth and Profitability with Resiliency in Transaction Volumes Despite Cryptocurrency Price Volatility -*

*- $1.2 Billion of Transaction Volume Since 2016; LTM Net Income of $6 Million (unaudited); LTM Adjusted EBITDA (non-GAAP) of $38 Million (unaudited)[1] -*

*- Estimated Post-Transaction Equity Value of $885 Million with Approximately $170 Million in Cash to Fund Growth -*

**ATLANTA and NEW YORK—August 25, 2022** -- Lux Vending LLC dba Bitcoin Depot® ("Bitcoin Depot" or the "Company"), a U.S.-based Bitcoin ATM ("BTM") operator and leading fintech company, and GSR II Meteora Acquisition Corp. (NASDAQ: GSRM) ("GSRM"), a special purpose acquisition company, today announced a definitive agreement for a business combination that would result in Bitcoin Depot becoming a publicly listed company. Upon closing of the transaction, the combined company will be named Bitcoin Depot Inc. and trade on the NASDAQ under the new ticker symbol "BTM."

Since its inception in 2016, Bitcoin Depot's mission has been to Bring Crypto to the Masses®. Bitcoin Depot's products and services provide an intuitive, quick, and convenient process to convert cash into cryptocurrency, giving users the ability on their own to access the broader, digital financial system, including payments, transfers, remittances, online purchases, and investments.

Bitcoin Depot enables users to convert their cash into Bitcoin, Ethereum and Litecoin at more than 7,000 kiosk locations in 47 U.S. states and nine Canadian provinces. Through its BDCheckout offering, users can fund their Bitcoin Depot account with cash at an additional 8,000+ locations at major retailers. Bitcoin Depot's mobile app allows users to locate nearby kiosks and manage their crypto wallet.

Bitcoin Depot currently offers the following products and services:

- ***Bitcoin Depot BTM:*** Bitcoin Depot's BTMs provide a streamlined, intuitive platform to convert cash to Bitcoin, Ethereum or Litecoin, giving users the ability on their own to access the broader, digital financial system. Bitcoin Depot's streamlined process at each BTM typically takes under two minutes for new accounts and existing users can typically purchase cryptocurrency in under a minute.

| 1 | LTM: Last 12 months as of June 30, 2022 |
|---|---|



- ***BDCheckout*** ™: Customers can fund their Bitcoin Depot accounts with cash directly at thousands of checkout counters at major participating retailers across the US through an existing relationship with a leading global payments technology company. Once an account is funded, the user can receive Bitcoin through the Bitcoin Depot mobile app.

**Bitcoin Depot Investment Highlights**

- **Network of More Than 7,000 Kiosks for Converting Cash to Cryptocurrency, with Convenient, High-Performing Locations.** The physical presence of kiosks in major participating retailers across North America drives new customer acquisition through an intuitive process. Bitcoin Depot's BTMs are located in zip codes containing over 40 percent of the US population today, while a pending license application in New York State represents a large market expansion opportunity.

- **Growth Opportunities Through Strong Relationships, Consolidation of Highly-Fragmented Market and International Expansion.** We believe robust retail relationships, such as with Circle K, consolidation of a highly-fragmented market, and international expansion pave the path for future growth. Large retailers have become increasingly interested in deploying BTMs because they help attract new customers and increase foot traffic from existing customers. Through a partnership with a payment solutions provider, Bitcoin Depot services are currently available at leading convenience store chains, a leading specialty retailer, and other leading retailer outlets. Bitcoin Depot can expand with current relationships as well as enter into new relationships and markets.

- **Attractive Combination of Historical Growth and Profitability with Demonstrated Track Record of Success.** Since 2016, Bitcoin Depot has demonstrated strong revenue growth and profitability while expanding its BTM footprint across North America. The growth in its footprint across North America has corresponded with the proliferation of cryptocurrency use and Bitcoin's position as a dependable network that offers convenient and fast digital asset transactions. In the last 12 months as of June 30, 2022 (unaudited), Bitcoin Depot has delivered $623 million of revenue, $6 million of net income, and $38 million of Adjusted EBITDA (non-GAAP).

- **Transaction Volumes are not Historically Correlated to Cryptocurrency Prices.** Bitcoin Depot's transaction volumes are not historically correlated to changes in cryptocurrency prices. Transaction volume across kiosk cohorts[2] since 2017 has accelerated despite volatility in cryptocurrency prices, which we believe indicates strong use cases for the digital asset payments economy.

- **Best-In-Class Compliance Standards and Infrastructure.** Bitcoin Depot's compliance team has over 50 years of combined experience in AML (Anti-Money Laundering), KYC (Know-Your-Customer), BSA (Bank Secrecy Act), and OFAC (Office of Foreign Assets Control) compliance. The team has established robust, multi-layer compliance procedures and takes a proactive approach to industry requirements, monitoring and reporting, and working closely with law enforcement as required.

| 2 | "Cohorts" refers to the group of kiosks deployed in any given year. |
|---|---|



- **Entrepreneurial and Visionary Management Team:** Bitcoin Depot is led by an accomplished and experienced senior management team with significant experience and a strong track record of driving growth and profitability.

"Today marks an important milestone for Bitcoin Depot," said Brandon Mintz, CEO and Founder of Bitcoin Depot. "We are always looking to expand our reach so as many people as possible can access cryptocurrency to control their own money and conduct easier and simpler financial transactions. Since inception, we've expanded our BTM footprint across North America, signed strategic relationships with major retailers, and enhanced our services to provide convenient access to cryptocurrency as we aim to become a digital asset economy on-ramp destination for users to efficiently turn cash into crypto. We're excited about numerous growth opportunities and believe a public listing enhances our ability to scale and evolve to achieve our goal of providing a convenient and secure way to purchase cryptocurrency."

Gus Garcia, Co-CEO and Director of GSRM, commented, "We are incredibly excited to partner with Bitcoin Depot to help drive its progress and support its mission to connect those who prefer to use cash to the broader, digital financial system. With its significant BTM footprint, key strategic relationships, and feature-rich mobile app, we believe Bitcoin Depot is well positioned to take advantage of the highly fragmented BTM market both domestically and overseas."

Lewis Silberman, Co-CEO and Director of GSRM, commented, "We're thrilled to announce our business combination with Bitcoin Depot. With an attractive growth profile, history of profitability, and exposure to cryptocurrency and digital asset adoption trends, we believe Bitcoin Depot will make for a compelling public-company story."

**Transaction Terms & Financing**

Assuming no redemptions, the combined company will have an estimated post-transaction enterprise value of $755 million with an estimated equity value of $885 million from the contribution of up to $170 million in cash proceeds from the transaction, net of cash distribution to selling equity holders and expenses.

The net proceeds raised from the transaction will consist of up to $321 million of cash held in GSRM's trust account and will be used to support Bitcoin Depot's working capital, complete acquisitions and scale its platform and suite of products.

The business combination has been unanimously approved by the leadership team of Bitcoin Depot and the Board of Directors of GSRM and is expected to close by the first quarter of 2023, subject to regulatory and stockholder approvals, and other customary closing conditions.

For a summary of the material terms of the proposed transaction, as well as a supplemental investor presentation, please see GSRM's Current Report on Form 8-K to be filed with the U.S. Securities and Exchange Commission ("SEC"). Additional information about the proposed transaction will be described in GSRM's proxy statement relating to the proposed business combination, which it will file with the SEC.



**Advisors**

Oppenheimer & Co. Inc. is serving as financial advisor and Latham & Watkins LLP is serving as legal advisor to GSRM. Kirkland & Ellis LLP is serving as legal advisor to Bitcoin Depot.

**About Bitcoin Depot**

Bitcoin Depot was founded in 2016 with the mission to connect those who prefer to use cash to the broader, digital financial system. Bitcoin Depot provides its users with simple, efficient and intuitive means of converting cash into cryptocurrency, which users can deploy in the payments, spending and investing space. Users can convert cash to cryptocurrencies at Bitcoin Depot's kiosks and at thousands of name-brand retail cash registers through BDCheckout. The company has

a significant market share in North America with over 7,000 kiosk locations. Learn more at www.bitcoindepot.com.

**About GSR II Meteora Acquisition Corporation**

GSR II Meteora Acquisition Corporation (NASDAQ: GSRM) is blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. Our management team is led by co-CEOs Gus Garcia and Lewis Silberman, President Anantha Ramamurti and CFO Joseph Tonnos. The company was formed in partnership with Meteora Capital, an investment adviser specializing in SPAC-related investments. For additional information, please visit www.gsrmet.com.

**Not an Offer**

This communication does not constitute an offer to sell or the solicitation of an offer to buy any securities or a solicitation of any vote or approval.

**Forward-Looking Statements**

The information in this press release includes "forward-looking statements" within the meaning of the "safe harbor" provisions of the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of words such as "estimate," "plan," "project," "forecast," "intend," "will," "expect," "anticipate," "believe," "seek," "target" or other similar expressions that predict or indicate future events or trends or that are not statements of historical matters, although not all forward-looking statements contain such identifying words. These forward-looking statements include, but are not limited to, statements regarding estimates and forecasts of financial and performance metrics and expectations and timing related to potential benefits, terms and timing of the proposed business combination. These statements are based on various assumptions, whether or not identified in this press release, and on the current expectations of Bitcoin Depot's and GSRM's management and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of Bitcoin Depot and GSRM. These forward-looking statements are subject to a number of risks and uncertainties, including changes in domestic and foreign business, market, financial, political and legal conditions; the inability of the parties to successfully or timely consummate the proposed business combination, including the risk that any required regulatory approvals are not obtained, are delayed or are subject to unanticipated



conditions that could adversely affect the combined company or the expected benefits of the proposed business combination or that the approval of the shareholders of GSRM or Bitcoin Depot is not obtained; failure to realize the anticipated benefits of the proposed business combination; risks relating to the uncertainty of the projected financial information with respect to Bitcoin Depot; future global, regional or local economic and market conditions; the development, effects and enforcement of laws and regulations; Bitcoin Depot's ability to manage future growth; Bitcoin Depot's ability to develop new products and solutions, bring them to market in a timely manner, and make enhancements to its platform; the effects of competition on Bitcoin Depot's future business; the amount of redemption requests made by GSRM's public shareholders; the ability of GSRM or the combined company to issue equity or equity-linked securities in connection with the proposed business combination or in the future; the outcome of any potential litigation, government and regulatory proceedings, investigations and inquiries; and those factors described or referenced in GSRM's final initial public offering prospectus dated February 24, 2022 and its most recent Quarterly Report on Form 10-Q for the quarter ended June 30, 2022, in each case, under the heading "Risk Factors," and other documents of GSRM filed, or to be filed, from time to time with the SEC. If any of these risks materialize or our assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. There may be additional risks that neither Bitcoin Depot nor GSRM presently know or that Bitcoin Depot and GSRM currently believe are immaterial that could also cause actual results to differ from those contained in the forward-looking statements. In addition, forward-looking statements reflect Bitcoin Depot's and GSRM's expectations, plans or forecasts of future events and views as of the date of this press release. Bitcoin Depot and GSRM anticipate that subsequent events and developments will cause Bitcoin Depot's and GSRM's assessments to change. However, while Bitcoin Depot and GSRM may elect to update these forward-looking statements at some point in the future, Bitcoin Depot and GSRM specifically disclaim any obligation to do so except as otherwise required by applicable law. These forward-looking statements should not be relied upon as representing Bitcoin Depot's and GSRM's assessments as of any date subsequent to the date of this press release. Accordingly, undue reliance should not be placed upon the forward-looking statements.

