# EXHIBIT 1

# EXHIBIT 1

# Kiosk Site Location Agreement

This Kiosk Site Location Agreement (the "Agreement") is made and entered into effect ( 3/9/2021 ) by and between Lux Vending, LLC ("Owner"), and ("Location") Roja 2 LLC

1. **Equipment:** Owner owns kiosks that facilitate the purchase and sale of virtual currency and owns or has the right to use all software needed for the operation of the kiosk (the "Kiosk"). Location agrees that Owner may install, operate, and maintain its Kiosk at Location's premises identified in Exhibit "1" attached hereto (the "Premises"). The Kiosk will be installed in an indoor, mutually agreeable location on the Premises. The Kiosk will be installed to provide an unrestricted view of the Kiosk with room for signage. Location will provide sufficient space for the Kiosk as is necessary to enable customers to have unobstructed access to the Kiosk and for maintenance and servicing of the Kiosk.

2. **Availability:** Location agrees that the Kiosk shall at all times remain available for use by Location's customers during Location's normal business hours for the Term (defined below) of this Agreement. Owner reserves the right to schedule reasonable downtime to accomplish necessary maintenance or system improvements.

3. **Location Fees:** Once the Kiosk has been installed on the Premises and is fully operational for use by the public, Owner shall pay Location a fee equal to three hundred dollars and zero cents ($300.00) per month throughout the Term or three dollars ($3.00) per transaction (the "Location Fee"). Whichever of the two payments is greater will be disbursed to the Location. For purposes of this Agreement, a transaction is defined as any sale of virtual currency where a transaction fee is collected by the Owner. The Location Fee will be disbursed monthly by Owner to Location the calendar month following the calendar month in which the Kiosk transactions occurred.

4. **Title:** Title to the Kiosk is, and shall at all times remain with the Owner. The Kiosk shall not be transferred or delivered legally or physically to any person other than Owner without prior written consent of Owner; neither shall this Agreement nor the bailment be assigned by Location, either by its own acts or by operation of law. In the event that any creditor of Location enters the Premises for the purpose of taking possession of Location's separate property pursuant to a security agreement, Writ of Possession, Distress Warrant or Writ of Fieri Facias, Location shall identify, designate, and exclude the Kiosk as Owner's property not subject to repossession or execution. Location shall promptly notify Owner in writing of any attempts by any creditor, landlord or third-party claimants seeking to repossess Location's separate property or seeking to execute a Writ of Possession, Distress Warrant or Writ of Fieri Facias at the Premises. Upon Owner's request, Location shall further identify any such creditors, landlords or third-party claimants to Owner. Upon request, Location shall execute and deliver documentation to put third parties on notice of Owner's ownership of the Kiosk. Notwithstanding Section 5 herein, Location acknowledges that the Kiosk is not a fixture of the Premises and Location shall undertake all necessary steps to ensure that the Kiosk does not become a fixture of the Premises. Except as otherwise provided in this Agreement, all cash kept in the Kiosk shall be the property of Owner.

5. **Installation/Training:** Owner agrees to ship and install the Kiosk at the Premises, train Location's staff as necessary, and deliver initial supplies to Location.  Subject to the terms and provisions of Section 4 herein, Owner shall have the right to bolt down the Kiosk and install appropriate signage at the Premises to advertise the availability of the Kiosk.

6. **Maintenance/Repair:** Owner, at its expense, will arrange for necessary servicing and repair of the Kiosk.  In the event of any Kiosk failure, damage, or other problem requiring repair, replacement, adjustment, or maintenance, Location shall notify Owner, or a person designated by Owner, within twenty-four (24) hours of first becoming aware of such failure, damage, or problem.  Location will not permit anyone, other than an authorized representative or designee of Owner, to perform any service or repair work on the Kiosk without Owner's prior written approval. Owner or its representatives shall, at any reasonable time and at all times during business hours, have the right to enter into and upon the Premises for the purpose of inspecting, repairing, maintaining, or upgrading the Kiosk and observing its use.  Location shall cooperate in allowing Owner to perform maintenance, service, updates, or repairs that can be performed by remote communication. Owner, or Owner's agents, shall replace paper in the Kiosk when necessary and shall correct any misfeeds.  Location shall maintain the space surrounding the Kiosk in a safe, neat, and orderly condition.

7. **Inventory Requirements:** Owner or Owner's agents shall maintain inventory of an adequate supply of paper and Bitcoin for the Kiosk.  Owner shall keep sufficient amounts of cash in the Kiosk at all times during Location's normal business hours if the Kiosk dispenses cash.

