CARLTON FIELDS, P.A.
Adam Schwartz (Admitted *Pro Hac Vice*)
Email: aschwartz@carltonfields.com
John J. Lamoureux (Admitted *Pro Hac Vice*)
Email: jlamoureux@carltonfields.com
Corporate Center Three at International Plaza
4221 W. Boy Scout Boulevard, Suite 1000
Tampa, Florida  33607-5780
Telephone: 813/223-7000
Facsimile:  813/229-4133

HOLLEY DRIGGS
Stacy H. Rubin, Esq. (NV Bar No. 9298)
Email: srubin@nevadafirm.com
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: 702/791-0308
Facsimile:  702/791-1912

*Attorneys for Lux Vending, LLC d/b/a Bitcoin Depot*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No. 23-10423-MKN |
| CASH CLOUD, INC., dba COIN CLOUD, | Chapter 11 |
| Debtor. | |
| CASH CLOUD, INC., dba COIN CLOUD, | Adv. No. 23-01015-MKN |
| Plaintiff, | |
| v. | Judge: Hon. Mike K. Nakagawa |
| LUX VENDING, LLC d/b/a BITCOIN DEPOT, | |
| Defendant. | |

**DEFENDANT LUX VENDING, LLC d/b/a BITCOIN DEPOT'S REQUEST FOR JUDICIAL NOTICE**

HOLLEY DRIGGS

15482-01/2923306_2.DOCX
132624929.1

Pursuant to Federal Rule of Evidence 201, Defendant Lux Vending, LLC d/b/a Bitcoin Depot ("Bitcoin Depot"), by and through counsel Adam P. Schwartz and John J. Lamoureux of the law firm Carlton Fields, P.A., and Stacy H. Rubin of the law firm Holley Driggs, respectfully requests that the Court take judicial notice of a true copy of the following public document from the Ontario Superior Court of Justice.

**Exhibit A:**   **October 4, 2022 Reasons for Decision, *Cash Cloud Inc. v. BitAccess Inc.*, Ontario Superior Court of Justice, Case No. 2022 ONSC 5622 (Court File No. CV-22-89887)**

Under Federal Rule of Evidence 201, courts "may take judicial notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *See Lawson v. Klondex Mines Ltd.*, 450 F. Supp. 3d 1057, 1071 (D. Nev. 2020) (taking judicial notice of a Supreme Court of British Columbia's order); *Dickerson v. Wells Fargo Bank, N.A.*, 2017 WL 1371259, at *2 (D. Nev. Apr. 13, 2017) (a court may take judicial notice of "matters of public record").

The Ontario Superior Court's decision provides relevant background information between Cash Cloud, Inc., dba Coin Cloud ("Cash Cloud"), BitAccess Inc. ("BitAccess"), and Bitcoin Depot. Specifically, Cash Cloud requested, in part, that the court restrain BitAccess from deactivating the software used by Cash Cloud to operate its cryptocurrency kiosks. After an emergency hearing on September 1, 2022, and an additional hearing on September 26, 2022, the Ontario Superior Court dismissed the application for injunctive relief due to Cash Cloud's failure to provide an undertaking for damages as required under the rules. The Ontario Superior Court also noted that granting the injunction "would place too heavy a burden on BitAccess" because Cash Cloud was "already in the process of replacing BitAccess' software," and "[t]o grant the injunction as sought … would, in effect, allow Cash Cloud to continue to replace BitAccess'

///

///

///

///

///

- 2 -

132624929.1

software on its machines while, at the same time, force BitAccess to devote time and resources to service and support those kiosks that remain."

DATED this 12th day of April 2023.

**HOLLEY DRIGGS**

_____/s/ Stacy H. Rubin_____
Stacy H. Rubin, Esq. Nevada Bar No. 9298
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101

**CARLTON FIELDS, P.A.**
Adam P. Schwartz, Esq.
(Admitted *Pro Hac Vice*)
John J. Lamoureux, Esq.
(Admitted *Pro Hac Vice*)
Corporate Center Three at International Plaza
4221 W. Boy Scout Boulevard, Suite 1000
Tampa, Florida 33607-5780

