CARLTON FIELDS, P.A.
Adam Schwartz, Esq. (Admitted *Pro Hac Vice*)
Email: aschwartz@carltonfields.com
John J. Lamoureux, Esq. (Admitted *Pro Hac Vice*)
Email: jlamoureux@carltonfields.com
Corporate Center Three at International Plaza
4221 W. Boy Scout Boulevard, Suite 1000
Tampa, Florida 33607-5780
Telephone: 813/223-7000
Facsimile: 813/229-4133

HOLLEY DRIGGS
Stacy H. Rubin, Esq. (NV Bar No. 9298)
Email: srubin@nevadafirm.com
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: 702/791-0308
Facsimile: 702/791-1912

*Attorneys for Lux Vending, LLC d/b/a Bitcoin Depot*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>CASH CLOUD, INC., DBA COIN CLOUD,<br><br>Debtor. | Case No. 23-10423-MKN<br>Chapter 11 |
| CASH CLOUD, INC., DBA COIN CLOUD,<br><br>Plaintiff,<br><br>v.<br><br>LUX VENDING, LLC d/b/a BITCOIN DEPOT,<br><br>Defendant. | Adv. No. 23-01015-MKN<br><br>**DEFENDANT LUX VENDING, LLC D/B/A BITCOIN DEPOT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Date of Hearing:   May 17, 2023<br>Time of Hearing:   9:30 a.m.<br><br>Judge: Hon. Mike K. Nakagawa |

Defendant Lux Vending, LLC d/b/a Bitcoin Depot ("Bitcoin Depot"), by and through undersigned counsel, hereby moves this Court for an Order dismissing the Complaint ("Complaint") filed by Cash Cloud, Inc., dba Coin Cloud ("Plaintiff") [ECF No. 1],[1] pursuant to

---

[1] Unless otherwise specified, all references to "ECF No." are to the numbers assigned to the documents filed in the Adversary Proceeding as they appear on the Adversary docket ("Docket")

Federal Rule of Civil Procedure 12(b)(6), made applicable to these proceedings pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure and Local Rule 7012 of the Local Rules of Bankruptcy Practice of the United States Bankruptcy Court, District of Nevada.[2] This Motion to Dismiss ("Motion") is made and based upon the following Memorandum of Points and Authorities and any oral argument the Court may entertain regarding this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  JURISDICTION

Bitcoin Depot consents to the entry of a final order by the bankruptcy judge as to this Motion if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

### II.  INTRODUCTION

Plaintiff brings this adversary proceeding against Bitcoin Depot for purportedly interfering with a contractual relationship by providing software to run Plaintiff's digital currency kiosks and allegedly attempting to "poach" Plaintiff's kiosk hosts away from the bankruptcy estate. Although Plaintiff's Complaint, full of hyperbole and exaggeration, goes into considerable detail about its contractual relationship with its software provider, BitAccess, Inc. ("BitAccess"), and Bitcoin Depot's pending acquisition of BitAccess, Plaintiff fails to disclose that Plaintiff's Canadian litigation against BitAccess was unsuccessful and that the Canadian court denied Plaintiff's request that BitAccess continue to provide Kiosk software (defined below) to Plaintiff. Here, Plaintiff's requested relief significantly overreaches, ranging from its conclusory and speculative allegations to requesting unavailable remedies. Tellingly, Plaintiff fails to allege the loss of a single contract out of the purportedly thousands of contracts that make up the bankruptcy estate. All of Plaintiff's nine causes of action suffer from fatal defects and fail to allege a right to relief. For the reasons below, the Complaint should be dismissed.

---

maintained by the Clerk of the Court of the United States Bankruptcy Court for the District of Nevada. The debtors of the Bankruptcy Case altogether are referenced herein as the "Debtors".

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 01–1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

### III. RELEVANT FACTS[3]

Plaintiff filed a Chapter 11 bankruptcy petition on February 7, 2023. Compl. ¶ 15. Plaintiff operates digital currency machines ("Kiosks") hosted in various retailers. *Id.* ¶¶ 18-21. The Kiosks act as digital currency ATMs, offering public access to buy and sell digital currencies by (i) depositing cash into a Kiosk and receiving digital currency in a digital currency wallet and (ii) selling digital currency to Plaintiff and receiving its value in cash from the Kiosk. *Id.* ¶¶ 18-19. Plaintiff installs Kiosks in retail locations by entering into contracts or leases with the host retailers. *Id.* ¶ 21. The terms of the contracts/leases vary, but "general[ly]" permit the exclusive installation of Plaintiff's Kiosk(s) in exchange for compensation (such as either fixed monthly rental payments or variable portions of a Kiosk's profit) for 3- to 7-year terms. *Id.* ¶¶ 21, 23.

The Kiosks require software to operate, and Plaintiff purchased instances of Licensed Software[4] from BitAccess for that operation. *Id.* ¶ 29. Plaintiff entered into two contracts with BitAccess: (i) a 2015 Purchase Agreement for BitAccess Kiosks, instances of the Licensed Software, and software support services and (ii) a 2020 Purchase Agreement that amended the 2015 Purchase Agreement "to reflect the fact that [Plaintiff] had scaled significantly since the 2015 Purchase Agreement." *Id.* ¶¶ 24-25, 35-36. Notably, in 2017, BitAccess shifted from offering Kiosks and Licensed Software, to focusing on the development and sale of its own software. *Id.* ¶ 33. Accordingly, Plaintiff "began purchasing kiosks from other manufacturers," but "continued to acquire instances of the Licensed Software from BitAccess" and use BitAccess' Support Services. *Id.* ¶¶ 34, 40. Both contracts granted Plaintiff a license to use the software. *Id.* ¶¶ 27, 38-39.

