BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
JEANETTE E. MCPHERSON, ESQ.
Nevada Bar No. 5423
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Tele: (702) 262-6899/Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
        jmcpherson@foxrothschild.com
        nkoffroth@foxrothschild.com
        zwilliams@foxrothschild.com

JAMES J. JIMMERSON, ESQ.
Nevada Bar No. 000264
JAMES M. JIMMERSON, ESQ.
Nevada Bar No. 12599
**THE JIMMERSON LAW FIRM, P.C.**
415 South 6th Street, Suite 100
Las Vegas, Nevada 89101
Telephone:    (702) 388-7171
Facsimile:    (702) 380-6413
Email: jimmerson@jimmersonlawfirm.com
        jmj@jimmersonlawfirm.com
*Counsel for Debtor Cash Cloud Inc.*

Electronically Filed May 3, 2023

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>                                Debtor. | Case No. BK- 23-10423-mkn<br><br>Chapter 11 |
| CASH CLOUD, INC., dba COIN CLOUD,<br><br>                                Plaintiff,<br><br>v.<br><br>Lux Vending, LLC d/b/a Bitcoin Depot,<br><br>                                Defendant. | Adv. Case No. 23-01015-MKN<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT LUX VENDING, LLC D/B/A BITCOIN DEPOT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Hearing Date: May 17, 2023<br>Hearing Time: 9:30 a.m. |

1

145454038.1

Cash Cloud, Inc. d/b/a Coin Cloud ("Cash Cloud," "Plaintiff," or "Debtor"), debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Chapter 11 Case"), by and through its undersigned counsel, Fox Rothschild LLP, and The Jimmerson Law Firm, P.C., hereby files this Response to Defendant Lux Vending, LLC d/b/a Bitcoin Depot's Motion to Dismiss Plaintiff's Complaint (the "Response"). This Response is based upon the papers and pleadings in this action, the following memorandum of points and authorities, and any arguments made by counsel during any hearing on Defendant Lux Vending, LLC d/b/a Bitcoin Depot's Motion to Dismiss Plaintiff's Complaint (the "Motion").[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This adversary proceeding centers on Defendant Lux Vending, LLC dba Bitcoin Depot's ("Defendant" or "Bitcoin Depot") malfeasance toward Plaintiff Cash Cloud Inc. As detailed in the Complaint, Defendant is a direct competitor of Cash Cloud with similar ATM-style kiosks that it also seeks to place in retail stores for use by consumers. For months, Defendant has waged an improper campaign to harm Cash Cloud, through, among other things, interference with Cash Cloud's contractual relationships, deactivation of the software needed to operate Cash Cloud's kiosks, infringement on Cash Cloud's federally registered trademarks, and the use of unfair and deceptive trade practices in a wrongful effort to cause Cash Cloud's hosts to cease doing business with Cash Cloud. The Complaint details Defendant's misconduct across 25 pages, containing nearly 200 paragraphs of allegations, supporting with numerous images and exhibits, and asserts claims for: (1) Temporary Restraining Order and Preliminary Injunctive Relief; (2) Violation of Automatic Stay, 11 U.S.C. § 362; (3) Violation of Lanham Act, 15 U.S.C. § 1125; (4) Consumer Fraud/Deceptive Trade Practices; (5) Tortious Interference with Contract – Host Agreements; (6) Tortious Interference with Contract – 2020 Purchase Agreement; (7) Intentional Interference with Prospective Business Relations; (8) Injurious Falsehoods; and (9) Defamation.

---

[1] Defendant Lux Vending, LLC d/b/a Bitcoin Depot's Motion to Dismiss Plaintiff's Complaint is cited herein as "Mot. at __."

2

In its Motion to Dismiss, Defendant argues that the Complaint fails to adequately plead any of Plaintiffs nine (9) claims. Defendant is in error. As detailed herein, the Complaint appropriately sets forth facts establishing the elements of each of Plaintiff's causes of action. Accordingly, Plaintiff respectfully requests that the Court deny the Motion.

## II. STATEMENT OF FACTS

Defendant is a direct competitor of Cash Cloud with similar ATM kiosks that it also seeks to place in retail stores for use by consumers. Compl. at ¶ 11. For months, Defendant has waged an improper campaign to harm Cash Cloud, through, *inter alia*, interference with Plaintiff's contractual relationships, deprivation of the software needed to operate Plaintiff's kiosks, and the use of unfair and deceptive trade practices in a wrongful effort to cause Plaintiff's hosts to cease doing business with Plaintiff. *Id*.

### **Interference with Cash Cloud's Agreement with BitAccess**

Plaintiff operated its kiosks using software provided by a Canadian company called BitAccess. *Id*. at ¶¶ 25, 26. Under the 2020 Master Purchase Agreement with BitAccess (the "2020 Purchase Agreement"), BitAccess agreed to continue to grant Cash Cloud a **perpetual**, **royalty-free** license to use the software, with very limited termination rights. *Id*. at ¶¶ 38, 39. On August 4, 2022, BitAccess sent to Plaintiff a notice of termination of the 2020 Purchase Agreement, stating that 14 days later, BitAccess would deactivate the software provided to Cash Cloud. *Id*. at ¶ 43. The notice of termination did not claim to terminate the 2020 Purchase Agreement in accordance with the termination provisions therein, and therefore, the purported termination constituted a breach of the 2020 Purchase Agreement. *Id*. at ¶ 44.

Unbeknownst to Plaintiff, in or around 2021, Defendant became a substantial shareholder of BitAccess. *Id*. at ¶ 58. In August 2022, Defendant caused to be filed with the SEC the disclosure of a special purpose acquisition company (SPAC), reflecting the upcoming merger of Defendant and BitAccess. *Id*. at ¶¶ 59-59. Defendant used its position with BitAccess and role in the upcoming merger to induce BitAccess to breach the 2020 Purchase Agreement and terminate the same without cause. *Id*. at ¶ 65.