**Non-GAAP Financial Measures**

This press release includes Adjusted EBITDA, a non-GAAP measure, which is not prepared in accordance with accounting principles generally accepted in the United States ("GAAP") and which may be different from non-GAAP measures used by other companies. Adjusted EBITDA should not be considered in isolation from, or as an alternative to, financial measures prepared in accordance with GAAP. The following table sets forth a reconciliation of Adjusted EBITDA to net income for the periods presented:

| ($ millions) | | Last Twelve Months as of June 30, 2022 | |
| --- | --- | --- | --- |
| Net Income | $ | 6 | |
| Interest Expenses | | 11 | |
| Tax Expenses | | (0 | ) |
| Depreciation & Amortization | | 18 | |
| Non-Recurring Expenses | | 2 | |
| Stock Based Compensation | | 1 | |
| | | | |
| Adjusted EBITDA | $ | 38 | |

Note: Figures in the table above are unaudited

**Additional Information About the Proposed Business Combination and Where to Find It**

The proposed business combination will be submitted to shareholders of GSRM for their consideration. GSRM intends to file a preliminary proxy statement of GSRM with the SEC, copies of which will be mailed (if and when available) to all GSRM shareholders once definitive. GSRM also plans to file other documents with the SEC regarding the proposed business combination. GSRM will mail copies of the definitive proxy statement and other relevant documents to its shareholders as of the record date established for voting on the proposed business combination. GSRM's shareholders and other interested persons are advised to read, once available, the preliminary proxy statement and any amendments thereto and, once available, the definitive proxy statement, as well as all other relevant materials filled or that will be filled with the SEC, in connection with GSRM's solicitation of proxies for its special meeting of shareholders to be held to approve, among other things, the proposed business combination, because these documents will contain important information about GSRM, Bitcoin Depot and the proposed business combination. Shareholders may also obtain a copy of the preliminary or definitive proxy statement, once available, as well as other documents filed with the SEC regarding the proposed business combination and other documents filed with the SEC by GSRM, without charge, at the SEC's website located at www.sec.gov or by directing a request to Cody Slach or Alex Kovtun, (949) 574-3860, GSRM@gatewayir.com.

**Participants in the Solicitation**

GSRM, Bitcoin Depot and certain of their respective directors, executive officers and other members of management and employees may, under SEC rules, be deemed to be participants in the solicitations of proxies from GSRM's shareholders in connection with the proposed business combination. Information regarding the persons who may, under SEC rules, be deemed participants in the solicitation GSRM's shareholders in connection with the proposed business combination will be set forth in GSRM's proxy statement when it is filed with the SEC. You can find more information about GSRM's directors and executive officers in GSRM's final initial public offering prospectus dated February 24, 2022 and filed with the SEC on February 28, 2022. Additional information regarding the participants in the proxy solicitation and a description of their direct and indirect interests will be included in the proxy statement and other relevant materials to be filed with the

SEC when they become available. Shareholders, potential investors and other interested persons should read the proxy statement carefully when it becomes available before making any voting or investment decisions. You may obtain free copies of these documents from the sources indicated above.



**Contacts:**

**Investors**

Cody Slach, Alex Kovtun

Gateway Group

949-574-3860

GSRM@gatewayir.com

**Media**

Zach Kadletz, Brenlyn Motlagh, Ryan Deloney

Gateway Group

949-574-3860

GSRM@gatewayir.com



Exhibit 99.2 Investor Presentation August 2022

# Disclaimer

For the purposes of this notice, this "presentation" will mean and include the slides, any oral presentation of the slides by members of management of GSR II Meteora Acquisition Corp. ("GSRM") or Lux Vending, LLC d/b/a Bitcoin Depot (the "Company" or "Bitcoin Depot") or any person on their behalf, any question-and-answer session that follows that oral presentation, hard copies of this document and any materials distributed at, or in connection with, that presentation. By attending the meeting where the presentation is made, or by reading the presentation slides, you will be deemed to have (i) agreed to the following limitations and notifications and made the following undertakings and (ii) acknowledged that you understand the legal and regulatory sanctions attached to the misuse, disclosure or improper circulation of this presentation.

Confidentiality: This presentation is preliminary in nature and provided solely for informational and discussion purposes only and must not be relied upon for any other purposes. This presentation is intended solely for investors that are qualified institutional buyers (as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"), institutional accredited investors (as defined under Regulation D as promulgated under the Securities Act) and eligible institutional investors outside the U.S. and has been prepared for the purposes of familiarizing such investors with the potential business combination (the "Business Combination") between GSRM and the Company and related transactions, including the proposed private offering of GSRM's or the Company's securities (the "PIPE" and together with the Business Combination, the "Proposed Transactions") and for no other purpose. The release, reproduction, publication or distribution of this presentation, in whole or in part, or the disclosure of its contents, without the prior consent of the Company and GSRM is unlawful and prohibited. Persons who possess this document should inform themselves about and observe any such restrictions. Each recipient acknowledges that it is (a) aware that the United States securities laws prohibit any person who has material, non-public information concerning a company from purchasing or selling securities of such company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (b) familiar with the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (collectively, the "Exchange Act"), and that the recipient will neither use, nor cause any third party to use, this presentation or any information contained herein in contravention of the Exchange Act, including, without limitation, Rule 10b-5 thereunder. By accepting this presentation, each recipient agrees: (i) that the information included in this presentation is confidential and may constitute material non-public information, (ii) to maintain the confidentiality of all information that is contained in this presentation and not already in the public domain and (iii) to use this presentation for the sole purpose of evaluating the Company and the Proposed Transactions.

No Offer or Solicitation: This presentation and any oral statements made in connection with this presentation do not constitute an offer to sell, or the solicitation of an offer to buy, or a recommendation to purchase, any securities in any jurisdiction, or the solicitation of any proxy, consent or approval in any jurisdiction in connection with the Proposed Transactions, nor shall there be any sale, issuance or transfer of any securities in any jurisdiction where, or to any person to whom, such offer, solicitation or sale may be unlawful under the laws of such jurisdiction. This presentation does not constitute either advice or a recommendation regarding any securities. Any offer to sell securities pursuant to the PIPE will be made only pursuant to a definitive subscription or purchase agreement and will be made in reliance on an exemption from registration under the Securities Act for offers and sales of securities that do not involve a public offering. GSRM and the Company reserve the right to withdraw or amend for any reason any offering and to reject any subscription or purchase agreement for any reason. The communication of this presentation is restricted by law; in addition to any prohibitions on distribution otherwise provided for herein, this presentation is not intended for distribution to, or use by any person, in any jurisdiction where such distribution or use would be contrary to local law or regulation. The contents of this presentation have not been reviewed by any regulatory authority in any jurisdiction.

No Representations or Warranties: No representations or warranties, express or implied, are given in, or in respect of, this presentation or as to the accuracy, reasonableness or completeness of the information contained in or incorporated by reference herein. To the fullest extent permitted by law, in no circumstances will GSRM, the Company or any of their respective affiliates, directors, officers, employees, members, partners, shareholders, advisors or agents be responsible or liable for any direct, indirect or consequential loss or loss of profit arising from the use of this presentation, its contents (including the internal economic models), its omissions, reliance on the information contained within it, or on opinions communicated in relation thereto or otherwise arising in connection therewith. Certain information contained herein has been derived from sources prepared by third parties. While such information is believed to be reliable for the purposes used herein, none of the Company, GSRM or any of their respective affiliates, directors, officers, employees, members, partners, shareholders, advisors or agents has independently verified the data obtained from these sources or makes any representation or warranty with respect to the accuracy of such information. Recipients of this presentation are not to construe its contents, or any prior or subsequent communications from or with GSRM, the Company or their respective representatives as investment, legal or tax advice. In addition, this presentation does not purport to be all-inclusive or to contain all of the information that may be required to make a full analysis of the Company, GSRM or the Proposed Transactions. Recipients of this presentation should each make their own evaluation of the Company, GSRM or the Proposed Transactions and the relevance and adequacy of the information and should make such other investigations as they deem necessary. Recipients are not entitled to rely on the accuracy or completeness of this presentation and are entitled to rely solely on only those particular representations and warranties, if any, which may be made by GSRM or the Company to a recipient of this presentation or other third party in a definitive written agreement, when, and if executed, and subject to the limitations and restrictions as may be specified therein. You should consult your own counsel and tax and financial advisors as to legal and related matters concerning the matters described herein, and, by accepting this presentation, you confirm that you are not relying upon the information contained herein to make any decision. Any representations, warranties, agreements or covenants between the recipient and any parties involved in the Proposed Transactions will be set forth in definitive agreements by and among such persons. The Company and GSRM expressly disclaim any duty to update the information contained in this presentation, whether as a result of new information, future events or otherwise.



2

Disclaimer For the purposes of this notice, this "presentation" will mean and include the slides, any oral presentation of the slides by members of management of GSR II Meteora Acquisition Corp. ("GSRM") or Lux Vending, LLC d/b/a Bitcoin Depot (the "Company" or "Bitcoin Depot") or any person on their behalf, any question-and-answer session that follows that oral presentation, hard copies of this document and any materials distributed at, or in connection with, that presentation. By attending the meeting where the presentation is made, or by reading the presentation slides, you will be deemed to have (i) agreed to the following limitations and notifications and made the following undertakings and (ii) acknowledged that you understand the legal and regulatory sanctions attached to the misuse, disclosure or improper circulation of this presentation. Confidentiality: This presentation is preliminary in nature and provided solely for informational and discussion purposes only and must not be relied upon for any other purposes. This presentation is intended solely for investors that are qualified institutional buyers (as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act")), institutional accredited investors (as defined under Regulation D as promulgated under the Securities Act) and eligible institutional investors outside the U.S. and has been prepared for the purposes of familiarizing such investors with the potential business combination (the "Business Combination") between GSRM and the Company and related transactions, including the proposed private offering of GSRM's or the Company's securities (the "PIPE" and together with the Business Combination, the "Proposed Transactions") and for no other purpose. The release, reproduction, publication or distribution of this presentation, in whole or in part, or the disclosure of its contents, without the prior consent of the Company and GSRM is unlawful and prohibited. Persons who possess this document should inform themselves about and observe any such restrictions. Each recipient acknowledges that it is (a) aware that the United States securities laws prohibit any person who has material, non-public information concerning a company from purchasing or selling securities of such company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (b) familiar with the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (collectively, the "Exchange Act"), and that the recipient will neither use, nor cause any third party to use, this presentation or any information contained herein in contravention of the Exchange Act, including, without limitation, Rule 10b- 5 thereunder. By accepting this presentation, each recipient agrees: (i) that the information included in this presentation is confidential and may constitute material non-public information, (ii) to maintain the confidentiality of all information that is contained in this presentation and not already in the public domain and (iii) to use this presentation for the sole purpose of evaluating the Company and the Proposed Transactions. No Offer or Solicitation: This presentation and any oral statements made in connection with this presentation do not constitute an offer to sell, or the solicitation of an offer to buy, or a recommendation to purchase, any securities in any jurisdiction, or the solicitation of any proxy, consent or approval in any jurisdiction in connection with the Proposed Transactions, nor shall there be any sale, issuance or transfer of any securities in any jurisdiction where, or to any person to whom, such offer, solicitation or sale may be unlawful under the laws of such jurisdiction. This presentation does not constitute either advice or a recommendation regarding any securities. Any offer to sell securities pursuant to the PIPE will be made only pursuant to a definitive subscription or purchase agreement and will be made in reliance on an exemption from registration under the Securities Act for offers and sales of securities that do not involve a public offering. GSRM and the Company reserve the right to withdraw or amend for any reason any offering and to reject any subscription or purchase agreement for any reason. The communication of this presentation is restricted by law; in addition to any prohibitions on distribution otherwise provided for herein, this presentation is not intended for distribution to, or use by any person, in any jurisdiction where such distribution or use would be contrary to local law or regulation. The contents of this presentation have not been reviewed by any regulatory authority in any jurisdiction. No Representations or Warranties: No representations or warranties, express or implied, are given in, or in respect of, this presentation or as to the accuracy, reasonableness or completeness of the information contained in or incorporated by reference herein. To the fullest extent permitted by law, in no circumstances will GSRM, the Company or any of their respective affiliates, directors, officers, employees, members, partners, shareholders, advisors or agents be responsible or liable for any direct, indirect or consequential loss or loss of profit arising from the use of this presentation, its contents (including the internal economic models), its omissions, reliance on the information contained within it, or on opinions communicated in relation thereto or otherwise arising in connection therewith. Certain information contained herein has been derived from sources prepared by third parties. While such information is believed to be reliable for the purposes used herein, none of the Company, GSRM or any of their respective affiliates, directors, officers, employees, members, partners, shareholders, advisors or agents has independently verified the data obtained from these sources or makes any representation or warranty with respect to the accuracy of such information. Recipients of this presentation are not to construe its contents, or any prior or subsequent communications from or with GSRM, the Company or their respective representatives as investment, legal or tax advice. In addition, this presentation does not purport to be all-inclusive or to contain all of the information that may be required to make a full analysis of the Company, GSRM or the Proposed Transactions. Recipients of this presentation should each make their own evaluation of the Company, GSRM or the Proposed Transactions and the relevance and adequacy of the information and should make such other investigations as they deem necessary. Recipients are not entitled to rely on the accuracy or completeness of this presentation and are entitled to rely solely on only those particular representations and warranties, if any, which may be made by GSRM or the Company to a recipient of this presentation or other third party in a definitive written agreement, when, and if executed, and subject to the limitations and restrictions as may be specified therein. You should consult your own counsel and tax and financial advisors as to legal and related matters concerning the matters described herein, and, by accepting this presentation, you confirm that you are not relying upon the information contained herein to make any decision. Any representations, warranties, agreements or covenants between the recipient and any parties involved in the Proposed Transactions will be set forth in definitive agreements by and among such persons. The Company and GSRM expressly disclaim any duty to update the information contained in this presentation, whether as a result of new information, future events or otherwise. 2