8. **Internet & Electrical Requirements:** Location can choose to provide and maintain a dedicated business Ethernet or Wi-Fi connection for the Kiosk or Location may require the Owner to provide a wireless connection for the Kiosk. Location shall, at its expense, provide one (1) dedicated operating electrical power outlet (110v).  Both the internet connection and the electrical power outlet shall be located within two (2) feet of the Kiosk site, or an extension cord shall be provided by Location.  Location shall pay for all expenses incurred for an internet connection if Location provides an ethernet connection for the Kiosk.  Location shall pay for all expenses incurred in connection with electrical power usage necessary to operate the Kiosk and related signage. Location shall not interfere with the Kiosk's electrical or internet connectivity for duration of the Agreement and Location shall not disconnect or deactivate the Kiosk or allow the Kiosk to be disconnected or deactivated. If the Kiosk remains disconnected or deactivated after Owner provides written notice, Owner will be excused from paying the Location Fee for so long as the Kiosk remains disconnected or deactivated and Location shall be liable to Owner for a "Disconnection Fee" in the amount of One Hundred ($100.00) for each day the Kiosk remains disconnected or deactivated. The Parties acknowledge and agree that the Disconnection Fee is not a penalty but is instead intended to be liquidated damages.  The Parties agree and acknowledge that Owner's damages would be difficult to estimate upon disconnection or deactivation of the Kiosk but that One Hundred Dollars per day ($100.00) is a reasonable method of calculating Owner's damages and the Parties agree that this provision should be read as liquidated damages rather than a penalty.  Location's liability

2

for the Disconnection Fee will continue during the Term for so long as the Kiosk remains disconnected or deactivated. Owner may retrieve the Kiosk for purposes of safe keeping, but Owner's acceptance of the Kiosk will not discharge Location of its obligation to pay the Disconnection Fee. Location agrees to pay Owner's reasonable attorney's fees and expenses of litigation in the event Owner engages counsel to collect the Disconnection Fee.

9. **Exclusivity; Competitors:**

   9.1    Location shall not permit the removal of the Kiosk from the Premises for the duration of the Term.

   9.2    Location shall not enter into an agreement with any Competitor or allow the placement of a Competitor's kiosk on the Premises (whether inside or outside the Premises) or anywhere on the underlying real property on which the Premises are located, nor subscribe to any processing service for the purchase or sale of virtual currency on the Premises that may compete with the Owner's Kiosk during the term of this Agreement. For purposes of this Agreement, "Competitor" means any person or entity that trades virtual currency; owns or operates digital currency kiosks; or conducts, authorizes, offers or provides services and products of the type conducted, authorized, offered or provided by Bitcoin Depot during the term of this Agreement or any person or entity that facilitates the purchase or sale of digital currency.

   9.3    Location agrees that Owner shall have the exclusive right to provide digital currency kiosks or any terminal that can conduct and/or execute digital currency transactions to Location and to all other business sites occupied (including by way of ownership, lease or sublease) by Location.

   9.4    If Location violates this Agreement by entering into an agreement with a Competitor and fails to cure such violation within thirty (10) days after receipt of Owner's notice of the violation, Owner shall have all remedies provided by law.

   9.5    Location's obligations under this Section 9 have been assumed as an accommodation to Owner and as a material inducement to Owner to enter into this Agreement. Any breach of Location's obligations under this Section 9 shall be deemed a material breach of this Agreement. The Parties agree that Location's breach of this exclusivity agreement would cause irreparable damage to Owner and monetary damages would provide inadequate remedy to Owner. Owner will be entitled to seek temporary and permanent injunctive relief to prohibit additional violations of this exclusivity agreement in addition to seeking any award of damages for such violation.

10. **Protection Requirements:** Location shall exercise due care for the safekeeping and maintenance of the Kiosk. Location shall not be held liable for damage, theft or loss of the Kiosk except in cases of fraud, gross negligence, or intentional malfeasance by the

Location.  Owner shall have no liability to Location in the event of theft, damage or loss caused by the Kiosk.

11. **Ownership of Premises or Lease Term(s):** Location represents and warrants that it is the owner of the Premises or that it holds a lease or option to renew a lease of the Premises of equal or greater length than the Initial Term (as defined below) of this Agreement.  If Location leases the premises, the Location shall notify Owner of any dispossessory or distress proceedings initiated against Location or the Premises within twenty-four (24) hours of being served with process of the dispossessory or distress proceedings.  In the event that dispossessory or distress proceedings are initiated against Location, Owner has the right to terminate this Agreement and reclaim possession of the Kiosk.

12. **Relocation; Sale; Expansion:** In the event Location transfers or moves its business from the Premises, expands its business to additional sites, or if Location sells its business or substantially all of its assets, Location shall provide Owner with at least sixty (60) days' advance written notice of such occurrence (or as much notice as reasonably practicable) ("Location's Notice"). Owner shall have the exclusive option to install an additional Kiosk at the Location's (or its successor in interest's) new business site(s) along the same terms and conditions set forth in this Agreement (the "Option"); and Owner may exercise its Option by delivering written notice of its intent to exercise its Option within thirty (30) days from its receipt of Location's Notice. Location agrees that, in the event of transfer, move or sale of Location's business, this Agreement remains in full force and effect as to the Location's new business site(s) and Exhibit "1" shall be deemed amended so that the Premises shall include the Location's new business site(s).  If the Location is sold or sells substantially all of its assets outside the ordinary course of business, this Agreement will terminate and Location's obligations discharged so long as Location provides a document to Owner evidencing the sale such as a receipt, asset purchase agreement or bill of sale.