*Attorneys for Lux Vending, LLC*
*d/b/a Bitcoin Depot*

- 3 -

132624929.1

# EXHIBIT A

**CITATION:** Cash Cloud v. BitAccess, 2022 ONSC 5622
**COURT FILE NO.:** CV-22-89887
**DATE:** 2022/10/04

### ONTARIO

### SUPERIOR COURT OF JUSTICE

**BETWEEN**

| | | |
|---|---|---|
| CASH CLOUD INC. | ) | Thomas Conway, Kevin Caron, and Jason |
| | ) | Rucci for the Applicant |
| Applicant | ) | |
| | ) | |
| **-and-** | ) | |
| | ) | |
| | ) | |
| BITACCESS INC. | ) | Peter Mantas, Nabila Abdul Malik, Gabrielle |
| | ) | Cyr, and Julien A. Frigon for the Respondent |
| Respondent | ) | |
| | ) | |
| | ) | **HEARD:** August 18, 2022, September 1, |
| | ) | 2022 and September 26, 2022 |
| | ) | |

### REASONS FOR DECISION

### HOOPER J.

### Overview

[1]     Cash Cloud Inc. d.o.b. Coin Cloud ("Cash Cloud") brought this urgent application for injunctive relief against BitAccess Inc. ("BitAccess") restraining BitAccess from terminating a Master Purchase Agreement dated January 23, 2020 and directing BitAccess to maintain the status quo under that agreement pending an arbitration between the parties.

[2]     There are many outstanding issues in this litigation; however, the urgent nature of this application derives from a termination letter dated August 4, 2022 wherein BitAccess stated its intention to:

      a.  deactivate cloud-based software used by the Applicant to operate its cryptocurrency kiosks; and

      b.  permanently delete the Applicant's customer information.

[3]     At the hearing held on August 18, 2022, BitAccess, through their counsel, provided an undertaking that no steps would be taken to do either (a) or (b) above, pending my decision. This removed the urgency of the proceeding and provided the court with an opportunity to review the hundreds of pages of evidence that had been filed.

[4]     Unfortunately, BitAccess' parent company, Lux Vending LLC d.b.a. Bitcoin Depot, did not agree with this undertaking, took control of the cloud-based software at issue in this proceeding, and deactivated the software on August 30, 2022. This necessitated an emergency hearing before me on September 1, 2022. At that time, I granted an interim order requiring the software be re-activated until my decision was rendered. The software was reactivated.

[5]     On September 21, 2022, the court received notice of a new development: the release of testimony by the Chair of the United States Securities and Exchange Commission ("SEC"), Gary Gensler before the United States Senate requiring corporations exchanging cryptocurrency to register forthwith with the SEC. BitAccess had previously put forth concerns regarding Cash Cloud's non-compliance with U.S. laws. BitAccess sought court direction regarding Mr. Gensler's testimony, expressing concern that my interim order could cause it to become non-compliant with the U.S. regulations as my order compelled BitAccess to continue all services. This includes a swap service where one cryptocurrency is exchanged or "swapped" for another. BitAccess believes that this particular service may require both it and Cash Cloud to register with the SEC.

[6]     A brief hearing on this issue was arranged for September 26, 2022. At that time, BitAccess conceded that its concern regarding U.S. SEC compliance was based solely on this testimony. The SEC had not yet published any guidelines or directives. There was no evidence my order actually ran afoul of any U.S. laws or regulations. As a result, no change was made to the interim order.

[7]     The following is my decision in relation to the original application for injunctive relief.

## Background

[8]     The Applicant, Cash Cloud, is a Nevada corporation which owns and operates a network of approximately 5,700 digital currency kiosk machines across the United States and Brazil. The Respondent, BitAccess, is a Canadian company headquartered in Ottawa. Initially, BitAccess developed BTM kiosks – machines similar to ATM's – enabling consumers to buy, sell, or exchange digital currency, such as Bitcoin and Ethereum, with traditional bank notes. Those BTM kiosks use specialized software, also developed by BitAccess.

[9]     The business relationship between these parties began in 2014 when the parties entered into the first Master Purchase Agreement. Under the 2014 agreement, Cash Cloud purchased several BitAccess BTM kiosks. BitAccess also granted Cash Cloud a limited licence for the use of its software to operate the kiosks.

[10]    In 2015, a further Master Purchase Agreement was entered into between the parties on virtually identical terms. Under this agreement, more BTM kiosks were purchased. Once again, BitAccess granted a limited licence to Cash Cloud for use of its software.

[11]    Thereafter, the market for digital currencies grew considerably. In 2017, BitAccess began to develop a new cloud-based software which could operate independently from its own kiosks and would be compatible across various platforms, including kiosks manufactured by third parties. As BitAccess' focus was now on software development, Cash Cloud began to purchase kiosks from other manufacturers with the intent to use BitAccess' new cloud-based software.

[12]    Both companies were aware of each other's actions and seemed to, for the most part, work cooperatively to build each other's share of the market.

[13]    With respect to the cloud-based software, BitAccess wanted a new agreement to be negotiated. To that end, a non-binding, Letter of Intent was signed December 12, 2017 to commence negotiations. That Letter of Intent was focused solely on the cloud-based software.

[14]    Following this Letter of Intent, BitAccess made numerous attempts to bring Cash Cloud to the table to negotiate a distribution agreement. Despite BitAccess' efforts in this regard, no distribution agreement was ever finalized.

[15]    On January 23, 2020, the parties executed a new Master Purchase Agreement. I have been advised that the terms of the 2014, 2015 and 2020 agreements are virtually identical, with the main difference being price. As a result, unless otherwise stated, any reference to the Master Purchase Agreement will be to the 2020 version ("2020 MPA").

[16]    After BitAccess turned its focus to cloud-based software, and as Cash Cloud began to purchase kiosks from third party providers, Cash Cloud also started to deactivate the kiosks it had originally purchased from BitAccess. By mid-2021 Cash Cloud deactivated the last of the BitAccess kiosks.

[17]    It is not challenged that this software is critical to the kiosks. Without this type of software, the kiosks are inoperable. As of August 2022, all of the kiosks operated by Cash Cloud were manufactured by companies other than BitAccess. The only service being provided by BitAccess was its cloud-based software.


**Position of the Parties regarding the 2020 MPA and the termination letter**

[18]    Cash Cloud argues that the 2020 MPA is the prevailing agreement between the parties.

[19]    BitAccess disagrees, arguing that there is currently no written agreement between the parties. BitAccess' position is that the 2020 MPA dealt strictly with the sale of hardware, not the

cloud-based software currently provided. Therefore, when Cash Cloud ceased using the last BitAccess BTM in mid-2021, the contract was repudiated, and its terms are of no force and effect.

[20]    With respect to its cloud-based software, BitAccess' position is that this software was being offered by BitAccess on a temporary, transitional basis and, according to BitAccess, permission to use this software could be withdrawn at any time. There is no written agreement to this effect.

[21]    Notwithstanding BitAccess' position of repudiation, the August 4, 2022 termination letter sent by BitAccess' Chief Operations Officer, Andrew McDonald, states the following:

> Dear Mr. McAlary,
>
> I am writing to provide you notice that BitAccess will cease to provide Cash Cloud Inc. DBA Coin Cloud ("Coin Cloud") services under the BitAccess Master Purchase Agreement ("MPA") signed on January 23, 2020.
>
> When our two businesses agreed to work with each other, the Bitcoin ATM industry was nascent and its future uncertain. Throughout that time, BitAccess has endeavoured to go above and beyond in supporting Coin Cloud's growth. From extending the hours of the SLA, agreeing to significant demands on our engineering team, and even providing a series of loans to Coin Cloud due to your cash flow mismanagement. Unfortunately, and for various reasons, we will no longer continue our relationship.
>
> While our contract remained silent on termination for any reason other than Coin Cloud breaking the law, breaching the agreement, or Bitcoin itself being outlawed, it was always understood that either party could terminate the contract at will and without notice. However, we have decided to provide Coin Cloud with 14 days notice of termination. On August 18, 2022 at 4 pm EDT, all Coin Cloud kiosks that utilize BitAccess software will cease to function, access to the BitAccess Operator Panel will be disabled, and all API keys will be revoked.
>
> Shortly thereafter, BitAccess will begin the process of permanently deleting all data related to Coin Cloud. Any Bitcoin remaining in the Coin Cloud hot wallet will be transferred to the whitelisted withdrawal address Coin Cloud has configured.
>
> We note that Coin Cloud has developed its own software and that it has been publicly demonstration that software to its customers, the industry in general and in its marketing. We wish you luck with that software and hope you can achieve success with it.
>
> Sincerely,
>
> Andrew McDonald, COO

[22]    Upon receiving this notice, Christopher McAlary, CEO of Cash Cloud, asked for an opportunity to discuss this abrupt termination. BitAccess' response was:

Page: 5

We do not see this as abrupt at all. BitAccess has offered Coin Cloud multiple opportunities to enter into contract negotiations that would provide greater certainty for both our businesses. Those offers have been rejected by Coin Cloud.

The decision has been made and there is really nothing to discuss at this time.

Once again, we wish you all the best with the software you have developed to replace BitAccess.

## Relief sought on this Application

[23]    The notice of application seeks the following:

(a)    an injunction restraining the respondent, BitAccess Inc., from interfering with Cash Cloud's ability to use software that it has licensed from BitAccess until such time as the validity of BitAccess' purported termination of the Master Purchase Agreement dated January 23, 2020 (the "2020 MPA") is finally determined through the mandatory dispute resolution process prescribed therein;

(b)    an order maintaining the *status quo* between Cash Cloud and BitAccess concerning the 2020 MPA until such time as the validity of BitAccess' notice of termination of that agreement is finally determined through the mandatory dispute resolution process prescribed by the 2020 MPA;

(c)    an injunction restraining BitAccess from deleting any data that it collected from Cash Cloud until the validity of BitAccess' notice of termination of the 2020 MPA is finally determined through the mandatory dispute resolution process prescribed therein;

(d)    an order requiring BitAccess to preserve any data that it collected from Cash Cloud until the disputes between the parties arising out of the 2020 MPA are finally determined through the mandatory dispute resolution process prescribed therein.

## Issues before the Court

[24]    The following issues were raised on this application:

a.    Is the Application moot?

b.    Does the court have jurisdiction to grant these injunctions?

Case 23-01015-mkn    Doc 30    Entered 04/12/23 21:23:59    Page 10 of 20

Page: 6

c. If the Application is not moot, and the court has jurisdiction, should the court grant an order preserving data collected by BitAccess from Cash Cloud pending resolution of this matter by arbitration?

d. If the Application is not moot, and the court has jurisdiction, should this court grant an injunction that restrains BitAccess from interfering with Cash Cloud's use of its software and maintain the status quo under the 2020 MPA pending the resolution of this matter by arbitration?

**Is the Application moot?**

[25]    BitAccess makes two arguments on the issue of mootness:

a. The 2020 MPA dealt solely with the sale of hardware, not the current cloud-based software service at issue on this application. Therefore, the terms of the 2020 MPA are not applicable to the issues before the court.

b. The 2020 MPA was repudiated in mid-2021 when Cash Cloud deactivated their last BitAccess BTM device.

[26]    Notwithstanding these two arguments, clearly BitAccess believed the 2020 MPA was the prevailing agreement between the parties. According to its COO, Mr. McDonald, that was the agreement being terminated on August 4, 2022.

[27]    Counsel for BitAccess argues that any reference to the 2020 MPA within the termination letter was a mistake by Mr. McDonald, a non-lawyer. I do not accept this submission. The termination letter was clear and unambiguous. Mr. McDonald did not provide evidence on this application to suggest his reference to the 2020 MPA was in error. He filed no affidavit.

[28]    In addition, the following terms of the 2020 MPA are relevant:

4.2 **BTM Service Fees.** BitAccess will be entitled to a percentage of the cumulative transactions.[1]

7.1 **Term.** This Agreement begins on the Effective Date and will remain in full force and effect unless/until terminated under Section 7.2.

---

[1] There is a schedule attached to this section of the agreement. The evidence before the court is that BitAccess was paid for transactions pursuant to this schedule, for any kiosk operating BitAccess' cloud-based software.

7.2 **Service Termination.** BitAccess reserves the right to terminate this agreement and access to the BTM Service if:

> a) BitAccess considers that Customer is non-compliant with applicable laws or fails to adhere to the terms of this Agreement (including non-payment of fees)

> b) Any requirement of a regulator or government body renders Bitcoin, cryptocurrencies or the provision of services as contemplated under this Agreement, illegal or subject to operational charges or fees which BitAccess considers unreasonable.

13.9 **Entire Agreement.** This Agreement, together with the schedules hereto, which are hereby incorporated by reference, constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all previous communications, agreements, and understandings…

**Schedule C  - Support and Service terms**

> **1.  Service Scope**
>
>> The following support services are covered by this Agreement but are subject to change on prior notification to Customer:
>> - Telephone support
>> - Monitored email support
>> - Remote assistance using Remote Desktop and a Virtual Private Network where available
>> - Regular system health check including updates to the Device Software.[2]

[29]    As a result, based on the evidence before me, I find that the 2020 MPA was not repudiated, and there is a live question of whether it relates to the ongoing provision of BitAccess' cloud-based software. Therefore, the within application is not moot.

---

[2] Although the Support and Service Terms under Schedule C specifically refer to BTM devices, the evidence on this application is that this constituted the support also provided for the cloud-based software on third party kiosks.

## Does the court have jurisdiction to hear the within application?

[30]    The following are the relevant sections of the 2020 MPA on jurisdiction:

> 13.4 **Choice of Law.** This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein without regard to its conflict of laws provision. Customer and BitAccess submit to the non-exclusive jurisdiction of the courts of the province of Ontario.

> 12.2 **Binding Arbitration.** Any dispute arising out of or relating to this contract, or the breach thereof, shall be finally resolved by arbitration administered by the Canadian Arbitration Association under its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The arbitration will be conducted in the English language in the City of Ottawa, Canada, in accordance with the Canadian Arbitration Act. There shall be one arbitrator, named in accordance with such rules unless the damages claimed under the Agreement is 1,000,000 or higher in which case a panel of three arbitrators will be appointed in accordance with such rules.

[31]    The court was referred to the Canadian Arbitration Associations' Commercial Arbitration Rules, the International Commercial Arbitration Act as well as the Model Law on International Commercial Arbitration, all to support the argument that the court has jurisdiction to grant the relief sought.

[32]    Rule 13.3 of the Canadian Arbitration Associations' Commercial Arbitration Rules states:

> A request for interim measures addressed by a Party to a court shall not be deemed incompatible with the Agreement to Arbitrate or a waiver of the right to arbitrate.

[33]    Based on the terms of the 2020 MPA and Rule 13.3 of the Arbitration Rules, I find that this court has the jurisdiction to grant injunctive relief.

[34]    Turning to the injunctions being sought, in my view, they can be grouped into two categories. The first category, set out in paragraphs (a) and (b) of the Notice of Application's prayer for relief, seeks to restrain BitAccess from deactivating its software. It also seeks an order to "maintain the status quo" which would include BitAccess providing ongoing service and support for that software. The second category, set out in paragraphs (c) and (d) of the Notice of Application's prayer for relief, seeks to preserve Cash Cloud's data currently stored on BitAccess' software.

[35]    I will deal with the preservation of data issue first.

**Should the court grant an order preserving Cash Cloud's client data pending resolution of this matter by arbitration?**

[36]     Rule 45.01 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg.194 states:

> (1) The court may make an interim order for the custody or preservation of any property in question in a proceeding or relevant to an issue in a proceeding, and for that purpose may authorize entry on or into any property in the possession of a party or of a person not a party.

[37]     The focus of the oral argument before me related to the deactivation of the software and maintaining the status quo (the first category of injunctions). Neither party argued the test for injunctive relief in terms of data preservation. In fact, in its response on this issue, BitAccess outlined how it could provide access to Cash Cloud's client data for a limited period of time in order for that information to be downloaded and retained directly by Cash Cloud.

[38]     The affidavit evidence filed by Cash Cloud states that it is subject to data retention laws requiring this information be safeguarded and stored for up to seven years. That is Cash Cloud's responsibility, not BitAccess. There is no evidence before me that Cash Cloud cannot download and retain its own customer information to ensure it remains in compliance with retention laws.

[39]     I therefore order BitAccess to preserve Cash Cloud's customer data for a period of sixty (60) days. During that time, BitAccess will enable Cash Cloud to download its customer data. Once Cash Cloud has downloaded its customer data, BitAccess is under no further obligation to preserve this information.

[40]     I note that the material filed raises technical issues on how the download can be properly executed. The court expects the parties to work together; however, if further direction is required, the parties may make submissions on that issue only. Those further submissions are not to exceed three pages in length per party.

**Should this court grant the injunctions sought to restrain BitAccess from interfering with the use of its software and compel the status quo be maintained between the parties?**

[41]     The test for obtaining an interim or interlocutory injunction was established by the Supreme Court of Canada in *RJR-MacDonald v. Canada (Attorney General)*, [1995] 3 S.C.R. 199 in which it was held that an injunction may be granted where the applicant establishes that:

> a.   There is a serious issue to be tried;
>
> b.   The moving party will suffer irreparable harm if an injunction is not granted; and
>
> c.   The balance of convenience favours granting the relief sought.

[42]    In this case, BitAccess argues a mandatory injunction is being sought. For a mandatory injunction to be ordered, the applicant must meet a modified version of the *RJR MacDonald* test and demonstrate a strong prima facie case that it will succeed at trial, not the lower threshold of a serious issue to be tried.

[43]    In *International Steel Services Inc. v. Dynatec Madagasgar S.A.*, 2016 ONSC 2810, 58 B.L.R. (5th) 150, the court heard a similar motion for injunctive relief. International Steel sought to restrain Dynatec from terminating an agreement and to maintain the status quo. The court considered the preliminary issue of whether this was a mandatory or prohibitive injunction. The court followed the analysis of D.M. Brown J. (as he then was) in *1323257 Ontario Ltd. (c.o.b. Hyundai of Thornhill) v. Hyundai Auto Canada Corp.* (2009), 55 B.L.R. (4th) 265:

> 30    I propose to follow the directions given by the Divisional Court in *TDL Group Ltd. v. 1060284 Ontario Ltd.*, [2001] O.J. No. 3614 where Lane, J. wrote:
>
> > •    It is clear that the categories of positive and negative covenants and orders are not clear cut. In our view, the essence of the order in its factual matrix is what is to be looked at in making this determination. (para. 4)
>
> He continued, at para. 9, by observing:
>
> > •    An order preventing the denial of a right previously agreed to is very different from an order establishing a new right never agreed to and requiring a party to act accordingly.
>
> *TDL* has been followed by several recent decisions of this court: *Erinwood Ford Sales Ltd. v. Ford Motor Co. of Canada*, 2005 CanLII 16616 (ON SC), [2005] O.J. No. 1970; *674834 Ontario Limited v. Culligan of Canada*, [2007] O.J. No. 979, 2007 CanLII 8014 (ON S.C.); *Struik v. Dixie Lee Food Systems Ltd.*, [ [2006] O.J. No. 3269.
>
> 31    In some cases involving the termination of dealerships or franchises courts have examined whether the injunctive relief sought would be prohibitive or mandatory by inquiring whether the dealership agreement in issue contained renewal rights. Where it did not, some courts have regarded a request for an injunction restraining termination as mandatory in nature, requiring, as it would, the franchisor to continue to supply the franchisee: *Parker, supra.*; *Esmail v. Petro-Canada* (1995), 86 O.A.C. 385 (Div. Ct.). Where it did, courts have tended to view requests for interlocutory injunctions restraining termination of the agreement prior to trial as ones for prohibitive relief, with the plaintiff seeking to prevent the denial of a right previously agreed upon: *TDL, supra*. Although the granting of an injunction in the latter case would require the parties to continue their relationship until trial, as Lane J. pointed out in *TDL*:

- That one effect of this is to require both parties to act in accordance with their contract while the dispute is being tried does not change the essence of the matter. (para. 9)

32    As Spies J. noted in *Erinwood Ford* at para. 60: "Where a party seeks to prevent early termination of a dealer agreement, the party does not ask the court to create a new right, but rather to preserve the status quo and leave the issue of whether or not the termination is proper for trial."

33    In my view, that describes precisely the circumstances of the present motion. The 1999 Agreement, as continued under the Minutes, provided for its annual automatic renewal absent termination for cause or proper notice of non-renewal. In this action Thornhill puts in issue the validity of its recent termination. Thornhill seeks to set aside the Minutes at trial. If the trial judge grants such relief, the validity of the 2006 Notice of Non-Renewal will be determined at arbitration. If the trial judge does not set aside the Minutes, the court will then consider the validity of the September 2008 Notice of Termination. In either case the essence of the injunctive relief sought is to preserve until trial the *status quo* of the dealer relationship between Thornhill and HAC.

[44]    The application before me deals with an existing agreement between the parties. As in *International Steel*, while there will be some requirements on BitAccess to provide ongoing services if an injunction is granted, the primary issue is whether BitAccess can deactivate the software needed to operate Cash Cloud's kiosks. I therefore conclude that this is a prohibitive injunction and the applicable standard for examining the strength of Cash Cloud's case is whether there is a serious issue to be tried.

**<u>Serious issue to be tried</u>**

[45]    The threshold under this first prong of the test is a relatively low one, with the judge tasked to make a preliminary assessment of the merits of the case and decide whether the application is frivolous or vexatious: see *RJR MacDonald* at paras.49-50.

[46]    I find there is a serious issue to be tried as to whether the 2020 MPA includes the ongoing provision of cloud-based software. There is also a serious issue as to whether Cash Cloud has breached the agreement by *inter alia* being non-compliant with applicable laws and regulations.

**<u>Irreparable harm</u>**

[47]    The term "irreparable" refers to the nature of the harm suffered rather than its magnitude: see *International Steel* at para. 50. It is a harm that cannot be quantified in monetary terms or that cannot be cured: see *RJR* at para. 59.

[48]    On the evidentiary record before me, the following has not been challenged:

Page: 12

- Cash Cloud operates approximately 5,700 kiosks throughout the United States and Brazil.

- BitAccess' cloud-based software runs on approximately 75% of those kiosks (it should be noted that, according to BitAccess' CEO, the within application was the first notice to BitAccess that its software had been replaced on 25% of the machines. This means that BitAccess was well aware deactivation would impact at least 75% of Cash Cloud's kiosks).

- The deactivation of BitAccess' cloud-based software would render those kiosks inoperable immediately.

[49]     The court is able to make inferences that reflect commercially reasonable conclusions: see *Molson Canada 2005 v. Miller Brewing Company*, 2013 ONSC 2758, 116 O.R. (3d) 108 at para. 132. Having 75% of its machines rendered immediately inoperable likely threatens the ongoing viability of Cash Cloud's business. This fact alone could support a finding of irreparable harm: see *Propurchaser.com v. Wifidelity Inc.*, 2017 ONSC 4905 at para 22.

[50]     In my view, however, I am unable to make a finding that Cash Cloud has demonstrated irreparable harm because Cash Cloud failed to provide an undertaking with respect to damages as required under the rules.

[51]     The Notice of Application filed for this injunction relies on s. 101 of the *Courts of Justice Act*, R.S.O. 1990, c. C.43 and several rules of the *Rules of Civil Procedure*, but it fails to make any reference to Rule 40. That omission is significant.

[52]     The following sections of Rule 40 are applicable to this application:

40.01 An interlocutory injunction or mandatory order under section 101 or 102 of the *Courts of Justice Act* may be obtained on motion to a judge by a party to a pending or intended proceeding.

40.03 On a motion for an interlocutory injunction or a mandatory order, the moving party shall, unless the court orders otherwise, undertake to abide by any order concerning damages that the court may make if it ultimately appears that the granting of the order has caused damage to the responding party for which the moving party ought to compensate the responding party.

[53]     In his text, *Injunctions and Specific Performance*, loose-leaf, (Toronto: Thomson Reuters, 2021) Sharpe J.A. (as he then was) wrote the following in terms of the need for an undertaking starting at page 2-64:

Concomitant with the question of irreparable hard is the requirement of the plaintiff's undertaking in damages. It is well established that, as a condition of obtaining an interlocutory injunction, the plaintiff must give an undertaking to pay

Page: 13

to the defendant any damages that the defendant sustains by reason of the injunction, should the plaintiff fail in the ultimate result. The English courts have held that the undertaking in damages is implicit and will be enforced even if not included in the order unless the contrary was argued and expressed at the time. However, an Ontario decision holds that the plaintiff must give an explicit undertaking by way of affidavit in the absence of which an interlocutory injunction may be refused even where an oral undertaking is given by counsel at the hearing. The rationale for the undertaking is to protect the defendant from the risk of granting a remedy before substantive rights have been determined.

[54]    The Ontario court decision referenced by Sharpe J.A. is *Guelph Taxi Inc. v. Guelph Police Service*, 2016 ONSC 3671, 55 M.P.L.R. (5th) 140. In *Guelph Taxi*, the undertaking was not made in an affidavit but was provided orally during the hearing. In refusing to accept an oral undertaking, Trimble J. stated at para. 17:

In my view, the importance of the undertaking is such that it should be made in an affidavit, by a person with clear authority to bind the corporation giving it.

[55]    When considering commercial cases, Sharpe J.A. in his text on injunctions wrote:

An undertaking in damages is almost invariably required in commercial cases, and a request to be excused from giving an undertaking may lead to an inference that the plaintiff is either not confident in the merits of its case or wishes to avoid any risk in this regard. However, there is a discretion in the court to relieve the plaintiff from the obligation to give an undertaking in special circumstances.

[56]    The Notice of Application does not ask the court for an order to relieve the applicant of its obligation under Rule 40.03. Further, I specifically raised the issue of the missing undertaking directly with counsel at the oral hearing on August 18, 2022. The undertaking was not offered, nor was the court provided with any special consideration as to why it would not be necessary.

[57]    This is a commercial dispute. Cash Cloud is a Nevada company. There is no evidence it has any assets in Ontario. BitAccess has filed evidence supporting its concern for potential financial exposure if compelled to continue to do business with Cash Cloud. This includes evidence of problems with Cash Cloud's cash flow, and excessive delays in fulfilling customers' transactions. On at least four occasions, BitAccess has had to provide short-term, interest-free loans to Cash Cloud to ensure Cash Cloud could meet its financial obligations. The most recent loan was made in June 2022. Now, Cash Cloud seeks an injunctive order that would force BitAccess to stay in business with it, without providing the requisite protection to BitAccess for such an order.

[58]    There is no evidence explaining why Cash Cloud refused to provide this undertaking. That was its choice. But it was a fatal choice in this application. The relief sought in (a) and (b) of the Notice of Application is denied.

Page: 14

**Balance of convenience**

[59]    Although the application is dismissed on the basis of Cash Cloud's failure to provide the requisite undertaking, I will turn to the balance of convenience prong of the *RJR MacDonald* test.

[60]    In my view, on the totality of the evidence before me, the balance of convenience would support only a time-limited injunction to maintain the status quo and restrain BitAccess from deactivating its software. This would balance the threat that immediate deactivation poses to Cash Cloud's current operation with the fact that Cash Cloud is already in the process of replacing BitAccess' software. To grant the injunction as sought – until the matter is finally determined by arbitration - would, in effect, allow Cash Cloud to continue to replace BitAccess' software on its machines while, at the same time, force BitAccess to devote time and resources to service and support those kiosks that remain. That would place too heavy a burden on BitAccess.

[61]    If Cash Cloud had provided the undertaking under Rule 40.03, I would have ordered a time restricted injunction for sixty (60) days from the date of this decision.

**Conclusion**

[62]    The application for an injunction restraining BitAccess from interfering with Cash Cloud's ability to use software and directing BitAccess to maintain the status quo under the 2020 MPA agreement is dismissed.

[63]    The application for an injunction to require BitAccess to preserve Cash Cloud's customer data is granted for sixty (60) days from the date of this decision. BitAccess will provide access to Cash Cloud to download this data within that time period. If further direction is required from the court on that data transfer, each party may make submissions no longer than three pages in length.

[64]    This result may appear to be one of mixed success. It is not. Data preservation was a very small part of the material and argument before me. Costs will be awarded to BitAccess on a partial indemnity basis. Counsel for BitAccess has until October 21st to provide cost submissions, including any offers to settle. The submissions will be no longer than five pages in length excluding offers and cost outlines. Counsel for Cash Cloud will have until November 4, 2022 to reply with the same page restrictions.



_____

Justice J. Hooper

**Released:** October 4, 2022

**CITATION:** Cash Cloud v. BitAccess, 2022 ONSC 5622
**COURT FILE NO.:** CV-22-89887
**DATE:** 2022/10/04

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**BETWEEN:**

**CASH CLOUD INC.**

**-AND-**

**BITACCESS INC.**

---

**REASONS FOR DECISION**

Justice J. Hooper

**Released:** October 4, 2022

## **CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Holley Driggs and that, on the 12th day of April 2023, I caused to be served a true and correct copy of DEFENDANT LUX VENDING, LLC d/b/a BITCOIN DEPOT'S REQUEST FOR JUDICIAL NOTICE in the following manner:

☒    (ELECTRONIC SERVICE)    Under Local Rule 5005 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐    (UNITED STATES MAIL)    By depositing a copy of the above-referenced document for mailing in the United States Mail, first-class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐    (OVERNIGHT COURIER)  By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐    (FACSIMILE)    By serving a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those listed on the attached service list, and on the date above written.

 /s/ Olivia Swibies
An employee of Holley Driggs

15482-01/2923306_2.DOCX
132624929.1