---

[3] In this recitation of relevant factual allegations, Bitcoin Depot will assume the truth of the allegations for purposes of this Motion only, as it must on a motion to dismiss. *South Ferry, LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (on motion to dismiss, "well-pleaded" allegations of a complaint must be accepted as true and construed in the light most favorable to the non-moving party").

[4] Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in Plaintiff's Complaint.

- 3 -

1    Bitcoin Depot also operates digital currency kiosks. According to the Complaint, Bitcoin Depot "began acquiring an ownership interest in BitAccess in 2021." On August 25, 2022, a merger involving Bitcoin Depot and BitAccess was disclosed in an SEC Form 8-K. *Id.* ¶¶ 59-60.

On August 4, 2022, BitAccess notified Plaintiff of BitAccess' intent to terminate the 2020 Purchase Agreement within 14 days, resulting in the deactivation of the Licensed Software on Plaintiff's Kiosks on August 18, 2022. *Id.* ¶¶ 42-43. Notably, the Complaint fails to provide the full August 4 letter from BitAccess, instead selectively choosing the details shared with this Court. For example, the letter informs Plaintiff that BitAccess is terminating the 2020 Purchase Agreement because Plaintiff developed and marketed its own software to operate the kiosks. Despite Plaintiff's demands that BitAccess not deactivate Plaintiff's access to the Licensed Software, BitAccess held firm in its decision to terminate. *Id.* ¶¶ 45-48.

On August 11, 2022, Plaintiff filed a Notice of Application against BitAccess in the Ontario [Canada] Superior Court of Justice (the "Canadian Litigation") and five days later filed a Notice of Arbitration with the Canadian Arbitration Association (the "Canadian Arbitration). *Id.* ¶¶ 49-50. On August 18, 2022, BitAccess deactivated the Licensed Software on Plaintiff's Kiosks. *Id.* ¶ 53. At a hearing the same day, the Canadian Court required BitAccess to reactivate the software, which it did that day. *Id.* ¶¶ 54-56. "Upon information and belief," Plaintiff contends Bitcoin Depot's "impending acquisition" of BitAccess "caused" the termination of the 2020 Purchase Agreement and the deactivation of the Licensed Software on Plaintiff's Kiosks. *Id.* ¶ 65.

On August 30, 2022, Bitcoin Depot, as the parent company of BitAccess, purportedly "hijacked" control over the Licensed Software and again deactivated the software on Plaintiff's Kiosks. *Id.* ¶¶ 67, 69, 72. The Complaint is silent as to the duration of the deactivation or any further action or resolution in the Canadian Litigation, leaving for this Court a significant gap in the history of the software deactivation prior to the filing of Plaintiff's bankruptcy petition on February 7, 2023, *id.* ¶ 15. The software was deactivated from August 30, 2022, to September 1, 2022, a period of fewer than 48 hours. Instead, the Complaint omits this relevant history but concludes that the "sudden shutdown crippled" its business, and asserts damages including the loss

of revenue from the Kiosks, as well as "the out of pocket expense to send technicians to each Kiosk and install alternate software on the Kiosk." *Id.* ¶¶ 74, 76.

Plaintiff further alleges "upon information and belief" that Bitcoin Depot "began a campaign to target [Plaintiff's] hosts to replace [Plaintiff's] Kiosks with [Bitcoin Depot's] kiosks." *Id.* ¶ 79. Plaintiff accuses Bitcoin Depot of making "false and misleading statements" to a single Kiosk host that Plaintiff "was unable to reorganize its debts, implying that Cash Cloud was liquidating and ceasing its business operations." *Id.* ¶ 80. Plaintiff asserts that Bitcoin Depot represented to other, unidentified hosts that Plaintiff "is out of business" and that Bitcoin Depot "wanted to replace [Plaintiff's] machines" with its own and take over the rent agreement.'" *Id.* ¶ 83. There are no further details on Bitcoin Depot's purportedly improper "campaign."

Finally, Plaintiff asserts that Bitcoin Depot infringed on Plaintiff's trademark "Coin Cloud" to misdirect internet traffic to the Bitcoin Depot website rather than Plaintiff's website. *Id.* ¶ 86. But other than including an image of what appears to be Google Sponsored Links, the Complaint offers no further details on this assertion. *Id.* at 16:1-28.

### IV. ARGUMENT

#### A. Legal Standard on Motion to Dismiss.

To survive a motion to dismiss under Civil Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting FED. R. CIV. P. 8(a)(2)). Labels, conclusions, and formulaic recitations of the elements of a cause of action are insufficient. *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not enough. *Id.* A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570).

In addition, factual allegations must meet the requisite level of specificity. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). Civil Rule 9(b) requires that, where fraud is alleged, "a party must state with particularity the circumstances constituting fraud." To satisfy Civil Rule 9(b)'s heightened pleading requirements, a plaintiff must allege "the who, what, when, where, and how" of the misconduct." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th

1  Cir. 2003). Importantly, even where fraud is not a necessary claim element, a plaintiff may allege

2  a course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim.

3  *Id.* at 1103. In such cases the claim is said to "sound in fraud," and any "averments of fraud" must

4  satisfy Rule 9(b)." *Id.* at 1103-04 (instructing courts to "disregard" averments of fraud or "strip

5  them from the claim" and analyze the remaining allegations to determine whether they state a

6  claim).

### B. The Complaint Should be Dismissed as an Impermissible Shotgun Pleading.

The Complaint impermissibly incorporates all allegations of purported fact and law into all nine counts against Bitcoin Depot. This is a quintessential example of a shotgun pleading, which does not allow the Court or Bitcoin Depot to identify which specific facts are allocated to which cause of action. *Duncan v. Peterson*, 2021 WL 7162003 at *2 (D. Nev. June 3, 2021).

Shotgun pleadings violate the "short and plain" pleading requirement of Civil Rule 8 and Civil Rule 10(b), which prohibits the incorporation of all factual allegations of prior counts into each subsequent count. *See Fosbre v. Las Vegas Sands Corp.*, 2012 WL 2848057 at *3 (D. Nev. July 11, 2012) (noting shotgun pleadings by incorporating every antecedent allegation into subsequent claims such that most of the counts contain irrelevant factual allegations and legal conclusions). Consequently, in ruling on the sufficiency of a claim, the court must sift out irrelevancies to ascertain exactly which facts are relevant to a particular cause of action asserted.

The Complaint asserts nine counts against Bitcoin Depot. A classic shotgun pleading, the Complaint begins with a list of general allegations which are then wholesale incorporated into each of the nine counts asserted against Bitcoin Depot, regardless of relevance. Compl. ¶¶ 90, 96, 101, 114, 121, 129, 137, 146, and 153 (incorporating the general allegations of paragraphs 1-89, and each subsequent count's allegations, into each and every count). The Complaint fails to point to specific allegations "contained in the foregoing paragraphs" that apply to a particular count. Thus, each count incorporates all of the conclusory and speculative factual allegations rendering impossible a determination of what conduct is at issue in any particular count. Accordingly, the Complaint should be dismissed as an impermissible shotgun pleading.

- 6 -

**C.    Count I Should be Dismissed Because Equitable Remedies are not Causes of Action.**

Plaintiff's omnibus claim for a temporary restraining order and a preliminary injunction should be dismissed because such claims are not properly characterized as a cause of action. *See Centeno v. Mortgage Electronic Registration Systems, Inc.*, 2012 WL 3730528 at 4 (D. Nev. Aug. 28, 2012) (noting that a temporary restraining order and/or injunction is a remedy, not a cause of action); *Sherstad v. Countrywide Home Loans, Inc.*, 2010 WL 3021614 *2 (D. Nev. Jul. 29, 2010) (dismissing claim for a temporary restraining order and preliminary injunction as an improper cause of action and plaintiff was not entitled to an equitable remedy because plaintiff's other claims failed).

**D.    The Complaint Fails to Allege a Violation of the Automatic Stay.**

Upon the filing of a bankruptcy petition, the automatic stay takes effect and is applicable to all entities of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Influencing a customer to opt for a competitor's service over a debtor's service through advertisements, false or otherwise, is not an act of control over the bankruptcy estate's property. *See In re Windstream Holdings, Inc.*, 2022 WL 5245633 at *7-*9 (S.D.N.Y. Oct. 6, 2022) (holding that advertisements, even false advertisements, without more, cannot reasonably be seen as an act to exercise control over property of the bankruptcy estate, even assuming that the debtor had executory contracts with its customers and that its goodwill in the marketplace was protected by the automatic stay). In *In re Windstream*, the court noted that unless a competitor goes beyond mere advertising, such as misusing proprietary information or misrepresenting its identity to the debtor's customers, advertising alone (whether false or otherwise) is not an act of control over the bankruptcy estate's property. *Id.* Because the Complaint merely alleges that Bitcoin Depot advertised its services over Plaintiff's, it fails to allege a violation of the automatic stay and Count II should be dismissed.

**E.    The Complaint Fails to Allege a Violation of Lanham Act.**

The Lanham Act protects federal trademarks and prohibits certain conduct including trademark infringement and false advertising. 15 U.S.C. § 1125(a). Section 1125(a) creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B).

- 7 -

In keeping with the shotgun-style pleading of this Complaint, Plaintiff appears to allege both in a single count – Count III. For this reason alone, Count III should be dismissed. But under either theory of liability, the Complaint fails to allege a violation of the Lanham Act.

A defendant is liable under Section 1125(a)(1)(A) if it, "in connection with any goods or services, ... use[ ] in commerce any ... false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person." 15 U.S.C. § 1125(1)(A). Section 1125(a)(1)(B) imposes civil liability against any entity who makes a "false or misleading description of fact, or false or misleading representation of fact" in commercial advertising or promotion which misrepresents the nature, characteristics, or qualities of its or another person or entity's goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1)(B). To invoke the Lanham Act's cause of action for false advertising, a plaintiff must allege an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014). In addition, Plaintiff's Lanham Act claims are subject to Civil Rule 9(b)'s heightened pleading standard because they sound in fraud. *See LT Intern. Ltd. v. Shuffle Master, Inc.*, 8 F. Supp. 3d 1238, 1244–45 (D. Nev. 2014) (applying Civil Rule 9(b) to Lanham Act claims alleging misrepresentations by a business competitor).

### 1.    The Complaint Fails to Allege a False Association/Trademark Infringement Claim.

As to the purported use of Plaintiff's trademark "Coin Cloud" in Google search engine keyword advertisements, any such use could not have resulted in a likelihood of confusion necessary to trigger liability under the Lanham Act. In *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, the Ninth Circuit found that the alleged infringer's use of its competitor's registered mark as a search engine keyword to trigger the display of the alleged infringer's advertisement of its products is a use in commerce under the Lanham Act. 638 F.3d 1137, 1144 (9th Cir. 2011). However, the Court did not find that such use resulted in a likelihood of confusion or constituted infringement. In considering whether such use was an infringement, the Court analyzed (1) the strength of the mark, (2) the evidence of actual confusion, (3) the type of goods

and degree of care likely to be exercised by the purchaser, and (4) the labeling and appearance of the advertisements and the surrounding context on the screen displaying the results page. *Id.* at 1154. The Court explained that initial interest confusion requires a likelihood of confusion, not the mere diversion of users online. *Id.* at 1149. Even where the mark is strong and the goods are similar, as in the instant case, a court must adequately consider the labeling and appearance of the advertisements. *Id.* at 1150.

Here, Plaintiff asserts that Bitcoin Depot used the "Coin Cloud" trademark to misdirect internet traffic to Bitcoin Depot's website rather than Plaintiff's. Compl. ¶ 86. However, as seen in the image on page 16 of the Complaint, an internet search of Cash Cloud's trademark "Coin Cloud" produced the Sponsored Link to https://www.bitcoindepot.com. Such "mere diversion" does not rise to the level of "confusion" required under the Lanham Act. "Due to the separate and distinct nature of the links created on any of the search results pages in question, potential consumers have no opportunity to confuse defendant's services, goods, advertisements, links or Web sites for those of plaintiff." *J.G. Wentworth, S.S.C. Ltd. Partn. v. Settle. Funding LLC*, 2007 WL 30115 at *8 (E.D. Pa. Jan. 4, 2007). In other words, because of the clear labeling of the Bitcoin Depot website in the Sponsored Link, there is no likelihood of confusion, and consequently, no liability for trademark infringement under the Lanham Act as a matter of law. This is especially true where individuals seeking to fund a cryptocurrency wallet through the use of a Bitcoin ATM are likely to be reasonably prudent customers accustomed to online searching, especially given the solely digital nature of cryptocurrencies. *See Network Automation*, 638 F.3d at 1152–53 (explaining that experienced internet consumers are likely to be reasonable, prudent, and unlikely to be confused into believing that a domain name that included a product name would necessarily have a formal affiliation with the maker of the product).

**2.     The Complaint Fails to Allege a False or Misleading Statements Claim.**

As to any purported false or misleading statements about Plaintiff's products and services, including its plans to reorganize its debts, in communications to Plaintiff's Kiosk hosts, Plaintiff's alleged misrepresentations do not constitute actionable commercial speech. To be actionable under the Lanham Act, the alleged commercial statements "must be sufficiently disseminated to the

relevant purchasing public." *Rimini St., Inc. v. Oracle Intl. Corp.*, 2017 WL 5158658 at *11–*12 (D. Nev. Nov. 7, 2017) (citing *Storage Tech Corp. v. Custom Hardware Eng'g & Consulting, Ltd.*, 2006 WL 1766434 (D. Mass. June 28, 2006) (holding that to be actionable a statement "must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals.")). Allegations of limited and direct customer interaction are "insufficient to satisfy the requirement that representations be disseminated widely in order to constitute 'commercial advertising or promotion' under the Lanham Act." *Id.*

Here, Plaintiff makes only conclusory allegations that Bitcoin Depot engaged in a "campaign" to "poach" its Kiosk hosts, basing these allegations "upon information and belief." Compl. ¶ 79. But allegations pled "upon information and belief" fail to satisfy Rule 9(b). *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (Civil Rule 9(b)'s standard may be relaxed when the facts are within defendant's exclusive control, but plaintiff must still state the factual basis for the belief). Plaintiff points only to statements made to a single host. Compl. ¶¶ 80-82. Even allegations of solicitations to one or two Kiosk hosts does not constitute a "campaign." And isolated statements to individual customers or potential customers do not have redress under the Lanham Act. *Rimini*, 2017 WL 5158658 at *12. Although Plaintiff alleges that Bitcoin Depot "told other hosts that Cash Cloud 'is out of business' and that it 'wanted to replace Cash Cloud's machines with Defendant's and take over the rent agreement,'" Compl. ¶ 83, Plaintiff fails to identify the "other hosts," or allege when any such statements were made or who made them. Plaintiff fails to allege that the facts of the fraud are in Bitcoin's exclusive control, and fails to allege a factual basis for a "campaign" to "poach" Kiosk hosts. The Complaint fails to identify either the who, what, when, and how of any "campaign" to "poach" Kiosk hosts, or the factual basis for the belief of any such campaign, and thus fails to meet the particularity requirements of Civil Rule 9(b). Accordingly, Count III should be dismissed.

### 3. Punitive damages are not available under the Lanham Act.

Plaintiff asserts that it is "entitled to punitive damages" under its Lanham Act claim. Compl. ¶ 112. But punitive damages are not available under the Lanham Act. *See Duncan v. Stuetzle*, 76 F.3d 1480, 1490 (9th Cir. 1996); *see also Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d

- 10 -

1105, 1114 (9th Cir. 2012) (noting Lanham Act "expressly forbid[s] the award of damages to punish an infringer."). Moreover, as the Lanham Act does not allow, under any circumstances, an award of punitive damages, dismissal of this demand should be with prejudice. *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004) (dismissal with prejudice is appropriate where amendment would be futile).

**F.      The Complaint Fails to Allege a Consumer Fraud/Deceptive Trade Practices Claim.**

Under Nevada law, a consumer fraud/deceptive trade practices claim must allege: "(1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff." *Urban Outfitters, Inc. v. Dermody Operating Co., LLC*, 2022 WL 4134127 at *3 (D. Nev. Sept. 12, 2022); *see* NRS § 41.600(2)(e) (defining consumer fraud as including deceptive trade practices listed in NRS §§ 598.0915 to 598.0925). A person engages in a deceptive trade practice if he, among other things, "(3) knowingly makes a false representation as to affiliation, connection, association with or certification by another person, [or] (8) disparages the goods, services or business of another person by false or misleading representation of fact…." *See* NRS § 598.0915; Compl. ¶ 115.

Plaintiff contends that Bitcoin Depot made false and misleading statements to a single Kiosk host regarding Plaintiff's bankruptcy filing, implying that Cash Cloud was liquidating and ceasing its business operations, when instead Plaintiff filed Chapter 11 bankruptcy to reorganize debts. Compl. ¶¶ 79-85. Plaintiff further alleges that Bitcoin Depot made additional misrepresentations to "other," unidentified hosts. *Id.* ¶ 83. But as noted above, Plaintiff's claims that, upon information and belief, Bitcoin Depot orchestrated a fraudulent "campaign" through these purportedly false or misleading statements in an attempt to "poach" Kiosk hosts away from Plaintiff are conclusory. *See supra* Part(E)(ii). Further, any allegations of causation and damages are similarly conclusory. *See* Compl. ¶¶ 84-85, 88, 117-18. These conclusory allegations fail to meet the pleading standards of Civil Rule 8, let alone the particularity required by Civil Rule 9(b). *See Urban Outfitters*, 2022 WL 4134127 at *4-*5 (dismissing consumer fraud/deceptive trade practice count for failure to allege the fraud or causation elements). Accordingly, Count IV should be dismissed.

- 11 -

15482-01/132501384_3  132501384

**1.     Punitive damages are not available under NRS § 41.600.**

NRS § 41.600 provides for a private right of action by victims of consumer fraud (including for deceptive trade practices under § 598.0915) but does not allow for treble or punitive damages. *Klaneski v. Malco Enterprises of Nevada, Inc.*, 2021 WL 8894485 at *1 (D. Nev. Sept. 21, 2021). Accordingly, this demand should be dismissed with prejudice. *Thinket*, 368 F.3d at 1061.

**G.     The Complaint Fails to Allege a Claim of Tortious Interference with Contract as to Plaintiff's Host Agreements.**

To allege a claim for intentional interference with contractual relations a plaintiff must allege: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts by the defendant intended or designed to disrupt the contractual relationship; (4) actual breach or disruption of the contract; and (5) damages from the disruption or breach. *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003). A general intent to interfere "does not alone suffice to impose liability." *Id.* at 1268. The inquiry of this intentional tort "usually concerns the defendant's ultimate purpose or the objective that he or she is seeking to advance." *Id.* Where a defendant's ultimate purpose is to win a contract from a competitor to grow its business, rather than to simply deprive a competitor of work, is insufficient to establish intent to interfere. *See V5 Techs., LLC v. Switch, Ltd.*, 2021 WL 149837 at *10 (D. Nev. Jan. 15, 2021) (finding insufficient intent to interfere with a contract on such facts).

Here, Plaintiff asserts Bitcoin Depot "used false and misleading statements in an attempt to lure Cash Cloud's Kiosk hosts to break its contracts with Cash Cloud and to 'partner' with [Bitcoin Depot] instead." Compl. ¶ 84. There are no allegations that Bitcoin Depot had any improper intent to deprive Cash Cloud of work by purportedly interfering with any Kiosk host contracts. *See V5 Techs*, 2021 WL 149837 at *10.

Plaintiff asserts that it entered into contracts or leases between itself and "thousands" of Kiosk hosts. Compl. ¶¶ 21, 23, 122. However, Plaintiff fails to allege the existence of a valid and existing contract or lease with even one Kiosk host. The Complaint appears only to imply that Plaintiff is contracted with one named Kiosk host. Compl. ¶¶ 80-82. But the Complaint fails to allege that any purported contract or lease with this Kiosk host contained an exclusivity clause.

- 12 -

*See* Compl. ¶ 21 (noting that the "terms in the Contracts and/or Leases vary"). Nor does the Complaint allege that Bitcoin Depot had knowledge of any particular Kiosk host contract or whether it contained an exclusivity clause.

Plaintiff relies on the same purportedly false and misleading statements for this claim as it does for its consumer fraud/deceptive trade practices claim. Compl. ¶¶ 79-85. But, because Plaintiff's allegations of a purported fraudulent "campaign" to "poach" Kiosk hosts are conclusory, they fail to allege the who, what, when, where, or how of the "poaching campaign." *See supra* Part (E)(ii). Accordingly, the Complaint once again fails to meet the pleading standards of Civil Rule 8 and Civil Rule 9(b). *See Vess*, 317 F.3d at 1106 ("[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction.")

Further, the Complaint is void of any allegations that the alleged misrepresentations caused a single disruption or breach of Plaintiff's Kiosk host contracts either by Plaintiff or by its hosts. *Id.* ¶¶ 85, 127. Plaintiff must allege specific facts showing that Bitcoin Depot's conduct directly caused disruption or breach of its Kiosk host contracts. *Operation: Heroes, Ltd. v. Procter & Gamble Prods., Inc.*, 2015 WL 5768534 at *7 (D. Nev. 2015). Plaintiff fails to do that and here there are no such specific facts. *See* Compl. ¶¶ 79-85; 122-28 (alleging only "upon information and belief," Defendant's misconduct has caused a host to breach the Contract with Cash Cloud). Without specific allegations of a disruption/breach, Plaintiff again fails to allege damages beyond mere speculation and fails to state a claim. Accordingly, Count V should be dismissed.

**H.     The Complaint Fails to Allege a Claim of Tortious Interference with Contract as  to Plaintiff's 2020 Purchase Agreement with BitAccess.**

Plaintiff's disingenuous pleading fails to allege a significant disruption of the 2020 Purchase Agreement or damages from any such disruption. Again, the elements of a claim for intentional interference with contractual relations are: (1) a valid and existing contract; (2) defendant's knowledge of the contract; (3) intentional acts by the defendant intended or designed to disrupt the contractual relationship; (4) actual breach or disruption of the contract; and (5) damages from the disruption or breach. *J.J. Indus.*, 71 P.3d at 1267. Further, a plaintiff must

- 13 -

15482-01/132501384_3   132501384

1  allege "either an actual breach of a contract or a significant disruption of a contract rather than a simple impairment of contractual duties." *V5 Techs*, 2021 WL 149837 at *7.

The Complaint alleges that on August 4, 2022, BitAccess' Chief Operations Officer emailed a letter to Plaintiff indicating the company's intention to terminate the 2020 Purchase Agreement and deactivate the software on Plaintiff's Kiosks. Compl. ¶ 43. Facing deactivation of the software, Plaintiff sought relief from the Ontario [Canada] Superior Court of Justice that BitAccess not deactivate the software. *Id.* ¶¶ 48-52. According to the Complaint, BitAccess deactivated the software for several hours on August 18, 2022. *Id.* ¶¶ 53-56. Plaintiff then offers contrived speculation "upon information and belief" that Bitcoin Depot, as a direct competitor of Plaintiff and through its acquisition of BitAccess, "cause[d] BitAccess to renounce the 2020 Purchase Agreement and terminate the provision of the software services, including deactivation" of the software. *Id.* ¶ 65.

But this speculation defies logic – specifically, that Bitcoin Depot would acquire BitAccess and then strip the company of one of its top revenue sources. *See id.* ¶ 37 ("The transaction fees paid to BitAccess were substantial [amounting to] hundreds of thousands of dollars each month to BitAccess in transaction fees."), ¶ 61 (displaying chart showing Plaintiff as a crypto ATM operator with the second highest volume), ¶ 134 (noting the deactivation of the software prevented transaction fee payments to BitAccess). The Complaint conveniently leaves out that the August 4 letter explicitly noted that Plaintiff "developed its own [kiosk] software … that [Plaintiff] has been publicly demonstrate[ing] to its customers, the industry in general and in its marketing." *See* Exhibit A to Bitcoin Depot's Request for Judicial Notice [ECF No. 30], *October 4, 2022 Reasons for Decision by Judge Hooper in Canadian Litigation* at p. 4, para. 21 (citing BitAccess' Chief Operations Officer's August 4, 2022 letter incorporated by reference in paragraphs 43-44 of the Complaint).[5] Plaintiff conveniently leaves out facts that could show the software deactivation was

---

[5] Bitcoin Depot requests that this Court take judicial notice of this October 4, 2022 Order from the Canadian Litigation under FED. R. EVID. 201. Courts "may take judicial notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue" without converting a motion to dismiss to a motion for summary judgment. *See Lawson v. Klondex Mines Ltd.*, 450 F. Supp. 3d 1057, 1071 (D. Nev. 2020) (taking

- 14 -

1  "motivated by a desire to protect [BitAccess'] own interests." *Leavitt v. Leisure Sports Incorporation*, 734 P.2d 1221, 1226 (Nev. 1987) (finding actions to protect interests acquired through a contract are privileged). Plaintiff then alleges that on August 30, 2022, Bitcoin Depot "took control" of BitAccess and deactivated the software on Plaintiff's Kiosks. Compl. ¶¶ 67-72. Yet, the Complaint is curiously silent as to any further action in the Canadian Court. Why? Because Plaintiff lost its case in Canada.

To provide the complete picture for this Court, on October 4, 2022, the Canadian Court dismissed Plaintiff's application for an injunction restraining BitAccess from deactivating the software. Ex. A ¶ 62. The Canadian Court acknowledged that Bitcoin Depot "deactivated the software on August 30, 2022," which necessitated an emergency hearing on September 1, 2022, during which the Canadian Court ordered the software to be reactivated, and the software was reactivated. Ex. A ¶ 4. The Canadian Court noted that by October 2022, Plaintiff had already replaced the Kiosk software with its own software on 25% of its Kiosks. *Id.* ¶ 48. The Canadian Court found the fact that Plaintiff was "already in the process of replacing BitAccess' software" balanced any "threat that immediate deactivation pose[d] to Plaintiff's current operation." *Id.* ¶ 60. The Canadian Court further noted, "To grant the injunction as sought … would, in effect, allow [Plaintiff] to continue to replace BitAccess' software on its machines while, at the same time, force BitAccess to devote time and resources to service and support those kiosks that remain." *Id.* Remarkably, Plaintiff fails to provide any of this detail in its Complaint –a detail that negates Plaintiff's contrived "motivation" for Bitcoin Depot to "prevent [Plaintiff] from doing business," Compl. ¶ 74.

Moreover, a less than 48-hour software deactivation is hardly the "significant disruption of a contract" as alleged by Plaintiff. Instead, in place of actual evidence, Plaintiff uses inflammatory rhetoric, stating that the "sudden shutdown crippled" its business and "caused substantial harm to [its] business, its goodwill, and reputation." Compl. ¶¶ 74-75. Plaintiff attempts to support this

---

judicial notice of a Supreme Court of British Columbia's order); *Dickerson v. Wells Fargo Bank, N.A.*, 2017 WL 1371259 at *2 (D. Nev. Apr. 13, 2017) (a court may take judicial notice of "matters of public record"). The Order provides the full text of the August 4, 2022 termination letter sent by BitAccess to Cash Cloud, which Cash Cloud incorporated by reference into its Complaint.

assertion by alleging damages estimated "in excess of several million dollars," but Plaintiff includes "the out of pocket expense to send technicians to each Kiosk and install alternate software on the Kiosk." Compl. ¶¶ 76-77. But Plaintiff was already "replacing BitAccess' software on its machines," as noted by the Canadian court (Ex. A ¶ 60), and would have undertaken those "out of pocket expenses" regardless of the software deactivation. Further, Plaintiff offers no illustration or detail of the expected profits for a 48-hour period of ATM transactions. As such, Plaintiff fails to allege that the deactivation amounted to an actual breach or significant distribution. *See V5 Techs*, 2021 WL 149837 at \*7. Accordingly, Count VI should be dismissed.

## I.     The Complaint Fails to Allege a Claim of Intentional Interference with Prospective Business Relations.

Under Nevada law, to sufficiently plead a claim for intentional interference with prospective economic advantage, a plaintiff must allege:  (1) the existence of a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of that prospective relationship; (3) an intent to harm the plaintiff by preventing or interfering with the prospective contractual relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct. *Treasury Sols. Holding Inc. v. Upromise, Inc.*, 2010 WL 5390134 at \*5 (D. Nev. 2010). A plaintiff must allege specific facts supporting the existence of a prospective business advantage. *Id.*

The Complaint fails to allege how Bitcoin Depot interfered with any third party with which Plaintiff maintained a contractual relationship or had a valid business expectancy or prospective advantage. Although Plaintiff alleges that deactivation of the BitAccess licensed software resulted in the inability of Plaintiff to "process any transactions on thousands of Kiosks that relied on the BitAccess software," Compl. ¶ 74, Plaintiff fails to connect the deactivation with any prospective contractual relationship(s). At most, Plaintiff alleges that it "executes new customer agreements through a new customer's use of a Cash Cloud Kiosk." Compl. ¶ 138. But Plaintiff fails to allege which deactivation interfered with prospective contractual relationships, the potential volume of such "new customer agreements" that could have been affected during the period that the software was deactivated, or the actual volume of transactions affected during the deactivation period. Any

- 16 -

1    purported "interference" by Bitcoin Depot or any valid business expectancy by Plaintiff is merely
2    speculative as alleged. *See Upromise*, 2010 WL 5390134 at *5 (dismissing prospective business
3    advantage claim for failure to allege specific facts supporting the existence of a prospective
4    business advantage).

5    Moreover, as with Plaintiff's other claims, Plaintiff has not pled any damages arising from
6    any purported interference with the prospective advantage that is beyond mere speculation. *See*
7    Compl. ¶ 144; *see Vess*, 317 F.3d at 1106 ("[A] plaintiff must set forth more than the neutral facts
8    necessary to identify the transaction."). Accordingly, Count VII should be dismissed.

### J.    The Complaint Fails to Allege an Injurious Falsehood Claim.

Bitcoin Depot is unaware of any authority recognizing "injurious falsehood" as a cognizable cause of action in Nevada. At least one District of Nevada case applying Nevada law found a claim for "injurious falsehood" failed as a matter of law based on the elements articulated in the Restatement (Second) of Torts § 623A. *Huston v. Verizon Fed. Network Sys., LLC*, 2008 WL 4279418 at *5 (D. Nev. Sept. 17, 2008) (granting motion for summary judgment).

Even if an "injurious falsehood" claim was cognizable under Nevada law, the Complaint fails to allege the requisite elements. According to the Restatement (Second), a claim for injurious falsehood requires (1) publication of a false statement harmful to another's interests, (2) intent or knowledge that the publication will result in harm, (3) knowledge that the statement is false or in reckless disregard of the truth, and (4) resulting pecuniary loss. Restatement (Second) of Torts § 623A. Furthermore, an injurious falsehood claim is one sounding in fraud (*Finley v. Kondaur Capital*, 909 F. Supp. 2d 969, 977 (W.D. Tenn. 2012); *Sadowy v. Sony Corp. of Am.*, 496 F. Supp. 1071, 1079 (S.D.N.Y. 1980)) and must be pled with particularity setting forth the time, place, and manner of each act of fraud (*Beshears v. Provident Life & Acc. Ins. Co.*, 2007 WL 1438738 at *1 (D. Ariz. May 15, 2007) (citing *Lancaster Cmty. Hosp. v. Antelope Valley Dist.*, 940 F.2d 397, 405 (9th Cir. 1991) ("Rule 9(b) "requires a pleader of fraud to detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme."")).

Here, for the same reasons Counts III, IV, V, and VII fail, Plaintiff's injurious falsehood claim fails. Plaintiff's allegations of a fraudulent "campaign" to "poach" Kiosk hosts, causation,

1  and damages are speculative and conclusory. Compl. ¶¶ 79-85; 147-51; *see supra* Part(E)(ii). Plaintiff fails to allege what disruption or breach of the contractual relationship between Plaintiff and its Kiosk hosts occurred due to any purported misrepresentations, which host breached a contract, or when any purported disruption or breach occurred. Such allegations fail to meet the pleading standards of both Civil Rule 8 and the particularity requirements of Civil Rule 9(b). *See Vess*, 317 F.3d at 1106 ("[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction."). Accordingly, Count VIII of the Complaint should be dismissed.

**K.     The Complaint Fails to Allege a Defamation Claim.**

In Nevada, a defamation action has four elements: "(1) a false and defamatory statement of fact by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Clark County Sch. Dist. v. Virtual Educ. Software, Inc.,* 213 P.3d 496, 503 (Nev. 2009) (quoting *Pope v. Motel 6*, 114 P.3d 277, 282 (Nev. 2005)). Because the purportedly false statements alleged by Plaintiff that purportedly led to "disruption" of contractual relationships, Plaintiff's claim is a business disparagement claim, rather than a general defamation claim. *See id.* at 504 (explaining that "communications constituting business disparagement are ... injurious falsehoods that interfere with the plaintiff's business and are aimed at the business's goods or services").

In Nevada, to succeed on a claim of business disparagement, the plaintiff must allege "(1) a false and disparaging statement, (2) the unprivileged publication by the defendant, (3) malice, and (4) special damages." *Weinstein v. Meritor, Inc.*, 2017 WL 4397947 at *5 (D. Nev. Sept. 29, 2017). A business-disparagement claim requires the defendant's disparaging comments to be the proximate cause of the economic loss. *Id.* "[I]f the plaintiff cannot show the loss of specific sales attributable to the disparaging statement, the plaintiff may show evidence of a general decline in business." *Id.* "Nonetheless, the general decline of business must be the result of the disparaging statements and the plaintiff must eliminate other potential causes." *Id.*

Plaintiff's speculative and conclusory allegations fail to allege any specific sales Plaintiff lost or economic loss that resulted from any alleged misstatements. *See supra* Parts (E)(ii), (F), and (J). Accordingly, Count IX should be dismissed. *See SVI, Inc. v. Supreme Corp.*, 2016 WL

- 18 -

7190548 at *5 (D. Nev. Dec. 12, 2016) (proposed business disparagement claim was not adequately pled when it failed to "allege any facts to show that [a false and disparaging statement] resulted in special damages, *i.e.*, the loss of a business deal, or a general decline in business").

### V. CONCLUSION

Based upon the foregoing, the Court should dismiss all of Plaintiff's claims against Bitcoin Depot, and grant such other relief as the Court deems proper.

DATED this 13th day of April 2023.

**HOLLEY DRIGGS**

/s/ Stacy H. Rubin
Stacy H. Rubin, Esq.
Nevada Bar No. 9298
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101

**CARLTON FIELDS, P.A.**
Adam P. Schwartz, Esq.
(Admitted *Pro Hac Vice*)
John J. Lamoureux, Esq.
(Admitted *Pro Hac Vice*)
Corporate Center Three at International Plaza
4221 W. Boy Scout Boulevard, Suite 1000
Tampa, Florida 33607-5780

*Attorneys for Lux Vending, LLC
d/b/a Bitcoin Depot*

15482-01/132501384_3  132501384

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of Holley Driggs and that, on the 13th day of April 2023, I caused to be served a true and correct copy of DEFENDANT LUX VENDING, LLC D/B/A BITCOIN DEPOT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT in the following manner:

☒ (ELECTRONIC SERVICE) Under Local Rule 5005 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐ (UNITED STATES MAIL) By depositing a copy of the above-referenced document for mailing in the United States Mail, first-class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐ (OVERNIGHT COURIER) By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐ (FACSIMILE) By serving a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those listed on the attached service list, and on the date above written.

/s/ Olivia Swibies
An employee of Holley Driggs

15482-01/132501384_3  132501384