Defendant's improper influence over BitAccess was further revealed in the lawsuit filed by Plaintiff in Canada against BitAccess seeking among other things, an injunction requiring BitAccess to provide the software to Cash Cloud. While that application for injunctive relief was pending, on August 18, 2022, BitAccess deactivated the software. *Id*. at ¶ 53. In response to the Canadian Court's admonishment, BitAccess reactivated the software and promised the Canadian Court that it would keep the software active for Cash Cloud until the court decided whether to issue the requested injunction. *Id*. at ¶ 55. Notwithstanding this representation to the Canadian Court, on August 30, 2022, Defendant, over the objection of BitAccess's officers and lawyers, unilaterally deactivated the software Cash Cloud used to operate thousands of its kiosks. *Id*. at ¶¶ 67-70.[2] As a result of the software deactivation, the kiosks immediately became inoperable and Plaintiff was unable to process any transaction on the thousands of kiosks that relied upon the BitAccess software. *Id*. at ¶¶ 73-74. Defendant's malfeasance caused substantial harm to Plaintiff's business, its goodwill, and its reputation, including the loss of revenue and substantial out of pocket expenses. *Id*. at ¶¶ 75-76.

### **Interference with Cash Cloud's Relationship with Its Hosts**

Defendant's misconduct has continued. Since the filing of the bankruptcy petition on February 7, 2023, Defendant has been improperly attempting to take over Cash Cloud's host locations—host locations where Cash Cloud has **exclusive** rights to operate digital currency kiosks as provided in its host contracts. *Id*. at ¶ 14. Beginning immediately after February 7, 2023, Defendant began contacting Cash Cloud's hosts in an effort to persuade them to switch from Cash Cloud to Defendant. *Id*. at ¶¶ 79-80. In these communications, Defendant made several materially false statements concerning Cash Cloud. *Id*. at ¶ 80. This effort by Defendant has not ceased. As recently as March 10, 2023, Defendant has continued to contact Cash Cloud's hosts, making even more false statements to them. *Id*. at ¶ 82. By way of example only, Defendant has made the following false statements to Cash Cloud's exclusive hosts:

---

[2] It was only until the Canadian Court issued an order requiring the software to be reactivated did Defendant permit the reactivation of the software. That order remained in place until the Canadian Court issued a decision denying the requested injunction. The denial was not because Plaintiff's application lacked merit. To the contrary, the Canadian Court in its decision stated that had there not been a procedural problem with the application, it would have granted a 60-day injunction against BitAccess to keep the software running.

4

- Cash Cloud "was unable to reorganize its debts." *Id*. at ¶ 80.
- Cash Cloud "is out of business." *Id*. at ¶ 83.
- Defendant "wanted to replace Cash Cloud's machines with [Defendant's] and take over the rent agreement." *Id.*
- "[Cash Cloud's] machines [are] online, but customers not receiving their crypto." *Id*. at ¶ 82.
- "[Cash] Cloud [is] being completely unresponsive to the host after not being paid for months." *Id*.
- They [Cash Cloud] stated they will resume payments, do it for a month or two, and then stop paying the retailers again. *Id*.

These statements are false and dangerous to Cash Cloud's business, its reputation and goodwill. They have caused actual disruption of the contractual relationship between Cash Cloud and its hosts, causing at least one host to breach the host contract with Plaintiff. *Id*. at ¶ 85.

**Trademark Infringement**

Additionally, Defendant has used Plaintiff's federally registered trademark "Coin Cloud" in its advertising to mislead customers into directing their internet traffic to Defendant's website rather than Plaintiff's. *Id*. at ¶ 86. Plaintiff has never permitted Defendant to use Cash Cloud's trademark in this fashion. *Id*. at ¶ 87. Defendant's marketing and advertising efforts are false and are likely to deceive or confuse a substantial segment of their intended audience in falsely portraying Defendant's website as that belonging to Cash Cloud. *Id*. at ¶ 105. As a result of Defendant's improper use of Plaintiff's trademark, Plaintiff has lost customers and revenue. *Id*. at ¶ 111.

### III. LEGAL ARGUMENT

#### A. Legal Standard

A properly pled complaint must provide "[a] short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1937, 1949 (2007). The Court "accept[s] the well-pleaded factual allegations of the complaint as true and construe[s] them in the light most favorable to plaintiff." *OSU Student All. v. Ray*, 699 F.3d 1053, 1061 (9th Cir. 2012). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions or a formulaic recitation of the elements of a cause of action...." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citation omitted) (internal quotations omitted). A complaint must contain sufficient factual matter to

145454038.1

"state a claim to relief that is plausible on its face." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 496 (9th Cir. 2019). A claim is facially plausible when the counterclaim alleges facts that allow the court to draw a reasonable inference that the plaintiff is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Applying this standard, the Court should find that the Complaint properly establishes Plaintiff's entitlement to relief and that Defendant's Motion should be denied.

### B. Plaintiff's Complaint Appropriately Sets Forth Facts Establishing The Elements of Each of Its Claims—the Motion Should be Denied

#### 1. The Complaint is Not a "Shotgun" Pleading

Defendant begins its Motion complaining that the Complaint is a "shotgun" pleading. Hardly. The Complaint is 25 pages long, contains over 163 paragraphs (many with subparagraphs), is organized within several headings, and includes numerous attached exhibits, all to establish the facts that support each of the claims therein. Defendant's argument that, "The Complaint impermissibly incorporates all allegations of purported fact and law into all nine counts against Bitcoin Depot," is not an appropriate reason to dismiss the Complaint.

Indeed, just because each cause of action in the Complaint incorporates all of the prior allegations does not render the Complaint a "shotgun" pleading. As explained by the Court in *Navajo Health Found. - Sage Mem'l Hosp., Inc. v. Razaghi Dev. Co., LLC*, 2:19-cv-00329, 2023 WL 2843649, at *3 (D. Nev. Jan. 30, 2023):

> Defendants are correct that Plaintiff repeats and incorporates each allegation contained in the preceding paragraphs at the beginning of each Count in the TAC. (See generally TAC). But as stated above, the Court finds that the general allegations provide context for Plaintiff's claims, and Plaintiff's incorporation of the general allegations into each Count does not make the TAC a "shotgun" pleading. Moreover, Defendants' attempt to dismiss the entire TAC is overly broad…

*Id*. The same conclusion can be drawn here. The substantial material provided in the General Allegations portions of the Complaint establish the factual basis for each claim. The remainder of

Defendant's Motion confirms the same as Defendant went through each claim in the Complaint, arguing that each of the claims should be dismissed. The Court should reject this argument.

### 2. The Claims for Injunctive Relief Should Not Be Dismissed

Defendant asks the Court to dismiss the first cause of action for equitable/injunctive relief arguing that the claim is technically a remedy rather than a cause of action. Mot. at 7. However, the Court should deny Defendant's request as it elevates form over substance. The Court should interpret the claim as Plaintiff intended—to put Defendant on notice that it would seek equitable/injunctive relief. The court in *Sands v. Wynn Las Vegas, LLC*, No. 2:10-cv-00297, 2010 WL 2348633, at *2 (D. Nev. June 9, 2010) reached the same result, explaining:

> The Court recognizes that injunctive relief and declaratory relief are not causes of action and that it is well within the Court's discretion to dismiss this claim. At the same time, however, **the Court is not required to dismiss this claim under the law cited by Wynn or any other law of which the Court is aware**. The Court therefore exercises its discretion and denies Wynn motion to dismiss this claim. The Court does so even though injunctive relief is a remedy because Sands' § 1981 claims are still before the Court. Thus, **if Sands succeeds on these claims he may very well be entitled to the injunctive and declaratory relief he seeks. Given this fact, the Court sees no reason why it should dismiss Sands' claims for injunctive and declaratory relief only to have him re-file an amended complaint containing the same basic request for relief**.

*Id*. (emphasis supplied); *see also Centex Homes v. Everest Nat'l Ins. Co.*, No. 2:16-cv-01275, 2017 WL 4349017, at *5 (D. Nev. Sept. 29, 2017) (same). As such, the Court should reject Defendant's request to dismiss the cause of action for equitable/injunctive relief.

### 3. The Complaint Establishes a Violation of the Automatic Stay

To recover for a violation of the automatic stay, a plaintiff must show that (1) the defendant violated the stay imposed by the Bankruptcy Code, (2) the violation was willful, and (3) the plaintiff was injured by the violation. *See In re Paxton*, 596 B.R. 686. Each of these elements are satisfied. *See* Compl. at ¶¶ 79-85; 97-100. In working to have Cash Cloud's hosts switch from hosting Cash Cloud's kiosk to hosting Defendant's kiosks, Defendant is violating the automatic stay as such conduct constitutes an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." § 362(a)(3).

145454038.1

It is black letter law that Cash Cloud's executory contracts with its hosts (which contain, *inter alia*, exclusivity provisions in favor of Cash Cloud), constitute property of the estate which is protected by the automatic stay. *See*, *e.g.*, *In re Lehman Bros. Holdings Inc.*, 544 B.R. 16, 40 (Bankr. S.D.N.Y. 2015); *In re Family Health Services, Inc.*, 105 B.R. 937, 942-43 (Bankr. C.D. Cal. 1989); *In re HMH Motor Services, Inc.*, 259 B.R. 440, 451 (Bankr. S.D. Ga. 2000).

Consequently, when Defendant is interfering with Cash Cloud's current contractual relationships or is otherwise soliciting Cash Cloud's hosts in an effort to have the hosts replace Cash Cloud kiosks with Defendant's kiosks, such conduct constitutes a willful violation of the bankruptcy stay. *See In re All Trac Transp., Inc.*, 306 B.R. 859, 880-81 (Bankr. N.D. Tex. 2004); *In re Sherlock Homes of W.N.Y, Inc.*, 246 B.R. 19 (Bankr. W.D.N.Y. 2000).

Defendant argues in its Motion that "[i]nfluencing a customer to opt for a competitor's services over a debtor's service through advertisements, false or otherwise, is not an act of control over the bankruptcy estate's property," citing to *In re Windstream Holdings, Inc.*, 2022 WL 5245633, at *7-9 (S.D.N.Y. Oct. 6, 2022). *See* Mot. at 7. Defendant's reliance on *Windstream* is misguided.

The critical distinction between the debtor in *Windstream* and Cash Cloud is that Cash Cloud's contracts with its hosts contain exclusivity provisions which prohibit the host from using any cryptocurrency kiosk provider other than Cash Cloud. *See* Compl. at ¶ 23. That the contracts are exclusive to Cash Cloud is dispositive to this issue as Defendant's attempts to interfere with such exclusive contracts constitutes a violation of the automatic stay. Indeed, the court in *Windstream* made multiple references to the importance of exclusive contracts in deciding whether the automatic stay had been violated, stating as follows:

> Rather, absent a contract that bound the customers to purchase **exclusively** from the debtor or required those customers to purchase specific quantities of products, the former employees did not breach the stay by competing for those customers (citing *In re Golden Distribs., Ltd.*, 122 B.R. 15, 20 (Bankr. S.D.N.Y. 1990))…
>
> These acts, through which the competitor actively sought to convert or override **exclusive** term contracts between debtors and their customers, by using the debtors' customer list and holding itself out as the proper and authorized servicer of those accounts, are properly characterized as attempts to exercise control (citing *In re Alert Holdings*, 148 B.R. 194, 198 (Bankr. S.D.N.Y. 1992)).

*In re Windstream Holdings, Inc.*, 2022 WL 5245633, at *8.[3]

Finally, Cash Cloud has been damaged by Defendant's violation of the bankruptcy stay. Compl. at ¶ 85. Accordingly, the Court should find that Plaintiff has appropriately pled its claim for Violation of the Automatic Stay.

### 4. The Complaint Properly Alleges a Lanham Act Claim

"To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (false association), a party must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011); *Russell Rd. Food & Beverage, LLC v. Galam*, 180 F. Supp. 3d 724, 740 (D. Nev. 2016). The Complaint satisfies both elements: (1) Plaintiff had a protectible interest in its federally registered trademark (Compl. at ¶ 86); and (2) Defendant's improper use of the mark in its advertisements is likely to cause customer confusion (*id*. at ¶¶ 105, 111).

Defendant argues that there is no likelihood of confusion created by Defendant's use of Plaintiff's trademark. Mot. at 8. If that were the case, what would be Defendant's purpose for misappropriating Plaintiff's federally registered trademark in its online advertising? The answer is of course the advertisement was posted precisely to confuse the customers, redirecting them from Plaintiff to Defendant. Compl. at ¶ 86. Additionally, evaluating the likelihood of confusion is generally premature at the pleading stage. *See*, *e.g.*, *CoStar Group, Inc. v. Commercial Real Estate Exch. Inc.*, No. CV 20-8819-CBM(ASX), 2022 WL 19003681, at *6 (C.D. Cal. June 17, 2022).[4]

Similarly, Plaintiff's Complaint appropriately establishes a clam for a Lanham Act violation under 15. U.S.C. § 1125(a)(1)(B) (false statements), for which there are six (6) elements: (1) the

---

[3] Tellingly, Defendant does not acknowledge the language in *Windstream* which holds that interference with exclusive contracts constitutes a violation of the bankruptcy stay.

[4] This would explain why Defendant was only able to cite to a decision from the Eastern District of Pennsylvania granting a motion to dismiss on likelihood of confusion grounds rather than citing to any in this district (or circuit).

145454038.1

defendant made a false statement either about the plaintiff's or its own product (Compl. at ¶¶ 79-83);[5] (2) the statement was made in commercial advertisement or promotion (*id*.); (3) the statement actually deceived or had the tendency to deceive a substantial segment of its audience (*id*. at ¶¶ 104, 105); (4) the deception is material (*id*. at ¶ 106); (5) the defendant caused its false statement to enter interstate commerce (*id*. at ¶ 107); and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product (*id*. at ¶¶ 109-111).  See *Incorp Services, Inc. v. Nevada Corp. Services, Inc.*, No. 2:09-cv-1300, 2010 WL 11579416, at *5 (D. Nev. Mar. 15, 2010).

While most of Defendant's argument on this cause of action is spent claiming that the Complaint fails to plead the facts with particularity (a matter addressed below and elsewhere in this Response), Defendant also argues that "isolated statements to individual customers or potential customers do not have redress under the Lanham Act." Mot. at 10.  Not only is Defendant's statement an oversimplification of the law, but it is also inapposite to issues at hand, whereby Defendant's statements are being made to the enterprise hosts controlling nearly 30% of Plaintiff's contracts going forward. *See*, *e.g.*, *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (upholding jury's verdict on Lanham Act where misrepresentation was made to one of three potential clients); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996) (finding evidence of dissemination sufficient where statements were made to eleven out of seventy-four potential customers).  For these reasons, the Court should find that the Complaint has properly alleged a claim for violation of the Lanham Act and deny the Motion.[6]

---

[5] As detailed in the next section (and elsewhere in this Response), Plaintiff's allegations concerning the false statements at issue satisfy the heightened pleading standard from Rule 9(b) as the "who, what, where, and when" of the statements at issue are provided in the Complaint.  Indeed, one of the key emails is dropped right into the Complaint itself. Compl. at ¶ 82.  However, in the event that the Court finds that the Complaint fails to plead these facts with particularity under Rule 9(b), Plaintiff respectfully requests leave to amend its Complaint.

[6] Plaintiff acknowledges that punitive damages are unavailable under the Lanham Act and withdraws its request for the same under that claim.

145454038.1

### 5. The Complaint Establishes a Claim for Consumer Fraud

A claim for consumer fraud in Nevada may be premised on, among other things, a violation of Nevada's Deceptive Trade Practices Act. *See* NRS 41.600(2)(e). A person engages in a deceptive trade practice if he, among other things, "(3) knowingly makes a false representation as to affiliation, connection, association with or certification by another person, [or] (8) disparages the goods, services or business of another person by false or misleading representation of fact…." *See* NRS 598.0915. "To state a private right of action under the NDTPA, a plaintiff must allege: (1) defendant violated the NDTPA, (2) causing plaintiff, (3) damages*.*" *Switch, Ltd. v. Uptime Inst., LLC*, 426 F. Supp. 3d 636, 643 (D. Nev. 2019).

The Complaint properly sets forth the facts establishing Plaintiff's claim for consumer fraud. Specifically, the Complaint states that since February 7, 2023, Defendant made several false representations to multiple Cash Cloud hosts that: (1) Plaintiff "was unable to reorganize its debts;" (Compl. at ¶ 80); (2) Plaintiff "is out of business" (*id*. at ¶ 83); (3) "[Cash Cloud's] machines [are] online, but customers not receiving their crypto" (*id*. at ¶ 82); (4) "[Cash] Cloud [is] being completely unresponsive to the host after not being paid for months" (*id*.); and (5) [Cash Cloud] stated they will resume payments, do it for a month or two, and then stop paying the retailers again (*id*.). The majority of these false statements are reflected in a March 10, 2023 email from Frank Schilling of Defendant to Landon Thomas of Royal Farms (one of Plaintiff's hosts).[7] These false statements disparaged the goods, services, or business of Plaintiff. *Id*. at ¶ 82. As a result of these false statements, Plaintiff has been damaged, by among other things, loss of goodwill, reputation, and disruption of its host agreements. *Id*. at ¶ 118.

Defendant argues that the allegations of causation and damages are conclusory and fail to meet the requisite pleading standard. *See* Mot. at 11. Defendant is in error. The Complaint not only

---

[7] While the identity of the two other hosts who received these messages was not included in the Complaint, the identity of the same has been provided in the exhibits to the motions pending before the Court. To the extent the Court would require identification of the other hosts in a pleading, Plaintiff would respectfully request leave to file an amended complaint.

145454038.1

provides the "who, what, when, where"[8] of the fraudulent conduct, but it also specifies that this conduct damaged Plaintiff in specific ways—not just in the form of lost revenue, but also in the form of loss of reputation and standing in the eyes of the consumer. *Id*. at ¶¶ 84, 85, 118.  The Complaint properly pleads the claim for consumer fraud.

Finally, Defendant's argument that punitive damages are unavailable for this claim is without any explanation or analysis, and therefore should be rejected.  Defendant cites to one federal decision which similarly provides no explanation for why punitive damages would not be available under a consumer fraud claim.  Mot. at 12, citing *Klaneski v. Malco Enterprises of Nevada, Inc.*, 2021 WL 8894485 at *1 (D. Nev. Sept. 21, 2021).  Other federal courts hold to the contrary.  *See, e.g.*, *Cheetany v. Bergstrom*, 2:20-cv-01692, 2022 WL 2541778, at *11 (D. Nev. June 21, 2022).  Additionally, since the *Klaneski* decision, the Nevada Supreme Court has clarified that the Nevada Deceptive Trade Practices Act should be construed liberally to effectuate its remedial purpose.  *See R.J. Reynolds Tobacco Co. v. Eighth Judicial Dist. Court in & for Cnty. of Clark*, 138 Nev. Adv. Op. 55, 514 P.3d 425, 430 (2022).  In light of the foregoing, punitive damages under NRS 42.005 (a statute which does not carve out any exception for NDTPA claims) should be available to Plaintiff.  *See, e.g.*, *Chudacoff v. Univ. Med. Ctr. of S. Nevada*, No. 2:08-cv-863, 2013 WL 5935206, at *7 (D. Nev. Nov. 1, 2013) (holding that punitive damage are generally available for tort claims).

### 6. Tortious Interference with Host Contracts

In an action for intentional interference with contractual relations, a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage.  *See WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*, 750 F. Supp. 2d 1180, 1195 (D. Nev. 2010).  A claim for intentional interference with contractual relations must be pled in

---

[8] "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Sanford v. MemberWorks, Inc*., 625 F.3d 550, 558 (9th Cir. 2010) (citations omitted).  The Complaint provides Defendant notice of the particular misconduct at issue.  Indeed, that Defendant did not deny that is made the misrepresentations at issue during earlier motion practice confirms that Defendant has more than sufficient notice of the particulars of their misconduct.

145454038.1

accordance with Rule 8 and not the heightened pleading standard of Rule 9. *See, e.g.*, *Diamond Resorts Int'l, Inc. v. Reed Hein & Associates, LLC*, No. 2:17-cv-03007, 2019 WL 6310717, at *7 (D. Nev. Nov. 25, 2019).[9]

The Complaint establishes each of these elements: (1) Cash Cloud's host contracts are valid and existing executory contracts (Compl. at ¶ 122); (2) Defendant knew of these contracts (*id.* at ¶ 124); (3) Through its marketing and solicitation to Cash Cloud's Kiosk hosts, while making false and misleading statements, Defendant intentionally and improperly interfered with contracts between Cash Cloud and its kiosk hosts by inducing or otherwise causing Cash Cloud's hosts to breach their contracts. (*id.* at ¶¶ 79-85, 123); (4) the contract was actually disrupted (*id.* at ¶¶ 85, 123, 126); and (5) As a direct, natural, and proximate result of Defendant's improper interference, Cash Cloud has suffered substantial damages, including, but not limited to, lost revenue, out of pocket expenditures, loss of goodwill, and reputational harm (*id.* at ¶ 127).

Notwithstanding the foregoing, Defendant seeks dismissal, gish galloping through several demonstrably false arguments. First, Defendant claims, "There are no allegations that Bitcoin Depot had any improper intent to deprive Cash Cloud of work by purportedly interfering with any Kiosk host contracts." Mot. at 12. This is false. Among other allegations, the Complaint states, "Through its marketing and solicitation to Cash Cloud's Kiosk hosts, while making false and misleading statements, Defendant intentionally and improperly interfered with contracts between Cash Cloud and its kiosk hosts," and "Defendant intentionally and without justification interfered with and continues to interfere with Contracts between Cash Cloud and its kiosk hosts by inducing and/or causing a breach of those contracts." Compl. at ¶¶ 123, 126.

Second, Defendant claims "Plaintiff fails to allege the existence of a valid and existing contract or lease with even one Kiosk host." Mot. at 12. Once again, Defendant is in error. Plaintiff pled the existence of thousands of contracts, including identifying one enterprise host by name. *See* Compl. at ¶¶ 14, 20, 21, 82 122. Indeed, the Complaint states, "Defendant has been contacting Cash

---

[9] In the section dedicated to this claim, Defendant argues, "the Complaint once again fails to meet the pleading standards of Civil Rule 8 and Civil Rule 9(b)," falsely suggesting that Plaintiff must satisfy Rule 9 when pleading a claim for intentional interference. Mot. at 13.

13

145454038.1

Cloud's kiosks hosts, with whom Cash Cloud has executory contracts containing exclusivity clauses, in an attempt to lure hosts into breaking their contracts with Coin Cloud and to replace Coin Cloud kiosks with Bitcoin Depot kiosks." *Id*. at ¶ 14.

Third, Defendant improperly suggests that "the Complaint [fails to] allege that Bitcoin Depot had knowledge of any particular Kiosk host contract or whether it contained an exclusivity clause." Mot. at 13. Defendant is again wrong. The Complaint not only generally avers Defendant's knowledge of the host agreements (Compl. at ¶ 124), it contains a direct quote from a host stating that Bitcoin Depot told them that it wanted to "take over the rent agreement" (*id*. at ¶ 83).

Finally, Defendant argues, "the Complaint is void of any allegations that the alleged misrepresentations caused a single disruption or breach of Plaintiff's Kiosk host contracts either by Plaintiff or by its hosts."[10] Defendant is mistaken. The Complaint expressly states that Defendant's conduct has caused actual disruption of the contractual relationships and breach[es] of host contract. *See* Compl. at ¶ 85. As such, the Court should find that the Complaint appropriately pleads a claim for intentional interference with Plaintiff's host contracts. See, e.g., *Chocolate Magic Las Vegas LLC v. Ford*, No. 2:17-cv-00690, 2018 WL 475418, at *8 (D. Nev. Jan. 17, 2018) ("Ford allegedly defamed Chocolate Magic to Hershey's and took steps to negatively affect the store's success. Chocolate Magic has alleged sufficient facts to plausibly show that Ford intended to disrupt its relationship with Hershey's.").

### 7. Tortious Interference with BitAccess Agreement

The Complaint appropriately pleads the elements of a claim for tortious interference with the 2020 Purchase Agreement with BitAccess: (1) The 2020 Purchase Agreement was and is a valid contract between BitAccess and Cash Cloud (Compl. at ¶ 131); (2) Defendant knew of the 2020 Purchase Agreement (*id*. at ¶ 132); (3) Defendant committed intentional acts intended to or designed to disrupt BitAccess's performance under the 2020 Purchase Agreement (*id*. at ¶¶ 65, 67-72, 133); (4) Defendant's intentional acts caused an actual disruption of the 2020 Purchase Agreement.

---

[10] Defendant argues, "Plaintiff must allege specific facts showing that Bitcoin Depot's conduct directly caused disruption or breach of its Kiosk host contracts," citing *Operation: Heroes, Ltd. v. Procter & Gamble Prods., Inc.*, 2015 WL 5768534 at *7 (D. Nev. 2015). Mot. at 13. Defendant's reliance on *Operation Heroes, Ltd.* is misplaced as in that case, the court resolved the claim on summary judgment, not on a motion to dismiss.

BitAccess breached the 2020 Purchase Agreement in renouncing the same, deactivating the software, and ceasing the software services provided thereunder. (*id*. at ¶ 133); and (5) As a direct, natural, and proximate result of Defendant's improper interference, Cash Cloud has suffered substantial damages, including, but not limited to, lost revenue, out of pocket expenditures, loss of goodwill, and reputational harm (*id*. at ¶ 135). As such, the Court should find that the claim for intentional interference with the BitAccess Purchase Agreement is properly pled.

Nevertheless, Defendant makes two (2) arguments in its Motion: (1) the Complaint "fails to allege a significant disruption of the 2020 Purchase Agreement; and (2) the Complaint fails to allege "damages from any such disruption." Mot. at 13. Both of these statements are without merit.

First, the Complaint alleges significant disruptions (plural) of the 2020 Purchase Agreement— the renunciation/termination of the agreement in the first instance (the Agreement provided a "***perpetual***, royalty free license" for the software) (Compl. at ¶ 12); as well as the subsequent acts to unilaterally turn off the software over the objection of BitAccess's officers and attorneys (*id*. at ¶ 13). By itself the termination of the contract is a breach of the same as the agreement could only be terminated for cause (of which there was none). *Id*. at ¶ 39; *see also Chocolate Magic Las Vegas LLC,* 2018 WL 475418, at *8 (denying a motion to dismiss, holding that breach of an agreement constitutes disruption of a contract). In addition to the foregoing, Defendant tortiously interfered with the 2020 Purchase Agreement when it in unilaterally caused the software deactivation on August 30, 2022. Compl. at ¶ 72.

Second, the Complaint appropriately alleges the damage caused by the aforementioned interference. By way of example only, Plaintiff lost revenue from the deactivation of thousands of machines (*id*. at ¶¶ 73-76), and it incurred substantial costs from having to replace the software in the kiosks (*id*. at ¶ 76). The damages are estimated to be in the millions of dollars. *Id*. at ¶ 77. As such, the Court should find that the claim is properly pled.

Defendant's argument to the contrary relies upon a self-serving and materially incomplete description of a Canadian Court order from October 4, 2022, whereby the Canadian Court was asked to issue a mandatory injunction requiring BitAccess to continue providing the software as it was obligated to under the 2020 Purchase Agreement. As has been discussed in earlier motion practice,

145454038.1

the Canadian Court stated that it would have issued the injunction had there not been a procedural problem with the posting of an undertaking. *See* Mot. Ex. A at ¶ 61. Now, ironically, Defendant begins its description of the Order, stating, "To provide the complete picture for this Court, on October 4, 2022, the Canadian Court dismissed Plaintiff's application for an injunction restraining BitAccess from deactivating the software." Mot. at 15 (emphasis supplied). However, the Motion's discussion of the order is anything but complete. Indeed, Defendant cites to Paragraphs 60 and 62 of the order, but conspicuously omits any reference to paragraph 61 in which the Canadian Court stated, "If Cash Cloud had provided the undertaking under Rule 40.03, I would have ordered a time restricted injunction for sixty (60) days from the date of this decision." Mot. Ex. A at ¶ 61. In other words, Plaintiff's claim for breach of contract had the requisite substantive merit to warrant an injunction.[11]

Defendant's reliance on the Canadian Court order in its Motion is improper. While this Court may take judicial notice of the existence of the order, it may not take judicial notice of the facts contained within that Order on a motion to dismiss. As explained in *Rowe v. Aranas*, 3:16-cv-00535, 2018 WL 4088019, at *6 (D. Nev. Aug. 27, 2018), "Plaintiff's attempt to borrow the factual and legal findings made in related cases is to no avail. The Court cannot take judicial notice of the facts that other Courts have accepted in order to find evidentiary support for Plaintiff's assertions." *Id.*; *see also Mendez v. Optio Solutions, LLC*, 219 F. Supp. 3d 1012, 1014-15 (S.D. Cal. 2016). For this reason alone, the Court should disregard all of Defendant's arguments concerning this claim.

Additionally, even if the Court were permitted to consider the findings of fact in the Canadian Court order on the Motion, the Court should still deny Defendant's Motion to Dismiss. First, Defendant cannot escape the fact that on August 30, 2022, it unilaterally deactivated the software over the objection of BitAccess's officers and attorneys and that deactivation lasted days. Arguing that the deactivation "only" lasted 48 hours is of no avail—and it is in fact an admission that damages have been established. Second, nothing in the Canadian Court's order would cause the Court to reject the allegations in the Complaint that Defendant used its position with BitAccess (including its role in

---

[11] Defendant's attempt to characterize the Canadian Court's order as finding that BitAccess terminated the contract to protect its own interests is belied by the court's statement that had an undertaking been posted, it would have issued a 60-day injunction. BitAccess was not privileged to terminate the 2020 Purchase Agreement.

145454038.1

creating the SPAC) to cause BitAccess to terminate the 2020 Purchase Agreement with one of Defendant's major competitors. *See* Compl. at ¶ 65. Accordingly, the Court should find that the claim for tortious interference with the BitAccess 2020 Purchase Agreement is properly pled.

### 8. The Complaint States a Claim For Interference with Prospective Business Relations

A claim of intentional interference with prospective business relations requires establishing the following elements:

> (1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct.

*In re Amerco Derivative Litigation*, 127 Nev. 196, 226, 252 P.3d 681, 702 (2011).

Plaintiff's Complaint sets forth facts establishing all five (5) elements: (1) Plaintiff executes new customer agreements through a new customer's use of its Kiosks and such new customer agreements are prospective contractual relationships between Plaintiff and its customers (*id*. at ¶¶ 138-139); (2) Defendant knew of these prospective contractual relationships between Cash Cloud and Cash Cloud's customers (*id*. at ¶ 140); (3) Defendant committed intentional acts intended to or designed to disrupt such prospective contractual relationships (*id*. at ¶ 141), including unilaterally deactivating the software needed to conduct transactions with customers (*id*. at ¶¶ 72, 74); (4) Defendant had no privilege or justification for their disruption of such prospective contractual relationships (*id*. at ¶ 143); and (5) as a result of Defendant's intentional interference with the prospective contracts with customers, Plaintiff has suffered substantial damages, including, loss of revenue and out of pocket expenditures (*id*. at ¶ 144).

Defendant erroneously argues that the Complaint fails to allege how Defendant interfered with Plaintiff's expected business with its customers, arguing that the Complaint fails to identify which deactivation interfered with prospective contractual relationships and that it fails to disclose the potential loss of customer volume caused by the software deactivation. Mot. at 16-17. Defendant's argument is a red herring—issues like transaction volume are not necessary to plead the claim. Defendant intentionally shut off Plaintiff's software that was needed to transact business with its customers on the thousands of kiosks using the software. As a result, no transactions that would have

145454038.1

otherwise taken place with its customers actually took place while the software was deactivated. Defendant's Motion should be denied. *See Sean K. Claggett & Associates, LLC v. Keenan*, No. 2:21-cv-02237, 2022 WL 3715767, at *5 (D. Nev. Aug. 28, 2022) (denying motion to dismiss).

### 9. The Complaint Establishes a Claim for Injurious Falsehood

The elements of a claim for injurious falsehood are as follows: "[o]ne who publishes a false statement harmful to the interests of another" and "(a) ... intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity." *Huston v. Verizon Fed. Network Sys., LLC*, No. 2:07-cv-00201, 2008 WL 4279418, at *5 (D. Nev. Sept. 17, 2008).[12] The Complaint satisfies these elements: (1) Defendant published several false and harmful statements to Plaintiff's hosts (Compl. at ¶¶ 79-83); (2) Defendant intended for the publication of its false statements to result in harm to the interests of Cash Cloud having a pecuniary value (Defendant was trying to "take over the rent agreements" (*id*. at ¶ 83); (3) Defendant knew that is published statements in its marketing solicitations were and continue to be false, or, at a minimum Defendant acted in reckless disregard of the truth or falsity of its published statements (*id*. at ¶ 84); and (4) Defendant's false and misleading statements in its marketing solicitations have and are likely to continue to injure Cash Cloud by causing Plaintiff to lose Kiosk hosts, resulting in business losses (*id*. at ¶ 151).

Defendant argues that the claim should be dismissed because it is not pled with particularity. Mot. at 17. However, the authority relied upon by Defendant (*Finley v. Kondaur Capital*, 909 F. Supp. 2d 969, 977 (W.D. Tenn. 2012) *Sadowy v. Sony Corp. of Am.*, 496 F. Supp. 1071, 1079 (S.D.N.Y. 1980)), does not support this argument. In neither decision did the court hold that the injurious falsehood claim was required to be pled in accordance with Rule 9(b). Indeed, defamation claims (of which injurious falsehood is but one example), need only satisfy Rule 8(a). *See Boink Sys.,*

---

[12] Defendant wonders aloud whether a claim for injurious falsehood is recognized in Nevada. *See* Mot. at 17. Notwithstanding that the Motion cites to a federal decision analyzing the claim under Nevada law (relying upon the elements as stated in the Restatement), the Court should find that the Nevada Supreme Court would recognize the claim. As the Ninth Circuit held in *Gerald Peters Gallery, Inc. v. Stremmel*, 815 Fed. Appx. 138, 139 (9th Cir. 2020), "Nevada courts frequently refer to the Restatement to assess issues relevant to defamation claims." *Id*.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

18
145454038.1

*Inc. v. Las Vegas Sands Corp.*, No. 2:08-cv-00089, 2008 WL 11389204, at *4 (D. Nev. May 30, 2008) ("defamation claim under Nevada law need only comply with the notice pleading requirements of Fed. R. Civ. P. 8(a)."). Regardless, the Complaint identifies the "who, what, when, where" of the statements at issue, which satisfies Fed. R. Civ. P. 9(b).

### 10. The Complaint Establishes a Claim for Defamation

Under Nevada law, a defamation claim has four (4) elements: "(1) a false and defamatory statement; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Okeke v. Biomat USA, Inc.*, 927 F. Supp. 2d 1021, 1026 (D. Nev. 2013). The Complaint appropriately sets forth facts establishing the claim for defamation: (1) Defendant made several false and defamatory statements (Compl. at ¶¶ 79-83); (2) these were unprivileged statements made to Plaintiff's hosts (*id*.); (3) Defendant's statements were made with knowledge of their falsity, or at a minimum, negligence as to their falsity (*id*. at ¶¶ 158-159); and (4) the false statements caused reputational and pecuniary harm (*id*. at ¶¶ 160-161).

Defendant's Motion attempts to erroneously reframe Plaintiff's claim into a claim for business disparagement. Mot. at 18. Plaintiff's claim is for defamation and not business disparagement as articulated by the court in *Sentry Ins. v. Estrella Ins. Serv., Inc.*, No. 2:13-cv-169, 2013 WL 2949610, at *3 (D. Nev. June 13, 2013):

> The Supreme Court of Nevada has differentiated between defamation per se and business disparagement. *Clark Cty. Sch. Dist. v. Virtual Educ. Software, Inc.*, 125 Nev. 374, 213 P.3d 496, 504 (Nev. 2009). Statements accusing an individual of personal misconduct in his or her business or attacking the individual's business reputation may be brought as an action for defamation per se. *Id*. However, if the statements are directed towards the quality of the individual's product or services, the claim is one for business disparagement. *Id*.

*Id*.

Because here, like in *Sentry*, the statements at issue attack Plaintiff's reputation and fitness for trade and/or business (e.g., claiming that Plaintiff isn't delivering the purchased digital currency to its customers or that Plaintiff is not being truthful with its hosts), and not the product or service offered by Plaintiff, the appropriate claim is for defamation. *See also Cohen v. Hansen*, No. 2:12-cv-1401, 2015 WL 3609689, at *6 (D. Nev. June 9, 2015) ("Defendants' statements attack CAM's fitness

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)
145454038.1

for trade, business, or profession, not the products it offers. CAM's claim against defendants is properly construed as one for defamation per se and not business disparagement."). As such, the Court should reject Defendant's effort to recast Plaintiff's defamation claim as one for business disparagement and deny the Motion.[13]

### C. Should the Court Find that Any Claim is Inadequately Pled, Leave Should Be Granted for Plaintiff to Amend Its Pleading

To the extent that the Court concludes that there are any pleading deficiencies in the Complaint, Plaintiff respectfully requests leave to amend to file an amended complaint. Such leave should be granted since Defendant has not shown that the Complaint could not be saved by any amendment. *See Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009) ("Dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment.").

## IV. CONCLUSION

Based upon the foregoing, Cash Cloud respectfully requests that the Court find that Plaintiff has properly pled the claims in its Complaint and deny Defendant's Motion.

Dated this 3rd day of May, 2023.

**FOX ROTHSCHILD LLP**

*/s/ Brett A. Axelrod, Esq.*
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
JEANETTE E. MCPHERSON, ESQ.
Nevada Bar No. 5423
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

**THE JIMMERSON LAW FIRM, P.C.**

JAMES M. JIMMERSON, ESQ.
Nevada Bar No. 12599
415 South 6th Street, Suite 100
Las Vegas, Nevada 89101

*Counsel for Debtor Cash Cloud Inc.*

---

[13] Although Plaintiff's claim is properly pled for defamation, were the Court to view it through the lens of a business disparagement claim, the Court should similarly find that the elements of the claim have been properly pled: (1) a false and disparaging statement (Compl. at ¶ 79-83); unprivileged publication to a third person (the hosts) (*id*.); (2) Defendant acted with actual malice (*id*. at ¶ 158); and special damages (*id*. at ¶¶ 160-161).

145454038.1