# Disclaimer

**Forward-Looking Statements:** This presentation includes "forward-looking statements" within the meaning of the federal securities laws, including, but not limited to, opinions and projections prepared by the Company's and GSRM's management. Forward-looking statements generally relate to future events or the Company's or GSRM's future financial or operating performance, including pro forma and estimated financial information, and other "forward-looking statements" (as such term is defined in the Private Securities Litigation Reform Act of 1995). For example, projections of future EBITDA, Adjusted EBITDA and other metrics are forward-looking statements. The recipient can identify forward-looking statements because they typically contain words such as "outlook," "believes," "expects," " will," "projected," "continue," "increase," "may," "should," "could," "seeks," "predicts," "intends," "trends," "plans," "estimates," "anticipates" or the negatives or variations of these words or other comparable words and/or similar expressions (but the absence of these words and/or similar expressions does not mean that a statement is not forward-looking). These forward-looking statements specifically include, but are not limited to, statements regarding estimates and forecasts of financial and performance metrics, projections of market opportunity and market share, potential benefits of the Proposed Transactions and the potential success of the Company's strategy and expectations related to the terms and timing of the Proposed Transactions. Forward-looking statements, opinions and projections are neither historical facts nor assurances of future performance. Instead, they are based only on the Company's and GSRM's current beliefs, expectations and assumptions regarding the future of their respective businesses and of the combined company, future plans and strategies, projections, anticipated events and trends, the economy and other future conditions. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict and many of which are outside of the Company's or GSRM's control. These uncertainties and risks may be known or unknown. Factors that may cause actual results to differ materially from current expectations include, but are not limited to: (1) the occurrence of any event, change or other circumstances that could give rise to the termination of negotiations, including, without limitation, as a result of matters discovered by the parties as they complete their respective due diligence investigations of the other, and any subsequent definitive agreements with respect to the Proposed Transactions; (2) the outcome of any legal proceedings that may be instituted against the Company, GSRM, the combined company or others following the announcement of the Proposed Transactions and any definitive agreements with respect thereto; (3) the inability to complete the Proposed Transactions due to the failure to obtain GSRM shareholder approval of the Business Combination, to obtain financing to complete the Proposed Transactions or to satisfy other conditions to closing; (4) changes to the proposed structure of the Proposed Transactions that may be required or appropriate as a result of applicable laws or regulations or as a condition to obtaining regulatory approval of the Business Combination; (5) the ability to meet stock exchange listing standards following the consummation of the Proposed Transactions; (6) the risk that the Proposed Transactions disrupt current plans and operations of the Company as a result of the announcement and consummation of the Proposed Transactions; (7) the ability to recognize the anticipated benefits of the Proposed Transactions, which may be affected by, among other things, competition, the ability of the combined company to grow and manage growth profitably, maintain relationships with customers and suppliers and retain its management and key employees; (8) costs related to the Proposed Transactions; (9) changes in applicable laws or regulations; (10) the possibility that the Company or the combined company may be adversely affected by general economic conditions and other economic, business and/or competitive factors; (11) the Company's estimates of expenses and profitability, business strategy and plans and the result of future financing efforts; (12) geopolitical events, natural disasters, acts of God and pandemics; and (13) other risks and uncertainties set forth in the sections entitled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements" in GSRM's final prospectus relating to its initial public offering dated February 24, 2022. If any of these risks materialize or the Company's or GSRM's assumptions prove incorrect, actual results could differ materially from the results implied by the forward-looking statements contained herein. In addition, forward-looking statements reflect the Company's and GSRM's expectations and views as of the date of this presentation. The Company and GSRM anticipate that subsequent events and developments will cause their respective assessments to change. However, while the Company and GSRM may elect to update these forward-looking statements in the future, each of them specifically disclaims any obligation to do so. Accordingly, you should not place undue reliance on the forward-looking statements, which speak only as of the date they are made.

**Use of Projections:** This presentation contains financial forecasts with respect to the Company's projected financial results. Such projected financial information constitutes forward-looking information, is included for illustrative purposes only and should not be relied upon as necessarily being indicative of future results. The assumptions and estimates underlying such projected financial information are inherently uncertain and are subject to a wide variety of significant business, economic, competitive and other risks and uncertainties that could cause actual results to differ materially from those contained in the prospective financial information. Actual results may differ materially from the results contemplated by the projected financial information contained in this presentation, and the inclusion of such information in this presentation should not be regarded as a representation by any person that the results reflected in such projections will be achieved. The independent auditors of the Company and GSRM have not audited, reviewed, compiled or performed any procedures with respect to the projections for the purpose of their inclusion in this presentation, and accordingly, they have expressed no opinion and have not provided any other form of assurance with respect thereto for the purpose of this presentation.

**Financial Information; Non-GAAP Measures:** Certain of the financial information and data contained in this presentation have not been subject to a completed audit and do not conform to Regulation S-X promulgated under the Securities Act. Accordingly, such information and data may not be included in, may be adjusted in or may be presented differently in, any proxy statement, registration statement or prospectus that may be filed with the Securities and Exchange Commission (the "SEC"). This presentation includes certain financial measures not presented in accordance with generally accepted accounting principles ("GAAP") including, but not limited to, EBITDA, Adjusted EBITDA and certain ratios and other metrics derived therefrom. The Company defines (i) EBITDA as earnings before interest expense, taxes, depreciation and amortization and (ii) Adjusted EBITDA as EBITDA further adjusted by the removal of certain non-recurring costs and assumed public company costs. These non-GAAP financial measures are not measures of financial performance in accordance with GAAP and may exclude items that are significant in understanding and assessing the Company's financial results. Such measures may not be indicative of the Company's historical operating results nor are such measures meant to be predictive of future results. Therefore, these measures should not be considered in isolation or as an alternative to net income, cash flows from operations or other measures of profitability, liquidity or performance under GAAP. You should be aware that the Company's presentation of these measures may not be comparable to similarly-titled measures used by other companies. As such, undue reliance should not be placed on these non-GAAP financial measures.



3

Disclaimer Forward-Looking Statements: This presentation includes "forward-looking statements" within the meaning of the federal securities laws, including, but not limited to, opinions and projections prepared by the Company's and GSRM's management. Forward-looking statements generally relate to future events or the Company's or GSRM's future financial or operating performance, including pro forma and estimated financial information, and other "forward-looking statements" (as such term is defined in the Private Securities Litigation Reform Act of 1995). For example, projections of future EBITDA, Adjusted EBITDA and other metrics are forward-looking statements. The recipient can identify forward-looking statements because they typically contain words such as "outlook," "believes," "expects," " will," "projected," "continue," "increase," "may," "should," "could," "seeks," "predicts," "intends," "trends," "plans," "estimates," "anticipates" or the negatives or variations of these words or other comparable words and/or similar expressions (but the absence of these words and/or similar expressions does not mean that a statement is not forward-looking). These forward-looking statements specifically include, but are not limited to, statements regarding estimates and forecasts of financial and performance metrics, projections of market opportunity and market share, potential benefits of the Proposed Transactions and the potential success of the Company's strategy and expectations related to the terms and timing of the Proposed Transactions. Forward-looking statements, opinions and projections are neither historical facts nor assurances of future performance. Instead, they are based only on the Company's and GSRM's current beliefs, expectations and assumptions regarding the future of their respective businesses and of the combined company, future plans and strategies, projections, anticipated events and trends, the economy and other future conditions. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict and many of which are outside of the Company's or GSRM's control. These uncertainties and risks may be known or unknown. Factors that may cause actual results to differ materially from current expectations include, but are not limited to: (1) the occurrence of any event, change or other circumstances that could give rise to the termination of negotiations, including, without limitation, as a result of matters discovered by the parties as they complete their respective due diligence investigations of the other, and any subsequent definitive agreements with respect to the Proposed Transactions; (2) the outcome of any legal proceedings that may be instituted against the Company, GSRM, the combined company or others following the announcement of the Proposed Transactions and any definitive agreements with respect thereto; (3) the inability to complete the Proposed Transactions due to the failure to obtain GSRM shareholder approval of the Business Combination, to obtain financing to complete the Proposed Transactions or to satisfy other conditions to closing; (4) changes to the proposed structure of the Proposed Transactions that may be required or appropriate as a result of applicable laws or regulations or as a condition to obtaining regulatory approval of the Business Combination; (5) the ability to meet stock exchange listing standards following the consummation of the Proposed Transactions; (6) the risk that the Proposed Transactions disrupt current plans and operations of the Company as a result of the announcement and consummation of the Proposed Transactions, which may be affected by, among other things, competition, the ability of the combined company to grow and manage growth profitably, maintain relationships with customers and suppliers and retain its management and key employees; (8) costs related to the Proposed Transactions; (9) changes in applicable laws or regulations; (10) the possibility that the Company or the combined company may be adversely affected by general economic conditions and other economic, business and/or competitive factors; (11) the Company's estimates of expenses and profitability, business strategy and plans and the result of future financing efforts; (12) geopolitical events, natural disasters, acts of God and pandemics; and (13) other risks and uncertainties set forth in the sections entitled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements" in GSRM's final prospectus relating to its initial public offering dated February 24, 2022. If any of these risks materialize or the Company's or GSRM's assumptions prove incorrect, actual results could differ materially from the results implied by the forward-looking statements contained herein. In addition, forward-looking statements reflect the Company's and GSRM's expectations and views as of the date of this presentation. The Company and GSRM anticipate that subsequent events and developments will cause their respective assessments to change. However, while the Company and GSRM may elect to update these forward-looking statements in the future, each of them specifically disclaims any obligation to do so. Accordingly, you should not place undue reliance on the forward-looking statements, which speak only as of the date they are made. Use of Projections: This presentation contains financial forecasts with respect to the Company's projected financial results. Such projected financial information constitutes forward-looking information, is included for illustrative purposes only and should not be relied upon as necessarily being indicative of future results. The assumptions and estimates underlying such projected financial information are inherently uncertain and are subject to a wide variety of significant business, economic, competitive and other risks and uncertainties that could cause actual results to differ materially from those contained in the prospective financial information. Actual results may differ materially from the results contemplated by the projected financial information contained in this presentation, and the inclusion of such information in this presentation should not be regarded as a representation by any person that the results reflected in such projections will be achieved. The independent auditors of the Company and GSRM have not audited, reviewed, compiled or performed any procedures with respect to the projections for the purpose of their inclusion in this presentation, and accordingly, they have expressed no opinion and have not provided any other form of assurance with respect thereto for the purpose of this presentation. Financial Information; Non-GAAP Measures: Certain of the financial information and data contained in this presentation have not been subject to a completed audit and do not conform to Regulation S-X promulgated under the Securities Act. Accordingly, such information and data may not be included in, may be adjusted in or may be presented differently in, any proxy statement, registration statement or prospectus that may be filed with the Securities and Exchange Commission (the "SEC"). This presentation includes certain financial measures not presented in accordance with generally accepted accounting principles ("GAAP") including, but not limited to, EBITDA, Adjusted EBITDA and certain ratios and other metrics derived therefrom. The Company defines (i) EBITDA as earnings before interest expense, taxes, depreciation and amortization and (ii) Adjusted EBITDA as EBITDA further adjusted by the removal of certain non-recurring costs and assumed public company costs. These non-GAAP financial measures are not measures of financial performance in accordance with GAAP and may exclude items that are significant in understanding and assessing the Company's financial results. Such measures may not be indicative of the Company's historical operating results nor are such measures meant to be predictive of future results. Therefore, these measures should not be considered in isolation or as an alternative to net income, cash flows from operations or other measures of profitability, liquidity or performance under GAAP. You should be aware that the Company's presentation of these measures may not be comparable to similarly-titled measures used by other companies. As such, undue reliance should not be placed on these non- GAAP financial measures. 3

# Disclaimer

The Company believes these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to the Company's financial condition and results of operations. The Company believes that the use of these non-GAAP financial measures provides an additional tool for investors to use in evaluating ongoing operating results and trends in and in comparing the Company's financial measures with other similar companies, many of which present similar non-GAAP financial measures to investors. These non-GAAP financial measures are subject to inherent limitations as they reflect the exercise of judgments by management about which expense and income are excluded or included in determining these non-GAAP financial measures. Please refer to footnotes where presented on each page of this presentation and/or to the appendix found at the end of this presentation for more details regarding the calculations of such measures and/or for a reconciliation of these measures to what the Company believes are the most directly comparable measures evaluated in accordance with GAAP.

This presentation also includes certain projections of non-GAAP financial measures. Due to the high variability and difficulty in making accurate forecasts and projections of some of the information excluded from these projected measures, together with some of the excluded information not being ascertainable or accessible, the Company is unable to quantify certain amounts that would be required to be included in the most directly comparable GAAP financial measures without unreasonable effort. Consequently, no disclosure of estimated comparable GAAP measures is included and no reconciliation of the forward-looking non-GAAP financial measures is included.

**Industry and Market Data:** In this presentation, the Company relies on and refers to certain information and statistics obtained from third-party sources which it believes to be reliable. Neither the Company nor GSRM has independently verified the accuracy or completeness of any such third-party information.

**Trademarks and Trade Names:** The Company and GSRM own or have rights to various trademarks, service marks and trade names that they use in connection with the operation of their respective businesses. This presentation also contains trademarks, service marks and trade names of third parties, which are the property of their respective owners. The use or display of third parties' trademarks, service marks, trade names or products in this presentation is not intended to, and does not imply, a relationship with the Company or GSRM, or an endorsement or sponsorship by or of the Company or GSRM. Solely for convenience, the trademarks, service marks and trade names referred to in this presentation may appear without the ®, ™ or ℠ symbols, but such references are not intended to indicate, in any way, that the Company or GSRM will not assert, to the fullest extent under applicable law, their rights or the right of the applicable licensor to these trademarks, service marks and trade names.

**Additional Information:** In connection with the proposed Business Combination, GSRM intends to file with the SEC either a preliminary proxy statement or a registration statement on Form S-4 containing a preliminary proxy statement and a preliminary prospectus of GSRM, and after the definitive proxy statement is filed (or the registration statement is declared effective, as applicable), GSRM will mail to its shareholders a definitive proxy statement (or a definitive proxy statement/prospectus, as applicable) relating to the proposed Business Combination. This presentation does not contain all the information that should be considered concerning the Proposed Transactions and is not intended to form the basis of any investment decision or any other decision in respect of the Proposed Transactions. GSRM's shareholders and other interested persons are advised to read, when available, the preliminary proxy statement (or the preliminary proxy statement/prospectus, as applicable) and the amendments thereto and the definitive proxy statement (or the definitive proxy statement/prospectus, as applicable) and other documents filed in connection with the Proposed Transactions, as these materials will contain important information about GSRM, the Company and the Proposed Transactions. When available, the definitive proxy statement (or the definitive proxy statement/prospectus, as applicable) and other relevant materials pertaining to the proposed Business Combination will be mailed to shareholders of GSRM as of a record date to be established for voting on the proposed Business Combination. Shareholders will also be able to obtain copies of the preliminary proxy statement (or the preliminary proxy statement/prospectus, as applicable), the definitive proxy statement (or the definitive proxy statement/prospectus, as applicable) and other documents filed with the SEC, without charge, once available, at the SEC's website at www.sec.gov, or by directing a request to: GSR II Meteora Acquisition Corp., 840 Park Drive East, Boca Raton, Florida 33432.



Disclaimer The Company believes these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to the Company's financial condition and results of operations. The Company believes that the use of these non-GAAP financial measures provides an additional tool for investors to use in evaluating ongoing operating results and trends in and in comparing the Company's financial measures with other similar companies, many of which present similar non-GAAP financial measures to investors. These non-GAAP financial measures are subject to inherent limitations as they reflect the exercise of judgments by management about which expense and income are excluded or included in determining these non-GAAP financial measures. Please refer to footnotes where presented on each page of this presentation and/or to the appendix found at the end of this presentation for more details regarding the calculations of such measures and/or for a reconciliation of these measures to what the Company believes are the most directly comparable measures evaluated in accordance with GAAP. This presentation also includes certain projections of non-GAAP financial measures. Due to the high variability and difficulty in making accurate forecasts and projections of some of the information excluded from these projected measures, together with some of the excluded information not being ascertainable or accessible, the Company is unable to quantify certain amounts that would be required to be included in the most directly comparable GAAP financial measures without unreasonable effort. Consequently, no disclosure of estimated comparable GAAP measures is included and no reconciliation of the forward-looking non-GAAP financial measures is included. Industry and Market Data: In this presentation, the Company relies on and refers to certain information and statistics obtained from third-party sources which it believes to be reliable. Neither the Company nor GSRM has independently verified the accuracy or completeness of any such third-party information. Trademarks and Trade Names: The Company and GSRM own or have rights to various trademarks, service marks and trade names that they use in connection with the operation of their respective businesses. This presentation also contains trademarks, service marks and trade names of third parties, which are the property of their respective owners. The use or display of third parties' trademarks, service marks, trade names or products in this presentation is not intended to, and does not imply, a relationship with the Company or GSRM, or an endorsement or sponsorship by or of the Company or GSRM. Solely for convenience, the trademarks, service marks and trade names referred to in this presentation may appear without the ®,™ or℠ symbols, but such references are not intended to indicate, in any way, that the Company or GSRM will not assert, to the fullest extent under applicable law, their rights or the right of the applicable licensor to these trademarks, service marks and trade names. Additional Information: In connection with the proposed Business Combination, GSRM intends to file with the SEC either a preliminary proxy statement or a registration statement on Form S-4 containing a preliminary proxy statement and a preliminary prospectus of GSRM, and after the definitive proxy statement is filed (or the registration statement is declared effective, as applicable), GSRM will mail to its shareholders a definitive proxy statement (or a definitive proxy statement/prospectus, as applicable) relating to the proposed Business Combination. This presentation does not contain all the information that should be considered concerning the Proposed Transactions and is not intended to form the basis of any investment decision or any other decision in respect of the Proposed Transactions. GSRM's shareholders and other interested persons are advised to read, when available, the preliminary proxy statement (or the preliminary proxy statement/prospectus, as applicable) and the amendments thereto and the definitive proxy statement (or the definitive proxy statement/prospectus, as applicable) and other documents filed in connection with the Proposed Transactions, as these materials will contain important information about GSRM, the Company and the Proposed Transactions. When available, the definitive proxy statement (or the definitive proxy statement/prospectus, as applicable) and other relevant materials pertaining to the proposed Business Combination will be mailed to shareholders of GSRM as of a record date to be established for voting on the proposed Business Combination. Shareholders will also be able to obtain copies of the preliminary proxy statement (or the preliminary proxy statement/prospectus, as applicable), the definitive proxy statement (or the definitive proxy statement/prospectus, as applicable) and other documents filed with the SEC, without charge, once available, at the SEC's website at www.sec.gov, or by directing a request to: GSR II Meteora Acquisition Corp., 840 Park Drive East, Boca Raton, Florida 33432. 4

## GSRM Team Overview



| | | | | |
|---|---|---|---|---|
| **Gus Garcia** | **Lewis Silberman** | **Anantha Ramamurti** | **Joseph Tonnos** | **Yuya Orime** |
| Co-CEO & Director | Co-CEO & Director | President & Director | CFO | Senior Vice President |

- GSR II Meteora Acquisition Corp ("GSRM") completed its IPO in March 2022 with $321 million cash-in-trust
- Highly experienced sponsor team with extensive SPAC transaction credentials
- Members of GSRM team have advised on 22 SPAC mergers that have closed within the last 2 years alone, and have served as officers of 4 SPACs

 BITCOIN DEPOT                                                                                    5

GSRM Team Overview Gus Garcia Lewis Silberman Anantha Ramamurti Joseph Tonnos Yuya Orime Co-CEO & Director Co-CEO & Director President & Director CFO Senior Vice President • GSR II Meteora Acquisition Corp ("GSRM") completed its IPO in March 2022 with $321 million cash-in-trust • Highly experienced sponsor team with extensive SPAC transaction credentials • Members of GSRM team have advised on 22 SPAC mergers that have closed within the last 2 years alone, and have served as officers of 4 SPACs 5

## What Bitcoin Depot IS and IS NOT



| Bitcoin Depot IS... | Bitcoin Depot IS NOT... |
|---|---|
| An Easy Way to Convert Cash to Crypto | A Crypto Miner or Exchange |
| A Money Services Business / Non-Traditional Financial Services Provider | A Provider or Vendor of Tokens, ICOs or NFTs |
| A Practitioner of Robust and Proactive Compliance | A Crypto Lender or Crypto Staking Business |
| A Company with a History of Profitability, with Multiple Growth Opportunities | Historically Correlated to Bitcoin Prices |

 BITCOIN DEPOT                                                                                    6

What Bitcoin Depot IS and IS NOT Bitcoin Depot IS... Bitcoin Depot IS NOT... An Easy Way to Convert Cash to Crypto A Crypto Miner or Exchange û A Money Services Business / Non-Traditional A Provider or Vendor of Tokens, ICOs or NFTs û Financial Services Provider A Practitioner of Robust and Proactive A Crypto Lender or Crypto Staking Business û Compliance A Company with a History of Profitability, with Historically Correlated to Bitcoin Prices û Multiple Growth Opportunities 6

## Bitcoin Depot is an Ideal Business Combination for GSRM



| | |
|---|---|
| **Leader in Growth Industry with Secular and Thematic Tailwinds** | ✓ |
| **Solid Financial Profile With Significant EBITDA** | ✓ |
| **Future Growth Opportunities Across Multiple Organic and Inorganic Initiatives** | ✓ |
| **Compelling Public Company Story with Quality Management** | ✓ |

⬡ **BITCOIN DEPOT**  ⑦

Bitcoin Depot is an Ideal Business Combination for GSRM Leader in Growth Industry with Secular and Thematic Tailwinds ✓ Solid Financial Profile With Significant EBITDA ✓ Future Growth Opportunities Across Multiple Organic and Inorganic Initiatives ✓ Compelling Public Company Story with Quality Management ✓ 7

## Transaction Overview


**Key Transaction Terms**

- Transaction will result in approximately $170 million of cash (assuming 0% redemption) added to Bitcoin Depot's balance sheet to go towards funding its business plan.

- Earn-out of 15 million shares outstanding at close issued to existing Bitcoin Depot shareholders vested equally at illustrative pro forma share prices of $12, $14, and $16 per share.

- The stock consideration to be issued to the existing Bitcoin Depot shareholders shall be a separate class that will have ten votes per share.

- $15mm minimum for secondary and potentially higher depending on various waterfalls relating to paydown of debt and retention of cash by Bitcoin Depot

**Illustrative Post-Transaction Ownership** [1]

| | Redemption Scenarios | |
|---|---|---|
| **Illustrative Pro Forma Valuation** [3] | **0%** | **85%** [2] |
| Redemption Price | $10.15 | $10.15 |
| Pro Forma Shares Outstanding (mm) | 87.2 | 60.4 |
| **Pro Forma Equity Value** | **$885** | **$613** |
| (+) Existing Net Debt [4] | 40 | 40 |
| (-) New Cash to Balance Sheet | (170) | (9) |
| **Pro Forma Enterprise Value** | **$755** | **$644** |
| | | |
| **Illustrative Sources and Uses** | | |
| **Sources** | | |
| GSRM Cash in Trust | $321 | $49 |
| Bitcoin Depot Equity Rollover | 448 | 448 |
| **Total Sources** | **$769** | **$497** |
| | | |
| **Uses** | | |
| Bitcoin Depot Equity Rollover | $448 | $448 |
| Cash to Equityholders | 128 | 21 |
| Cash to Balance Sheet | 170 | 9 |
| Fees & Expenses [5] | 22 | 19 |
| **Total Uses** | **$769** | **$497** |

*0% Redemption* — Bitcoin Depot Shareholders 51%, GSRM Public Shareholders 42%, GSRM Sponsor 7%

*85% Redemption* [2] — Bitcoin Depot Shareholders 73%, GSRM Public Shareholders 17%, GSRM Sponsor 10%

(1) Excluding earn-out of the existing Bitcoin Depot shareholders and deferred founder shares. GSRM Public Shareholders include GSRM rights and potential additional issuances to equity holders. Does not reflect the impact from potential dilution from GSRM public warrants and Sponsor warrants.
(2) Average redemption of closed SPAC mergers in the last 6 months as of August 17, 2022. Redemption scenarios are illustrative and subject to minimum cash and other closing conditions.
(3) Pro Forma valuation at $10.15 per share.
(4) Estimated balance as of FY2022.
(5) Fees and expenses are preliminary and subject to confirmation. For larger redemption scenario, a portion of the fees will be paid in GSRM common stock rather than in cash.


⬡ **BITCOIN DEPOT**  ⑧

Transaction Overview Key Transaction Terms (3) (2) Transaction will result in approximately $170 million of cash (assuming 0% redemption) added to Bitcoin Depot's balance sheet to go towards funding its business plan. (4) Earn-out of 15 million shares outstanding at close issued to existing Bitcoin Depot shareholders vested equally at illustrative pro forma share prices of $12, $14, and $16 per share. The stock consideration to be issued to the existing Bitcoin Depot shareholders shall be a separate class that will have ten votes per share. $15mm minimum for secondary and potentially higher depending on various waterfalls relating to paydown of debt and retention of cash by Bitcoin Depot (1) Illustrative Post-Transaction Ownership (2) 0% Redemption 85% Redemption 7% 10% Bitcoin Depot Shareholders (5) 17% GSRM Public Shareholders 42% 51% GSRM Sponsor 73% (1) Excluding earn-out of the existing Bitcoin Depot shareholders and deferred founder shares. GSRM Public Shareholders include GSRM rights and potential additional issuances to equity holders. Does not reflect the impact from potential dilution from GSRM public warrants and Sponsor warrants. (2) Average redemption of closed SPAC mergers in the last 6 months as of August 17, 2022. Redemption scenarios are illustrative and subject to minimum cash and other closing conditions. (3) Pro Forma valuation at $10.15 per share. (4) Estimated balance as of FY2022. (5) Fees and expenses are preliminary and subject to confirmation. For larger redemption scenario, a portion of the fees will be paid in GSRM common stock rather than in cash. 8





## Company Overview

Company Overview 9



Mission BRINGING BITCOIN to the MASSES

## Entrepreneurial and Visionary Management Team





Entrepreneurial and Visionary Management Team Brandon Mintz Scott Buchanan Founder & Chief Executive Officer Chief Operating Officer / Chief Financial Officer Cash to Crypto Sarah Wessel Jason Sacco Mark Smalley Bill Knoll VP of Sales VP of Operations Chief Compliance Officer Head of Product 11

## Bitcoin Depot at a Glance

*Leading BTM (1) operator providing a simple and convenient process to convert cash into cryptocurrency*



Bitcoin Depot at a Glance (1) Leading BTM operator providing a simple and convenient process to convert cash into cryptocurrency $1.2B 149% 2.3M 25k 7k+ $38M Total Transacted Total Transactions Installed Kiosks LTM Adjusted (4) (3) Same-Kiosk Sales Monthly Active Users (2) (5) Volume Completed in North America EBITDA (6) Significant BTM Operator by Market Share Profitable Growth 8% $623m 56% 20% 9 +51% YoY Margin 47 Canadian U.S. States LTM LTM Provinces Adj. EBITDA as % Revenue (5)(7) of Gross Profit Note: Metrics are as of June 2022, unless noted otherwise. (1) Bitcoin ATM. (5) As of June 30, 2022. Adjusted EBITDA is a non-GAAP measure. Please see appendix. (2) Since inception of Bitcoin Depot in 2016. (6) Source: Coinatmradar.com as of August 3, 2022. https://coinatmradar.com/charts/top-operators/united-states/ and (3) Total number of users that transacted in June 2022. https://coinatmradar.com/charts/top-operators/canada/ (7) Gross Profit is a non-GAAP measure. Please see appendix. 12



TM Get Bitcoin in a Minute 1 2 3 4 Setup a Bitcoin Wallet Choose Crypto Amount Scan Digital Wallet Receive Crypto Download Bitcoin Depot or Click "Buy Crypto" and Choose Insert Cash and Scan the QR Code on Kiosk Other Digital Wallet the Amount to Purchase Click "Finish" Mobile App At Kiosk 13









Why Our Users Love Us Customers use the Bitcoin Depot mobile app to access several dynamic tools that are key to the cryptocurrency user experience Convenient Locations Simple & Quick Account Set Up Cryptos Available in Minutes Responsive Customer Support Transact Without a Bank Account Intuitive Mobile App (1) (3) Key Use Cases for Bitcoin Depot Bitcoin Depot vs. Online Crypto Exchanges Online Exchanges Account Setup Time 1 Minute 3+ Days Domestic International Investment / Online Time to Receive First Crypto Purchase < 1 Hour 3+ Days Money (2) Remittance Store Value Purchases (2) Transfer Accessible Without a Bank Account X ✓ Accepts Cash X ✓ Customer Support via Phone / Texts X ✓ (1) Based on our user survey data as of August 3, 2022. n=1,200. (2) Subject to licensing in certain jurisdictions, as applicable. (3) Representative user experience. 14

## Why Our Partners Love Us



| Benefits to Retailers | | Retailer Distribution Overview |

**Benefits to Retailers:**

Increased Average Customer Spend

Predictable Flat Rate Monthly Rent

Small Kiosk Footprint (2' x 2' ft)

Hands-off: Bitcoin Depot Manages Entire Process

Minimal Out-of-Pocket Cost [1]

Increased Retail Store Foot Traffic

**Retailer Distribution Overview**

Transaction Volume Breakdown (CY2021: $528M) [2]

- CIRCLE K — 20%
- Independent Retailers — 74%
- Other Retail Chains — 6%

(1) Kiosk uses standard outlet in store; cost to power is de minimis.
(2) Excludes transaction volume from inactive kiosks.



BITCOIN DEPOT

15

Why Our Partners Love Us Benefits to Retailers Retailer Distribution Overview Transaction Volume Breakdown Increased Average Predictable Flat Rate (2) (CY2021: $528M) Customer Spend Monthly Rent 6% 20% Small Kiosk Hands-off: Bitcoin Depot Manages Entire Process Footprint (2' x 2' ft) 74% Increased Retail Store Minimal Out-of-Pocket Foot Traffic (1) Cost Independent Retailers Other Retail Chains (1) Kiosk uses standard outlet in store; cost to power is de minimis. (2) Excludes transaction volume from inactive kiosks. 15

## Setting the Bar with our Compliance Practices and Standards



**Best-in-Class Compliance is a Core Value for Bitcoin Depot**



Bitcoin Depot's compliance team takes a proactive approach to industry requirements, monitoring and reporting suspicious activities and working closely with law enforcement as required

Bitcoin Depot has established robust multi-layer compliance procedures, including KYC (Know-Your-Customer) and AML (Anti-Money Laundering) programs

Bitcoin Depot has robust transaction monitoring systems to analyze transactions in real-time, taking advantage of the rich transaction data from its own network and on the blockchain



BITCOIN DEPOT

16

Setting the Bar with our Compliance Practices and Standards Best-in-Class Compliance is a Core Value for Bitcoin Depot Bitcoin Depot's compliance team takes a proactive approach to industry requirements, monitoring and reporting suspicious activities and working closely with law enforcement as required Bitcoin Depot has established robust multi-layer compliance procedures, including KYC (Know-Your- Customer) and AML (Anti-Money Laundering) programs Bitcoin Depot has robust transaction monitoring systems to analyze transactions in real-time, taking advantage of the rich transaction data from its own network and on the blockchain 16

## Bitcoin Depot Compliance Infrastructure

| People: Experienced Compliance Team | Technology: Multi-Layer Compliance Procedures | Communication: Proactive Dialogue with Regulatory Agencies |
|---|---|---|
| • Bitcoin Depot's compliance team has over 50 years of combined experience in AML, KYC, BSA (Bank Secrecy Act), and OFAC (Office of Foreign Assets Control) compliance<br><br>• Bitcoin Depot utilizes Blockchain analysis and works with various third parties for transaction monitoring and case management | • Accounts are verified at the time of creation with ongoing transaction monitoring and screening against sanctions lists<br><br>• Transaction review includes ID, wallet check, OFAC screening, FinCEN reporting, and screening/reporting via third-party compliance software | • Bitcoin Depot coordinates closely with financial regulators, screening for blacklisted individuals and wallets<br><br>• Bitcoin Depot regularly files Currency Transaction Reports and Suspicious Activity Reports |

 BITCOIN DEPOT

 17

Bitcoin Depot Compliance Infrastructure Communication: Proactive Dialogue People: Experienced Technology: Multi-Layer with Regulatory Agencies Compliance Team Compliance Procedures Bitcoin Depot's compliance team Accounts are verified at the time Bitcoin Depot coordinates closely has over 50 years of combined of creation with ongoing with financial regulators, experience in AML, KYC, BSA transaction monitoring and screening for blacklisted (Bank Secrecy Act), and screening against sanctions lists individuals and wallets OFAC (Office of Foreign Assets Control) compliance Transaction review includes ID, Bitcoin Depot regularly files wallet check, OFAC screening, Currency Transaction Reports and Bitcoin Depot utilizes Blockchain FinCEN reporting, and Suspicious Activity analysis and works with various screening/reporting via third- Reports third parties for transaction party compliance software monitoring and case management 17



Investment Highlights 18

## Investment Highlights



**1** Beneficiary of Megatrend: Broadening Adoption of Cryptocurrencies

**2** Network of 7,000+ Kiosks for Converting Cash to Digital Currency, with Convenient, High-Performing Locations

**3** Attractive Combination of Historical Growth and Current Profitability with Demonstrated Track Record of Success

**4** Transaction Volumes Are Not Historically Correlated to the Price of Bitcoin or other Cryptocurrencies; Resiliency Despite Cryptocurrency Volatility

**5** Primed for Unique Growth Opportunities Through Strong Partnerships, Consolidation of Highly-Fragmented Market and International Expansion

**BITCOIN DEPOT**   (19)

Investment Highlights Beneficiary of Megatrend: Broadening Adoption of Cryptocurrencies 1 Network of 7,000+ Kiosks for Converting Cash to Digital Currency, with Convenient, High-Performing Locations 2 Attractive Combination of Historical Growth and Current Profitability with Demonstrated Track Record of Success 3 Transaction Volumes Are Not Historically Correlated to the Price of Bitcoin or other Cryptocurrencies; Resiliency Despite 4 Cryptocurrency Volatility Primed for Unique Growth Opportunities Through Strong Partnerships, Consolidation of Highly-Fragmented Market and 5 International Expansion 19

## Digital Asset Market Tailwinds

| Growth of Global Crypto ATM Market [1] | Annual Transaction Volume ($bn) by Payment Network (2021) [2] |
|---|---|



# of BTMs

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1H 2022 |
|---|---|---|---|---|---|---|
| 969 | 2,076 | 4,106 | 6,364 | 14,051 | 34,386 | 38,429 |

+95% CAGR



| VISA | mastercard | ₿ | AMERICAN EXPRESS | DISCOVER |
|---|---|---|---|---|
| $13,505 | $7,722 | $3,007 | $1,284 | $504 |

(1) Source: Coinatmradar.com as of August 3, 2022. https://coinatmradar.com/charts/growth/
(2) Source: Glassnode and corporate filings.

**BITCOIN DEPOT**   (20)

Digital Asset Market Tailwinds (1) (2) Growth of Global Crypto ATM Market Annual Transaction Volume ($bn) by Payment Network (2021) # of BTMs 38,429 $13,505 34,386 +95% CAGR $7,722 14,051 $3,007 6,364 $1,284 4,106 2,076 $504 969 2016 2017 2018 2019 2020 2021 1H 2022 (1) Source: Coinatmradar.com as of August 3, 2022. https://coinatmradar.com/charts/growth/ (2) Source: Glassnode and corporate filings. 20

## Bitcoin Depot has Leading BTM Market Share in North America

- **Bitcoin Depot currently operates approximately 7,000 kiosks in 47 U.S. states and 9 Canadian provinces**
  - Our kiosks are located in zip codes addressing over 40% of US population
  - Pending license application in New York State, which represents a large market opportunity (less than 300 BTMs statewide as of August 3, 2022) [1]
    - We believe the state's population could potentially support 2,500-3,000 BTMs over time [2]





**Top Crypto ATM Operators (United States)** [1]

| Operator | Value |
|---|---|
| BITCOIN DEPOT | 6692 (20%) |
| CoinCloud | 5673 (17%) |
| COINFLIP | 4027 (12%) |
| Bitcoin | 2289 (7%) |
| BITSTOP | 1899 (6%) |
| rockitcoin | 1779 (5%) |
| Coinsource | 1092 (3%) |
| byte federal | 895 (3%) |
| National Bitcoin ATM | 844 (3%) |



**Top Crypto ATM Operators (Canada)** [1]

| Operator | Value |
|---|---|
| Localcoin | 834 (34%) |
| BITCOIN WELL | 240 (10%) |
| BITCOIN DEPOT | 201 (8%) |
| HoneyBadger | 196 (8%) |
| instacoin | 166 (7%) |
| HODL | 159 (7%) |
| National | 147 (6%) |
| FastBTC | 93 (4%) |
| Bitcoinias | 72 (3%) |
| | 57 (2%) |

(1) Source: Coinatmradar.com as of August 3, 2022.The source only accounts for cash-to-Bitcoin ATMs; therefore, excluding LibertyX and Coinme from the chart. https://coinatmradar.com/country/226/bitcoin-atm-united-states/, https://coinatmradar.com/charts/top-operators/united-states/ and https://coinatmradar.com/charts/top-operators/canada/
(2) Internal analysis; based on similar population size in state of Florida.

**BITCOIN DEPOT**                                      21

Bitcoin Depot has Leading BTM Market Share in North America Bitcoin Depot currently operates approximately 7,000 kiosks in 47 U.S. states and 9 Canadian provinces (1) Top Crypto ATM Operators (United States) – Our kiosks are located in zip codes addressing over 40% of US population Bitcoin Depot 6692 (20%) CoinCloud 5673 (17%) – Pending license application in New York State, which represents a Coinflip 4027 (12%) large market opportunity (less than 300 BTMs statewide as of August 3, 2022) (1) BITSTOP 1899 (6%) • We believe the state's population could potentially support ROCKITCOIN 1779 (5%) (2) 2,500-3,000 BTMs over time COINISURNACE 1600 (5%) Byte Federal 1092 (3%) National Bitcoin ATM 895 (3%) Cash Bitcoin 844 (3%) (1) Top Crypto ATM Operators (Canada) Localcoin 834 (34%) Bitcoin Well 240 (10%) Bitcoin Depot 201 (8%) HoneyBadger 196 (8%) HODL 166 (7%) Instacoin 159 (7%) Bitnational 147 (6%) FastBTC 93 (4%) Bitcoin4U 72 (3%) Bitcoiniacs 57 (2%) (1) Source: Coinatmradar.com as of August 3, 2022.The source only accounts for cash-to-Bitcoin ATMs; therefore, excluding LibertyX and Coinme from the chart. https://coinatmradar.com/country/226/bitcoin-atm-united-states/, https://coinatmradar.com/charts/top-operators/united-states/ and https://coinatmradar.com/charts/top-operators/canada/ (2) Internal analysis; based on similar population size in state of Florida. 21

## Robust Retail Partnerships Pave Our Path for Further Growth

**Bitcoin Depot is Circle K's Exclusive BTM Provider**



- Over 1,900 kiosks deployed across U.S. and Canada as of July 2022
- Circle K has over 9,000 stores in North America, with over 4,800 stores in Europe and other International markets

*"Our partnership with Bitcoin Depot further builds on our commitment, **giving our brand an important, early presence in the fast-growing cryptocurrency marketplace** as a convenient destination where customers can buy Bitcoin."*

*Denny Tewell, Senior Vice President Global Merchandise and Procurement*

**We Partner with Major Retailers** [1]

 **Largest Privately Owned American Gas Station Chain**

 **Fortune 500 Specialty Retailer**

**Major Convenience Store Chains**

**Fortune 500 American Gas Station Chain**

 **Leading Retail Outlets**

(1) Via a partnership with payment processing provider. Select partners represented.

**BITCOIN DEPOT**                                      22

Robust Retail Partnerships Pave Our Path for Further Growth (1) Bitcoin Depot is Circle K's Exclusive BTM Provider We Partner with Major Retailers Fortune 500 Largest Privately Owned Specialty Retailer American Gas Station Chain Over 1,900 kiosks deployed across U.S. and Canada as of July Fortune 500 Major Convenience 2022 American Gas Station Chain Store Chains Circle K has over 9,000 stores in North America, with over 4,800 stores in Europe and other International markets "Our partnership with Bitcoin Depot further builds on our commitment, giving our brand an important, early presence in the fast-growing cryptocurrency marketplace as a convenient destination where customers Leading Retail Outlets can buy Bitcoin." Denny Tewell, Senior Vice President Global Merchandise and Procurement (1) Via a partnership with payment processing provider. Select partners represented. 22

## Bitcoin Depot Results Decoupled from Crypto Prices



(1) Factset as of June 30, 2022.

🟡 **BITCOIN DEPOT**

23

Bitcoin Depot Results Decoupled from Crypto Prices $180 $80 $160 $70 $140 $60 $120 $50 $100 $40 $80 $30 $60 $20 $40 $10 $20 $0 Q1'20 Q2'20 Q3'20 Q4'20 Q1'21 Q2'21 Q3'21 Q4'21 Q1'22 Q2'22 (1) Total Transaction Volume Bitcoin Price (1) Factset as of June 30, 2022. 23 Total Transaction Volume ($mm) (1) Bitcoin Price ($'000)

## Transaction Volume by Kiosk Cohort



🟡 **BITCOIN DEPOT**  (1) *Calculated since the initial deployment years for respective cohort groups.*

24

Transaction Volume by Kiosk Cohort Annual Cohort 1H Cohort (1) (1) Initial Year 1H Transaction Volume 1H 2022 Transaction Volume Initial Year Transaction Volume 2021 Transaction Volume CAGR CAGR $89 $193 +73% +164% $52 $84 $73 +26% +134% +49% +75% $15 +56% +17% +23% $10 $19 $18 $15 $4 $4 $3 $2 $1 $1 $4 $4 $1H 1H 1H 1H 1H 1H 1H 1H 2017 Cohort 2018 Cohort 2019 Cohort 2020 Cohort 1H17 Cohort 1H18 Cohort 1H19 Cohort 1H20 Cohort 1H21 Cohort # of 59 65 335 900 28 46 62 230 1,663 Kiosks: (1) Calculated since the initial deployment years for respective cohort groups. 24 Transaction Volume ($mm) Transaction Volume ($mm)

## BDCHECKOUT    Cryptocurrencies "At The Register"

- We signed an agreement with an industry leading payment processing provider, allowing customers to purchase crypto at **over 8,000 retail locations across 22 states and Puerto Rico** [1]
- Agreements with retailers that have **over 18,000 locations** [1]
- Through this relationship, we can scale our customer reach with **limited capital expenditure**

| Find a Location | Select an Amount | Pay at Register | Complete Transaction |
|---|---|---|---|

   

*Find a potential location*    ***Select an amount*** *to purchase, transaction limits are displayed here*    *Bring barcode to scan at* ***retailer's register***    *Once purchased, customers can* ***send and exchange crypto immediately***

 **BITCOIN DEPOT**  (1) *As of August 12, 2022.*  25

Cryptocurrencies "At The Register" We signed an agreement with an industry leading payment processing provider, allowing customers to purchase crypto at over 8,000 (1) retail locations across 22 states and Puerto Rico (1) Agreements with retailers that have over 18,000 locations Through this relationship, we can scale our customer reach with limited capital expenditure Find a Location Select an Amount Pay at Register Complete Transaction Find a potential location Select an amount to Bring barcode to scan at Once purchased, customers can send retailer's register purchase, transaction and exchange crypto immediately limits are displayed here 25 (1) As of August 12, 2022.

## Multiple Future Growth Opportunities



*Credit/Debit Transactions on BTMs*



*International Expansion*



*Industry Consolidation*



*Additional Consumer-Facing Financial Services*



*Buy/Sell Cryptos on Traditional Cash ATMs*



*B2B Software and Data Solutions*

 **BITCOIN DEPOT**  26

Multiple Future Growth Opportunities Credit/Debit International Industry Transactions Expansion Consolidation on BTMs Additional Consumer- Buy/Sell Cryptos B2B Software Facing Financial on Traditional and Data Solutions Services Cash ATMs 26

## Financial Summary

| ($mm) | Actual | | | |
|---|---|---|---|---|
| | CY2020 | CY2021 | 1H 2021 | 1H 2022 |
| Revenue | $245 | $549 | $248 | $322 |
| Gross Profit (Non-GAAP) [1] | $31 | $56 | $24 | $35 |
| % of Revenue | 13% | 10% | 10% | 11% |
| Adjusted EBITDA [2] | $21 | $29 | $14 | $22 |
| % of Gross Profit | 68% | 53% | 59% | 64% |

*Note: Majority of revenue is represented by total transacted volume at kiosks.*
*(1)  Gross Profit is a non-GAAP measure. Please see appendix.*
*(2)  Adjusted EBITDA is a non-GAAP measure. Please see appendix.*

 BITCOIN DEPOT

 27

Financial Summary ($mm) Actual CY2020 CY2021 1H 2021 1H 2022 Revenue $245 $549 $248 $322 (1) $31 $56 $24 $35 Gross Profit (Non-GAAP) % of Revenue 13% 10% 10% 11% (2)(3) $21 $29 $14 $22 Adjusted EBITDA % of Gross Profit 68% 53% 59% 64% Note: Majority of revenue is represented by total transacted volume at kiosks. (1) Gross Profit is a non-GAAP measure. Please see appendix. (2) Adjusted EBITDA is a non-GAAP measure. Please see appendix. 27

## Key Business Takeaways

**Mainstreaming of Cryptocurrency and Digital Assets**

**#1 Bitcoin ATM Operator in North America with 7,000+ Kiosks**

**Key Retail Relationships, Highlighted by Circle K**

**Multiple Service Offerings and Geographic Expansion Opportunities Driving Growth**

**Meaningful Revenue Scale and Currently Profitable**

 BITCOIN DEPOT

28

Key Business Takeaways Mainstreaming of Cryptocurrency and Digital Assets #1 Bitcoin ATM Operator in North America with 7,000+ Kiosks Key Retail Relationships, Highlighted by Circle K Multiple Service Offerings and Geographic Expansion Opportunities Driving Growth Meaningful Revenue Scale and Currently Profitable 28



Appendix 29

## Reconciliation of Non-GAAP Financials

| ($mm) | Actual | | | |
|---|---|---|---|---|
| | CY2020 | CY2021 | 1H 2021 | 1H 2022 |
| **Revenue** | $ 245 | $ 549 | $ 248 | $ 322 |
| Cost of Revenue [1] | (214) | (493) | (224) | (287) |
| **Gross Profit (Non-GAAP)** | $ 31 | $ 56 | $ 24 | $ 35 |

| ($mm) | Actual | | | |
|---|---|---|---|---|
| | CY2020 | CY2021 | 1H 2021 | 1H 2022 |
| **Net Income** | $ 14 | $ 6 | $ 5 | $ 6 |
| Interest Expenses | 1 | 8 | 3 | 6 |
| Tax Expenses | - | (0) | - | - |
| Depreciation & Amortization | 2 | 13 | 5 | 9 |
| Non-Recurring Expenses | 0 | 2 | 1 | 1 |
| Stock Based Compensation | - | 1 | - | 1 |
| Special Bonus | 3 | - | - | - |
| **Adjusted EBITDA** | $ 21 | $ 29 | $ 14 | $ 22 |

*Note: Non-GAAP financials are unaudited figures.*
*(1)  Cost of Revenue consists primarily of direct costs related to selling digital assets and operating Bitcoin Depot's network of kiosks, excluding depreciation and amortization.*



30

Reconciliation of Non-GAAP Financials ($mm) Actual CY2020 CY2021 1H 2021 1H 2022 Revenue $ 245 $ 549 $ 248 $ 322 (1) Cost of Revenue ( 214) ( 493) (224) (287) Gross Profit (Non-GAAP) $ 31 $ 56 $ 24 $ 35 ($mm) Actual CY2020 CY2021 1H 2021 1H 2022 Net Income $ 14 $ 6 $ 5 $ 6 Interest Expenses 1 8 3 6 Tax Expenses - (0) - - Depreciation & Amortization 2 13 5 9 Non-Recurring Expenses 0 2 1 1 Stock Based Compensation - 1 - 1 Special Bonus 3 - - - Adjusted EBITDA $ 21 $ 29 $ 14 $ 22 Note: Non-GAAP financials are unaudited figures. (1) Cost of Revenue consists primarily of direct costs related to selling digital assets and operating Bitcoin Depot's network of kiosks, excluding depreciation and amortization. 30

# Risks Related to Our Business and Industry

1. Our transaction volume may be partially dependent on the prices of digital assets, which can be volatile. If such prices decline, the volume of customer transactions could decrease and our business, operating results, and financial condition would be adversely affected.

2. Our long-term success depends on our ability to develop new and innovative products and services to address and keep pace with the rapidly evolving market for payments and financial services, and, if we are not able to implement successful enhancements and new features for our products and services, our business, operating results and financial condition could be materially and adversely affected.

3. Our risk management efforts may not be effective, which could expose us to losses and liability and otherwise harm our business.

4. We obtain and process a large amount of sensitive customer data. Any real or perceived improper use of, disclosure of, or access to such data could harm our reputation, as well as have an adverse effect on our business.

5. We operate in a highly competitive industry and we compete against unregulated or less regulated companies and companies with greater financial and other resources, and our business, operating results, and financial condition may be adversely affected if we are unable to respond to our competitors effectively.

6. Converting cash into digital assets (and vice versa) involves risks, which could result in loss of customer assets, customer disputes and other liabilities, which could adversely impact our business.

7. Disputes with our customers could adversely impact our brand and reputation and our business, operating results, and financial condition.

8. There are a number of risks associated with our international operations that could adversely affect our business.

9. Our products and services may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. If any of our customers use our business to further such illegal activities, our business could be adversely affected.

10. If we fail to retain existing customers or add new customers, or if our customers decrease their level of engagement with our products and services, our business, operating results, and financial condition may be significantly harmed.

11. Our strategy and focus on delivering high-quality, compliant, easy-to-use, and secure digital asset-related services may not maximize short-term or medium-term financial results.

12. From time to time, we may encounter technical issues in connection with the integration of supported digital assets and changes and upgrades to their underlying networks, which could adversely affect our business.

13. Any significant disruption in our kiosks or software, in our information technology systems, or in any of the blockchain networks related to our business, could result in a loss of customers or funds and adversely impact our brand and reputation and our business, operating results, and financial condition.

14. Banks and financial institutions may not provide banking services, or may cut off services, to businesses that engage in bitcoin- and/or other digital asset-related activities, or that accept bitcoin as payment, including financial institutions of investors in our securities, and we may be exposed to counterparty risk as a result.

15. Due to unfamiliarity and some negative publicity associated with digital asset-related businesses, existing and potential customers may lose confidence in digital asset-related products and services which could negatively affect our business.

16. We have entered into, and may enter into in the future, acquisitions, strategic investments, partnerships or relationships, entries into new businesses, joint ventures, divestitures, and other transactions which could fail to achieve strategic objectives, disrupt our ongoing operations or result in operating difficulties, divert the attention of management, liabilities and expenses, harm our business, and negatively impact our results of operations.

17. We may not be able to secure financing on favorable terms, or at all, to meet our future capital needs, and our existing debt financing agreements contain, and any future debt financing agreements may contain, covenants that impact the operation of our business and pursuit of business opportunities.

18. Expanding our business globally subjects us to new challenges and risks.



Risks Related to Our Business and Industry 1. Our transaction volume may be partially dependent on the prices of digital assets, which can be volatile. If such prices decline, the volume of customer transactions could decrease and our business, operating results, and financial condition would be adversely affected. 2. Our long-term success depends on our ability to develop new and innovative products and services to address and keep pace with the rapidly evolving market for payments and financial services, and, if we are not able to implement successful enhancements and new features for our products and services, our business, operating results and financial condition could be materially and adversely affected. 3. Our risk management efforts may not be effective, which could expose us to losses and liability and otherwise harm our business. 4. We obtain and process a large amount of sensitive customer data. Any real or perceived improper use of, disclosure of, or access to such data could harm our reputation, as well as have an adverse effect on our business. 5. We operate in a highly competitive industry and we compete against unregulated or less regulated companies and companies with greater financial and other resources, and our business, operating results, and financial condition may be adversely affected if we are unable to respond to our competitors effectively. 6. Converting cash into digital assets (and vice versa) involves risks, which could result in loss of customer assets, customer disputes and other liabilities, which could adversely impact our business. 7. Disputes with our customers could adversely impact our brand and reputation and our business, operating results, and financial condition. 8. There are a number of risks associated with our international operations that could adversely affect our business. 9. Our products and services may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. If any of our customers use our business to further such illegal activities, our business could be adversely affected. 10. If we fail to retain existing customers or add new customers, or if our customers decrease their level of engagement with our products and services, our business, operating results, and financial condition may be significantly harmed. 11. Our strategy and focus on delivering high-quality, compliant, easy-to-use, and secure digital asset-related services may not maximize short-term or medium-term financial results. 12. From time to time, we may encounter technical issues in connection with the integration of supported digital assets and changes and upgrades to their underlying networks, which could adversely affect our business. 13. Any significant disruption in our kiosks or software, in our information technology systems, or in any of the blockchain networks related to our business, could result in a loss of customers or funds and adversely impact our brand and reputation and our business, operating results, and financial condition. 14. Banks and financial institutions may not provide banking services, or may cut off services, to businesses that engage in bitcoin- and/or other digital asset-related activities, or that accept bitcoin as payment, including financial institutions of investors in our securities, and we may be exposed to counterparty risk as a result. 15. Due to unfamiliarity and some negative publicity associated with digital asset-related businesses, existing and potential customers may lose confidence in digital asset-related products and services which could negatively affect our business. 16. We have entered into, and may enter into in the future, acquisitions, strategic investments, partnerships or relationships, entries into new businesses, joint ventures, divestitures, and other transactions which could fail to achieve strategic objectives, disrupt our ongoing operations or result in operating difficulties, divert the attention of management, liabilities and expenses, harm our business, and negatively impact our results of operations. 17. We may not be able to secure financing on favorable terms, or at all, to meet our future capital needs, and our existing debt financing agreements contain, and any future debt financing agreements may contain, covenants that impact the operation of our business and pursuit of business opportunities. 18. Expanding our business globally subjects us to new challenges and risks. 31

## Risks Related to Our Business and Industry (Cont'd)

19. Our business could be harmed if we are unable to accurately forecast demand for digital assets and to adequately manage our digital asset inventory.

20. Cryptocurrency inventory, including the inventory we maintain for our own account or inventory that may be maintained for us, and any investments in digital assets, are subject to volatile market prices, impairment, and other risks of loss.

21. Our products and services may not function as intended due to undetected errors in our software, hardware, and systems, product defects, developmental delays, or due to security breaches or incidents or human error in administering these systems, which could damage customer or third-party relations, decrease our potential profitability and expose us to liability, and materially and adversely affect our business.

22. Cybersecurity threats continue to increase in frequency and sophistication; a successful cybersecurity attack could interrupt or disrupt our information technology systems or cause the loss of confidential or protected data which could disrupt our business, force us to incur excessive costs or cause reputational harm.

23. Litigation or investigations involving us, our agents or other contractual counterparties could result in material settlements, fines or penalties and may adversely affect our business, financial condition and results of operations.

24. Major bank failure or sustained financial market illiquidity, or illiquidity at our clearing, cash management and custodial financial institutions, could adversely affect our business, financial condition and results of operations.

25. Our recent rapid growth, including growth in our transaction volume, may not be indicative of our future growth. Our rapid growth also makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful.

26. The further development and acceptance of digital asset networks and other digital assets, which represent a new and rapidly changing industry, are subject to a variety of factors that are difficult to predict and evaluate. The slowing or stopping of the development or acceptance of digital asset systems may adversely affect an investment in us.

27. Fluctuations in currency exchange rates could harm our operating results and financial condition.

28. If we are unable to adequately protect our brand and the intellectual property rights related to our existing and any new or enhanced products and services, or if we infringe on the rights of others, our business, prospects, financial condition and results of operations could be adversely affected.

29. We are subject to economic and geopolitical risk, business cycles, and the overall level of consumer, business and government spending, which could negatively affect our business, financial condition, results of operations and cash flows.

30. We depend on major mobile operating systems and third-party platforms. If Google Play, the Apple App Store, or other platforms prevent customers from downloading our mobile app, our ability to grow may be adversely affected.

31. If miners or validators of any supported digital asset demand high transaction fees, our operating results may be adversely affected.

32. We rely on search engines, social networking sites and other web-based platforms to attract a meaningful portion of our customers, and if those search engines, social networking sites and other web-based platforms change their listings or policies regarding advertising, or increase their pricing or suffer problems, it may limit our ability to attract new customers.





Risks Related to Our Business and Industry (Cont'd) 19. Our business could be harmed if we are unable to accurately forecast demand for digital assets and to adequately manage our digital asset inventory. 20. Cryptocurrency inventory, including the inventory we maintain for our own account or inventory that may be maintained for us, and any investments in digital assets, are subject to volatile market prices, impairment, and other risks of loss. 21. Our products and services may not function as intended due to undetected errors in our software, hardware, and systems, product defects, developmental delays, or due to security breaches or incidents or human error in administering these systems, which could damage customer or third-party relations, decrease our potential profitability and expose us to liability, and materially and adversely affect our business. 22. Cybersecurity threats continue to increase in frequency and sophistication; a successful cybersecurity attack could interrupt or disrupt our information technology systems or cause the loss of confidential or protected data which could disrupt our business, force us to incur excessive costs or cause reputational harm. 23. Litigation or investigations involving us, our agents or other contractual counterparties could result in material settlements, fines or penalties and may adversely affect our business, financial condition and results of operations. 24. Major bank failure or sustained financial market illiquidity, or illiquidity at our clearing, cash management and custodial financial institutions, could adversely affect our business, financial condition and results of operations. 25. Our recent rapid growth also makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful. 26. The further development and acceptance of digital asset networks and other digital assets, which represent a new and rapidly changing industry, are subject to a variety of factors that are difficult to predict and evaluate. The slowing or stopping of the development or acceptance of digital asset systems may adversely affect an investment in us. 27. Fluctuations in currency exchange rates could harm our operating results and financial condition. 28. If we are unable to adequately protect our brand and the intellectual property rights related to our existing and any new or enhanced products and services, or if we infringe on the rights of others, our business, prospects, financial condition and results of operations could be adversely affected. 29. We are subject to economic and geopolitical risk, business cycles, and the overall level of consumer, business and government spending, which could negatively affect our business, financial condition, results of operations and cash flows. 30. We depend on major mobile operating systems and third-party platforms. If Google Play, the Apple App Store, or other platforms prevent customers from downloading our mobile app, our ability to grow may be adversely affected. 31. If miners or validators of any supported digital asset demand high transaction fees, our operating results may be adversely affected. 32. We rely on search engines, social networking sites and other web-based platforms to attract a meaningful portion of our customers, and if those search engines, social networking sites and other web- based platforms change their listings or policies regarding advertising, or increase their pricing or suffer problems, it may limit our ability to attract new customers. 32

## Risks Related to Government Regulation and Privacy Matters

33. Any failure to obtain or maintain necessary money transmission licenses could adversely affect our operations.

34. We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.

35. It may be illegal now, or in the future, to acquire, own, hold, sell or use bitcoin, or other cryptocurrencies, participate in blockchains or utilize similar digital assets in one or more countries, the ruling of which would adversely affect us.

36. The theft, loss, or destruction of private keys required to access any digital assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any digital assets, it could cause regulatory scrutiny, reputational harm, and other losses.

37. The digital asset economy is novel and has limited access to policymakers or lobbying organizations, which may harm our ability to effectively react to proposed legislation and regulation of digital assets or digital asset businesses adverse to our company.

38. Our obligations to comply with the laws, rules, regulations, and policies of a variety of international jurisdictions may increase and we may be subject to inquiries, investigations, and enforcement actions by U.S. and non-U.S. regulators and governmental authorities, including those related to sanctions, export control, and anti-money laundering.

39. Complex and evolving U.S. and international laws and regulation regarding privacy and data protection could result in claims, changes to our business practices, penalties, increased cost of operations or otherwise harm our business.

40. We are subject to compliance with U.S. anti-money laundering laws, the Bank Secrecy Act, the Dodd-Frank Act, the Foreign Corrupt Practices Act and numerous laws and regulations. Failure to comply with these laws could result in material settlements, fines, penalties and increased operating costs, all of which may adversely affect our business, financial condition and results of operations.

41. Future developments in tax laws or regulations regarding the treatment and reporting of digital assets for U.S. and foreign tax purposes could adversely impact our tax expense and liabilities, reporting obligations, liquidity and business.

42. Digital assets held by us are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

43. If we were deemed to be an investment company under the Investment Company Act of 1940, applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business, financial condition and results of operations.

## Risks Related to Third Parties

44. We currently rely on third-party service providers and their systems for certain aspects of our operations, and any interruptions in services provided by these third parties may impair our ability to support our customers.

45. Many of our kiosks and key components to these kiosks are procured from a single or limited number of suppliers. Thus, we are at risk of shortage, price increases, tariffs, changes, delay, or discontinuation of these kiosks or components, which could disrupt and materially and adversely affect our business.

46. A substantial portion of our kiosks are placed with a small number of merchants as of the date of this presentation. The expiration, termination or renegotiation of any of these contracts with our top merchants, or if one or more of our top merchants were to cease doing business with us, or substantially reduce its dealings with us, could cause our revenues to decline significantly and our business, financial condition and results of operations could be adversely impacted.



Risks Related to Government Regulation and Privacy Matters 33. Any failure to obtain or maintain necessary money transmission licenses could adversely affect our operations. 34. We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws

and regulations could adversely affect our brand, reputation, business, operating results, and financial condition. 35. It may be illegal now, or in the future, to acquire, own, hold, sell or use bitcoin, or other cryptocurrencies, participate in blockchains or utilize similar digital assets in one or more countries, the ruling of which would adversely affect us. 36. The theft, loss, or destruction of private keys required to access any digital assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any digital assets, it could cause regulatory scrutiny, reputational harm, and other losses. 37. The digital asset economy is novel and has limited access to policymakers or lobbying organizations, which may harm our ability to effectively react to proposed legislation and regulation of digital assets or digital asset businesses adverse to our company. 38. Our obligations to comply with the laws, rules, regulations, and policies of a variety of international jurisdictions may increase and we may be subject to inquiries, investigations, and enforcement actions by U.S. and non-U.S. regulators and governmental authorities, including those related to sanctions, export control, and anti-money laundering. 39. Complex and evolving U.S. and international laws and regulation regarding privacy and data protection could result in claims, changes to our business practices, penalties, increased cost of operations or otherwise harm our business. 40. We are subject to compliance with U.S. anti-money laundering laws, the Bank Secrecy Act, the Dodd-Frank Act, the Foreign Corrupt Practices Act and numerous laws and regulations. Failure to comply with these laws could result in material settlements, fines, penalties and increased operating costs, all of which may adversely affect our business, financial condition and results of operations. 41. Future developments in tax laws or regulations regarding the treatment and reporting of digital assets for U.S. and foreign tax purposes could adversely impact our tax expense and liabilities, reporting obligations, liquidity and business. 42. Digital assets held by us are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections. 43. If we were deemed to be an investment company under the Investment Company Act of 1940, applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business, financial condition and results of operations. Risks Related to Third Parties 44. We currently rely on third-party service providers and their systems for certain aspects of our operations, and any interruptions in services provided by these third parties may impair our ability to support our customers. 45. Many of our kiosks and key components to these kiosks are procured from a single or limited number of suppliers. Thus, we are at risk of shortage, price increases, tariffs, changes, delay, or discontinuation of these kiosks or components, which could disrupt and materially and adversely affect our business. 46. A substantial portion of our kiosks are placed with a small number of merchants as of the date of this presentation. The expiration, termination or renegotiation of any of these contracts with our top merchants, or if one or more of our top merchants were to cease doing business with us, or substantially reduce its dealings with us, could cause our revenues to decline significantly and our business, financial condition and results of operations could be adversely impacted. 33

# Risk Related to Management and Employees

47. Our founder and chief executive officer has control over key decision making as a result of his control of a majority of the voting power of our outstanding capital stock.

48. Our management team has limited experience managing a public company.

49. The loss of one or more of our key personnel, or our failure to attract and retain other highly qualified personnel in the future, could adversely impact our business, operating results and financial condition.

50. Our officers, directors, employees, and large stockholders may encounter potential conflicts of interests with respect to their positions or interests in digital assets, entities, and other initiatives, which could adversely affect our business and reputation.

# General Risk Factors

51. Adverse economic conditions may adversely affect our business.

52. Investors' expectations of our performance relating to environmental, social and governance factors may impose additional costs and expose us to new risks.

53. We may be adversely affected by natural disasters, pandemics such as COVID-19, and other catastrophic events, and by man-made problems such as geopolitical conflicts and terrorism, that could disrupt our business operations, and our business continuity and disaster recovery plans may not adequately protect us from a serious disaster.

54. The requirements of being a public company, including maintaining adequate internal control over our financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act, may strain our resources, divert management's attention, and affect our ability to attract and retain executive management and qualified board members.

55. We might require additional capital to support business growth, and this capital might not be available.

56. Our projections are subject to significant risks, assumptions, estimates and uncertainties. As a result, our projected revenues, market share, expenses and profitability may differ materially from our expectations in any given quarter or fiscal year.

57. Key business metrics and other estimates are subject to inherent challenges in measurement, and our business, operating results, and financial condition could be adversely affected by real or perceived inaccuracies in those metrics.

58. If our estimates or judgment relating to our critical accounting policies prove to be incorrect, our operating results could be adversely affected.

59. The nature of our business requires the application of complex financial accounting rules, and there is limited guidance from accounting standard setting bodies. If financial accounting standards undergo significant changes, our operating results could be adversely affected.

60. We have identified material weaknesses in our internal control over financial reporting. If we are unable to develop and maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results in a timely manner, which may adversely affect investor confidence in us and materially and adversely affect our business and operating results, and we may face litigation as a result.

 BITCOIN DEPOT

34

Risk Related to Management and Employees 47. Our founder and chief executive officer has control over key decision making as a result of his control of a majority of the voting power of our outstanding capital stock. 48. Our management team has limited experience managing a public company. 49. The loss of one or more of our key personnel, or our failure to attract and retain other highly qualified personnel in the future, could adversely impact our business, operating results, and financial condition. 50. Our officers, directors, employees, and large stockholders may encounter potential conflicts of interests with respect to their positions or interests in digital assets, entities, and other initiatives, which could adversely affect our business and reputation. General Risk Factors 51. Adverse economic conditions may adversely affect our business. 52. Investors' expectations of our performance relating to environmental, social and governance factors may impose additional costs and expose us to new risks. 53. We may be adversely affected by natural disasters, pandemics such as COVID-19, and other catastrophic events, and by man-made problems such as geopolitical conflicts and terrorism, that could disrupt our business operations, and our business continuity and disaster recovery plans may not adequately protect us from a serious disaster. 54. The requirements of being a public company, including maintaining adequate internal control over our financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act, may strain our resources, divert management's attention, and affect our ability to attract and retain executive management and qualified board members. 55. We might require additional capital to support business growth, and this capital might not be available. 56. Our projections are subject to significant risks, assumptions, estimates and uncertainties. As a result, our projected revenues, market share, expenses and profitability may differ materially from our expectations in any given quarter or fiscal year. 57. Key business metrics and other estimates are subject to inherent challenges in measurement, and our business, operating results, and financial condition could be adversely affected by real or perceived inaccuracies in those metrics. 58. If our estimates or judgment relating to our critical accounting policies prove to be incorrect, our operating results could be adversely affected. 59. The nature of our business requires the application of complex financial accounting rules, and there is limited guidance from accounting standard setting bodies. If financial accounting standards undergo significant changes, our operating results could be adversely affected. 60. We have identified material weaknesses in our internal control over financial reporting. If we are unable to develop and maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results in a timely manner, which may adversely affect investor confidence in us and materially and adversely affect our business and operating results, and we may face litigation as a result. 34