13. **Term:** This Agreement shall be for a term of three (3) years from the date of installation of the Kiosk at the Premises, unless amended or terminated by written agreement signed by both Owner and Location, or terminated as set forth below (the "Initial Term").  Upon the expiration of the Initial Term, this Agreement will automatically renew for subsequent additional terms of three (3) years each on the same terms and conditions as provided herein unless canceled by written notice at least ninety (90) days prior to expiration of the then current term (the Initial Term, as extended, the "Term").

14. **Termination:** Upon the occurrence of a breach, either party may terminate this Agreement effective ten (10) days after giving written notice of intent to terminate, provided that such breach continues for ten (10) days after notice of such breach.  Either party may terminate this Agreement in accordance with the terms and provisions of Section 13.  In addition, Owner may terminate this Agreement upon giving thirty (30) days prior written notice to Location.  Owner has the right to terminate this Agreement immediately in the event of damage, destruction, vandalism, misuse, loss, or the Owner, in good faith, believes that the Kiosk is at risk for damage, destruction, vandalism, misuse or loss.  Even if the Agreement is terminated, Location's obligation to pay a Disconnection Fee shall survive for the duration of the length of the Term.  In the event the Agreement is terminated, Owner may

declare all Disconnection Fees due for the length of the Term immediately due and payable so long as the Owner discounts the future Disconnection Fees to a net present value using the Wall Street Journal's Prime Rate.

All notices hereunder shall be in writing and shall be deemed given upon personal delivery or upon deposit in the United States certified mail, return receipt requested, with postage paid or by overnight receipted courier service, addressed to Owner and Location at their respective addresses as listed below. Any party may change its address for notice in accordance with the terms of this paragraph.

15. **Disclaimer:** EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, LOCATION UNDERSTANDS AND AGREES THAT OWNER MAKES NO WARRANTY, EXPRESS, IMPLIED, OR STATUTORY AS TO ANY MATTER WHATSOEVER, INCLUDING THE CONDITION OF THE KIOSK, ITS MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. OWNER SHALL IN NO EVENT BE RESPONSIBLE FOR ANY LOST PROFITS OR INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR INDIRECT DAMAGES THAT LOCATION MAY INCUR. OWNER'S SOLE LIABILITY TO LOCATION HEREUNDER, EXCEPT AS OTHERWISE PROVIDED, SHALL BE TO REMEDY ANY BREACH OF THIS AGREEMENT IN A TIMELY MANNER. NEITHER PARTY WILL BE LIABLE FOR FAILURE TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT IF SUCH FAILURE IS DUE TO ACTS OR EVENTS BEYOND SUCH PARTY'S REASONABLE CONTROL.

16. **Not Assignable:** Location shall not assign or dispose of any of its rights or obligations under this agreement without prior written consent of Owner. This agreement is binding on the successors and permitted assigns of the parties.

17. **Waiver:** A waiver by either party of a breach of any provision of this Agreement shall not constitute a waiver of that party's rights to otherwise demand strict compliance with this Agreement and any and all provisions hereof.

18. **Arbitration:** Except as specified in this Section 18, any dispute, controversy, or claim arising out of or relating to this Agreement or the breach, termination or validity of this Agreement will be submitted to arbitration as prescribed herein. The parties will agree on a single arbitrator within thirty (30) days of receipt of a notice of intent to arbitrate. Such arbitrator will be knowledgeable about the ATM industry and will conduct the arbitration under the current Commercial Arbitration rules of the American Arbitration Association ("AAA"), unless otherwise provided herein. The arbitrator will be selected in accordance with AAA procedures from a list of qualified people maintained by AAA. The arbitration will be conducted in Atlanta, Georgia. The arbitrator's decision and award will be final and binding, and judgement upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereon. Any duty to arbitrate under this Agreement will remain in effect and enforceable after termination of this Agreement for any reason.

19. **Entire Agreement:** This Agreement, including any schedule or exhibit attached hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof. There are no other promises, representations, terms, conditions, or obligations other than those contained herein. This agreement supersedes all prior communications, representations or agreements, oral or written, between the parties and shall not be modified except in writing signed by both parties.

20. **Controlling Law:** This Agreement shall be construed, interpreted, and enforced in accordance with the laws of the State of Georgia, without regard to its conflict of law principles. The jurisdiction and venue for any legal proceeding to interpret or enforce this Agreement shall be in Fulton County, Georgia or any county where Owner (or its successor in interest) maintains its principal place of business or residence.

21. **Counterparts:** This Agreement may be executed in counterparts and exchanged via email transmission. Each email transmitted counterpart (including pdf) bearing a signature shall be an original for all purposes and all such counterparts shall constitute one and the same agreement.

22. **Third-Party Beneficiaries**.  There shall be no Third-Party Beneficiaries to this agreement.

IN WITNESS WHEREOF, the undersigned duty authorized representatives of the parties have executed this Agreement.

| **Owner** | **Location** |
|---|---|
| _____ | _____ |
| Lux Vending, LLC<br>2870 Peachtree Rd NE #327<br>Atlanta, GA  30305 | |
| | Are you the landlord or the tenant of the Location?<br>❏  Landlord<br>❏  Tenant |

**Exhibit "1"**

Address                                          of                                          Premises: